Exhibit "C"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

—————————————————————X

VERONICA BROWN,                                    Docket No.: 14-CV-5960

                            Plaintiff,             **AFFIDAVIT OF**
            -against-                              **CAROL FRENSILLI**

MARRIOTT INTERNATIONAL, INC.,

                            Defendant.

—————————————————————X

CAROL FRENSILLI, after first duly sworn, deposes and states:

1.    I have personal knowledge of the facts set forth in this Affidavit and am competent to testify to them if called upon to do so.

2.    I am Assistant Corporate Secretary for Marriott International, Inc. ("Marriott") and have been so employed since 2006.  I am personally familiar with the ownership structure of Marriott as well as, Luxury Hotels International Management St. Kitts Limited ("LHI" and formerly known as Marriott St. Kitts Management Company, Inc.), the entity that operated the St. Kitts property that is described in Plaintiff's amended complaint.

3.    I have the requisite authority and knowledge to make the factual representations contained in this Affidavit on behalf of Marriott, as well as LHI.

4.    I am not a party to this action.

5.    Neither I, nor Marriott, nor LHI, are making a general or specific appearance in the above-captioned action by submitting this Affidavit.

6.    Neither I, nor Marriott, nor LHI, expressly or impliedly waive or relinquish any rights or defenses, jurisdictional or otherwise, to the above-captioned action by submitting this Affidavit, except as stated herein.

7.    Plaintiff's amended complaint refers to both Marriott and LHI.

8.    The amended complaint describes an incident that allegedly occurred at a hotel commonly known as "St. Kitts Marriott Resort & The Royal Beach Casino" ("Hotel") in the sovereign country of the Federation of St. Kitts & Nevis.

9.    To the best of my knowledge, on July 18, 2013, Marriott did not own, operate, maintain, or control the Hotel in St. Kitts.

10.    To the best of my knowledge, on July 18, 2013, LHI operated, maintained, and managed the Hotel in St. Kitts pursuant to a contract dated May 18, 2006. To the best of my knowledge, attached as Exhibit "1" is a true and accurate copy of the contract as maintained in the regular course and scope of Marriott's business.

11.    To the best of my knowledge, Marriott does not have any ownership interest in Royal St. Kitts Beach Resort Limited ("RSK"). Upon information and belief, the sources of which include the above-referenced contract, RSK owned the Hotel on July 18, 2013.

12.    LHI is a company formed under and existing under the laws of the Federation of St. Kitts & Nevis.  Attached here as Exhibit "2" is a true and accurate copy of the articles of incorporation for LHI, formerly known as Marriott St. Kitts Management Co., Inc., which are maintained in the regular course and scope of Marriott's business.

13.    Attached here as Exhibit "3" are true and accurate copies of the certificate of incorporation for LHI's predecessor company, and the certificate of change of name, as maintained in the regular course and scope of Marriott's business.

14.    LHI is an indirect subsidiary company of Marriott.

15.    LHI has knowledge concerning the operation, control, and maintenance of the Hotel in St. Kitts.

16.    LHI is not incorporated in New York.

17.   LHI has never been incorporated in New York.

18.   LHI does not own any real property in New York.

19.   LHI does not have any bank accounts in New York.

20.   LHI does not have any offices in New York.

21.   LHI does not conduct any business in New York.

22.   LHI does not pay New York taxes.

23.   LHI does not have any employees working or living in New York.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Carol Frensilli

Signed and sworn to before me this
2nd day of August, 2015

_____
Notary Public

LORIE L. REESE
NOTARY PUBLIC
MY
COMMISSION
EXPIRES
APR. 15, 2016
MONTGOMERY CO. MD

# EXHIBIT 1

ST. KITTS MARRIOTT RESORT

AMENDED AND RESTATED

MANAGEMENT AGREEMENT

between

MARRIOTT ST. KITTS MANAGEMENT COMPANY, INC.
("MANAGER")

and

ROYAL ST. KITTS BEACH RESORT LIMITED

("OWNER")

205961v6

MI - 00001

## TABLE OF CONTENTS

ARTICLE I DEFINITIONS; INTERPRETATIONS ........................................................1
1.01    Definitions ....................................................................................................1
1.02    Interpretation .............................................................................................16
ARTICLE II HOTEL MANAGEMENT AND OPERATION ...................................17
2.01    Appointment ..............................................................................................17
2.02    Delegation of Authority ...........................................................................18
2.03    Standard of Care ........................................................................................22
2.04    Marriott Chain Standards .........................................................................22
2.05    Licenses and Permits .................................................................................22
ARTICLE III OWNERSHIP, ENCUMBRANCE AND USE OF HOTEL ...............22
3.01    Ownership of Hotel ...................................................................................22
3.02    Covenants, Conditions and Restrictions .................................................23
3.03    Non-Disturbance and Attornment Agreement .......................................24
3.04    Impositions ................................................................................................26
3.05    Unencumbered Management and Protection of Rights .........................26
3.06    Use; Legal Compliments ...........................................................................26
3.07    Casino .........................................................................................................26
3.08    The Private Units .......................................................................................31
3.09    Casino Reservations and Casino Reserved Patron Charges ...................31
ARTICLE IV TERM; TRANSITION PROCEDURES .............................................34
4.01    Term ............................................................................................................34
4.02    Transition Procedures ...............................................................................35
4.03    Condition to Termination .........................................................................36
ARTICLE V COMPENSATION OF MANAGER ....................................................36
5.01    Management Fee .........................................................................................36
5.02    Accounting and Distribution of Adjusted House Profit ........................36
ARTICLE VI REPAIRS, MAINTENANCE, AND REPLACEMENTS ....................37
6.01    Routine Repairs and Maintenance ..........................................................37
6.02    Reserve .......................................................................................................38
6.03    Major Hotel Building Expenditures ........................................................39
6.04    Liens ...........................................................................................................40
6.05    Determinations Regarding and Ownership of Capital Items ................41
6.06    Renovation and Replacement Standards .................................................41
ARTICLE VII BOOKKEEPING AND BANK ACCOUNTS ...................................41
7.01    Books and Records ....................................................................................41
7.02    Hotel Accounts; Expenditures .................................................................42
7.03    Annual Operating Projection ...................................................................42
7.04    Currency .....................................................................................................44
7.05    Operating Funds ........................................................................................45
7.06    Regular Meetings .......................................................................................45
ARTICLE VIII HOTEL NAME AND MARRIOTT TRADEMARKS; COMPUTER
SOFTWARE AND EQUIPMENT ...........................................................................45
8.01    Hotel Name and Marriott Trademarks ....................................................45
8.02    Purchase of Inventories and Fixed Asset Supplies ...............................46
8.03    Intellectual Property; Computer Software and Equipment ...................46
8.04    Breach of this Article; Survival ................................................................47

205961v6

i

ARTICLE IX INSURANCE ............................................................................47
9.02     Property Insurance.............................................................................47
9.03     Operational Insurance.........................................................................47
9.04     General Insurance Provisions..............................................................48
9.05     Costs and Expenses...........................................................................49
9.06     Owner's Option to Obtain Certain Insurance .......................................49
ARTICLE X HOTEL EMPLOYEES .................................................................51
10.01    Hotel Employees...............................................................................51
ARTICLE XI DAMAGE CONDEMNATION, AND EXTRAORDINARY EVENTS .......52
11.01    Damage and Repair ..........................................................................52
11.02    Condemnation..................................................................................53
11.03    Extraordinary Events .......................................................................54
ARTICLE XII EVENTS OF DEFAULT; REMEDIES ...........................................54
12.01    Events of Default..............................................................................54
12.02    Remedies ........................................................................................55
ARTICLE XIII ASSIGNMENT .......................................................................56
13.01    Assignment .....................................................................................56
ARTICLE XIV HOTEL SALE .........................................................................57
14.01    Hotel Sale .......................................................................................57
14.02    Right of First Negotiation...................................................................58
ARTICLE XV MISCELLANEOUS ...................................................................59
15.01    Right to Make Agreement ..................................................................59
15.02    Consents, Approvals, and Agreements; No Warranties ..........................59
15.03    Relationship....................................................................................60
15.04    Procurement Affiliates.......................................................................60
15.05    Confidentiality .................................................................................60
15.06    Applicable Law.................................................................................61
15.07    Arbitration ......................................................................................61
15.08    Recordation; Binding Character .........................................................61
15.09    Notices ............................................................................................62
15.10    Brokerage........................................................................................63
15.11    Environmental Matters ......................................................................63
15.12    Expert Decisions ..............................................................................64
15.13    [RESERVED] ...................................................................................64
15.14    Projections ......................................................................................65
15.15    [Reserved].......................................................................................65
15.16    Waiver ............................................................................................65
15.17    Partial Invalidity ..............................................................................65
15.18    Cooperation .....................................................................................66
15.19    Competing Facilities..........................................................................66
15.20    Language .........................................................................................66
15.21    Limitation on Recourse .....................................................................66
15.22    Indemnification.................................................................................67
15.23    Entire Agreement..............................................................................67
EXHIBIT A ...................................................................................................1
\M" Logo ......................................................................................................1
EXHIBIT B....................................................................................................1
Legal Description of the Hotel and the Site ......................................................1

MI – 00003

EXHIBIT C ..................................................................................................................1
Private Units .................................................................................................................1
EXHIBIT D 1
Casino Description ........................................................................................................1
EXHIBIT E 1
Restricted Area Map ......................................................................................................1
EXHIBIT F 1
Resort Complex Diagram ..............................................................................................1
EXHBIT G 1
Internet Gaming Letter Agreement ...............................................................................1

MI - 00004

## ST. KITTS MARRIOTT RESORT
### AMENDED AND RESTATED MANAGEMENT AGREEMENT

This Amended and Restated Management Agreement (this "Agreement") is executed to be effective as of the 18ᵗʰ day of May, 2006 ("Effective Date") between:

Royal St. Kitts Beach Resort Limited ("Owner"), a company organized and existing under the laws of the Federation of St. Christopher & Nevis,

and

Marriott St. Kitts Management Company, Inc. ("Manager"), a company organized and existing under the laws of the Federation of St. Christopher and Nevis.

### RECITALS:

A.    Owner  and Manager are parties to that certain Management Agreement dated as of January 30, 2001 and that certain First Amendment to Management Agreement dated February 25, 2003 (collectively the "Original Agreement"), pursuant to which Manager manages and operates the Hotel (as defined in Section 1.01 hereof) on behalf of Owner.

B.    Owner and Manager desire to amend and restate the Original Agreement *in toto* in accordance herewith.

NOW, THEREFORE, in consideration of the mutual covenants contained in this Agreement and other good and valuable consideration, the receipt of which is hereby acknowledged, Owner and Manager agree as follows:

### ARTICLE I
### DEFINITIONS; INTERPRETATION

1.01    Definitions

A.    The following terms when used in this Agreement have the meanings set forth below:

"Accounting Period" shall mean any one of the 12 calendar months in the calendar year.

"Additional Incentive Fee" shall mean, with respect to any Fiscal Year, the lesser of (provided that the Additional Incentive Fee cannot be less than zero):

# REDACTED

205961v6

MI - 00005

# REDACTED

"Adjusted House Profit"                    REDACTED

"Affiliate" shall mean any Person Controlling, Controlled by, or under common Control with another Person.

"Agreement" shall mean this agreement (including the exhibits, schedules and addenda hereto), as amended, restated or supplemented from time to time.

"Alternate Additional Incentive Fee"            REDACTED

"Amended MVCI Contract for Sale" shall mean that certain Amended and Restated Contract for Sale and Purchase and Option Agreement between Owner and MVCI dated as of the Effective Date pursuant to which, among other things, (i) MVCI will acquire from Owner eight (8) Guest Room Buildings as well as acquire an option to purchase an adjacent parcel and (ii) Owner will convert the guest rooms in each Guest Room Building acquired by MVCI into Vacation Club Buildings containing eleven (11) Vacation Club Units.

"Annual Operating Projection" has the meaning given such term in Section 7.03.

"Association" shall mean the St. Kitts Beach Club Condominium Owners' Association, its legal successors and permitted assigns.

"Auditor" shall mean the internationally recognized accounting firm experienced in hotel audits engaged by Owner with Manager's approval to audit the Hotel books and records for any Fiscal Year. For purposes of appointment of an Expert by the Auditor as provided for in this Agreement, the Auditor shall be deemed to be the firm most recently engaged by Owner with Manager's approval to audit the Hotel books and records.

"Auxiliary Facility" or "Auxiliary Facilities" shall mean one or all of the Private Units, Casino, the Cogeneration Facility, the Wastewater Facility, and the Desalination Facility

"Auxiliary Services Agreement" shall mean that certain agreement dated as of the Effective Date between Manager and Owner pursuant to which Manager is obligated to deliver certain services to the Auxiliary Facilities and Owner is obligated to provide certain services to Hotel using certain Auxiliary Facilities.

MI - 00006

"Casino" shall mean the gaming casino located in the Frigate Bay Building as more fully described in **Exhibit D**.

"Casino Operator" means the Owner or other Person selected by the Owner having authority for the day-to-day management and operation of the Casino. As of the Effective Date, the Casino is leased by Owner to Royal Resort Casino-St. Kitts-Inc., a company organized by the laws of St. Kitts.

"CC&R(s)" has the meaning given such term in Section 3.02 A.

"Cogeneration Facility" shall mean that certain cogeneration plant constructed adjacent to the Frigate Bay Building, including all related land, equipment and facilities.

"Consumer Price Index" shall mean and refer to the "U.S. City Average, All Items" Consumer Price Index for All Urban Consumers (Base: 1967=100) issued by the U.S. Department of Labor, Bureau of Labor Statistics, or any similar successor index. If the substance of the Consumer Price Index is materially changed or if the Consumer Price Index is no longer published, then the Consumer Price Index shall be any other recognized index reflecting changes in the purchasing power of the U.S. Dollar as designated by the Auditor.

"Control" (and any form thereof, such as "Controlled" or "Controlling") shall mean the possession by one Person, directly or indirectly (through one or more intermediaries) of the power or ability (i) to vote more than fifty percent (50%) of the voting stock of another Person, or (ii) to direct or cause the direction of the management or policies of another Person, whether through the ownership of voting interests, by contract, or otherwise. Notwithstanding the foregoing or any other provision of this Agreement, no transfers of beneficial ownership of Owner among the holders of such interests as of the date of this Agreement or to or among their respective immediate families or entities established for estate planning purposes shall be treated as a change in the Control of Owner or subjected to any notice to or review by Manager.

"Cumulative Adjusted House Profit" shall mean, with respect to any Fiscal Year, the cumulative amount of Adjusted House Profit during the Term, beginning with the Opening Date through the end of such Fiscal Year.

"Damages" shall mean any claims, causes of action, losses, costs or expenses (including attorneys' fees and expenses and litigation costs and expenses), liabilities, penalties, and damages (including consequential, punitive, and exemplary damages).

"Deductions" shall mean the following costs and expenses which are incurred by Manager in connection with the Hotel on an accrual basis:

(1)   the cost of sales, including, without limitation, compensation, benefits, payroll taxes, pension-related liabilities, and other costs related to Hotel Employees (the foregoing costs shall include the allocable portion of the salary and other employee costs of any personnel assigned to a "cluster" of hotels which includes the Hotel, provided that Owner has an opportunity to review the financial impact of the appointment of such "cluster" personnel and the method of cost allocation regarding any "cluster" personnel as part of the Annual Operating Projection);

MI - 00007

(2)     departmental expenses (expenses incurred by the revenue-generating departments of the Hotel); Hotel-specific administrative and general expenses; Hotel-specific training expenses; the cost of locally-generated Hotel advertising, marketing, and business promotion; costs of utilities, including heat, air conditioning, light, power, water and sewage treatment and disposal, if any; and routine repairs, maintenance and minor alterations treated as Deductions under Section 6.01;

(3)     the cost of Inventories and Fixed Asset Supplies;

(4)     a reasonable reserve for doubtful accounts receivable established in accordance with Manager's standard operating procedures, modified as appropriate for the Hotel;

(5)     the fees and expenses of independent accountants (except with respect to External Audits conducted in accordance with Section 7.01 and any other exceptions as may be specified herein), independent legal counsel, and other third parties who perform services required or permitted hereunder;

(6)     the fees and expenses of technical, operational and other consultants, experts, and advisors for specialized services in connection with non-routine Hotel work (but not including the costs of the Expert, which will be assessed in accordance with Section 15.12);

(7)     the handling and service charges imposed by third parties (including Affiliates of Manager in accordance with Section 15.04) for procurement;

(8)     amounts charged or allocated pursuant to the International Services Agreement;

(9)     amounts payable, if any, pursuant to the Fee Agreement;

(10)    reasonable travel, living, and other out-of-pocket costs and expenses of corporate and regional personnel of Manager and any of its Affiliates visiting the Hotel on specific Hotel business; provided, however, that if any such travel involves more than one Marriott Chain hotel during any one continuous trip, such costs and expenses shall be fairly allocated among the Hotel and any other Marriott Chain hotels visited and only the portion allocated to the Hotel shall be a Deduction;

(11)    the costs and expenses of operating computer systems and communication lines at and used by the Hotel;

(12)    the costs and expenses of the insurance described in Sections 9.01 (Hotel's allocated share) and 9.02;

(13)    Impositions, charges under CC&R for Hotel as approved by Manager and any taxes, duties, levies, assessments, or fees of any nature charged, imposed, or assessed

MI - 00008

by a government agency or instrumentality related to the Hotel in any of the Marriott Agreements, or to the management, operation, or promotion of the Hotel, exclusive of:

    (i)    any income, capital, franchise or similar tax imposed on Manager or Owner or their Affiliates; and

    (ii)    any tax payable on account of gains from the sale of the Hotel or its FF&E;

(14)    amounts due pursuant to the License and Royalty Agreement;

(15)    the costs and expenses of obtaining and maintaining operating licenses and permits;

(16)    contributions to the Reserve and Expensed Items;

(17)    utility costs for Private Units and Staff Housing occupied by Hotel Employees; and

(18)    such other costs and expenses as are specifically provided for elsewhere in this Agreement or are otherwise reasonably necessary for the management and operation of the Hotel.

Costs and expenses which are not Deductions include the following:

- Major Hotel Building Expenditures (except to the extent deducted as and when funds for such purposes are contributed to the Reserve);

- Routine Capital Expenditures (except Expensed Items and except to the extent deducted as and when funds for such purposes are contributed to the Reserve);

- Fees and expenses incurred in connection with External Audits conducted in accordance with Section 7.01;

- debt service related to the Hotel;

- depreciation related to the Hotel, including depreciation of Fixed Asset Supplies;

- fees and expenses to obtain and maintain occupancy permits and other non-operating licenses and permits;

- ground rent and other payments made pursuant to any ground lease, right of way, right of use, license, or similar arrangement applicable to the Hotel, if any;

- lease payments on items of Hotel FF&E such as televisions, mini-bar refrigerators/storage units, and any similar capital items in the Hotel that are leased rather than purchased; and

- the costs incurred by Hotel for provision of Employee Services pursuant to the Auxiliary Services Agreement;

- the costs incurred by Hotel and allocated to the Private Units, and/or Vacation Club Property pursuant to the Resort Integration Agreement and Resort Reciprocal Agreement; and

MI - 00009

-- the costs incurred by Hotel for the provision of those services to Casino or Private Units pursuant to the Auxiliary Services Agreement for which Hotel only charges Owner for the costs of providing such services.

"Default" shall mean any occurrence that, with the giving of notice, the passage of time, or both, would become an Event of Default.

"Desalination Facility" shall mean the desalination plant located remotely from Hotel that is owned or controlled by Owner. and processes seawater into potable water and transports the same to the Resort Complex.

"Effective Date" shall mean the date of this Agreement as set forth in the Preamble.

"Environmental Laws" shall mean any rules, regulations, laws, or other enactments now or hereafter in effect (whether of a national, regional, state, or local government, agency, or instrumentality), regulating, relating to or imposing liability or standards of conduct concerning the use, generation, treatment, storage, disposal, or abatement of Hazardous Materials.

"Event of Default" has the meaning given such term in Section 12.01.

"Existing Mortgage"                    **REDACTED**


"Expensed Item" has the meaning given such term in Section 6.02.

"Expert" shall mean an independent internationally recognized hotel consulting firm or individual appointed in each instance by agreement of Owner and Manager or, failing agreement, by Auditor.

"External Audit" shall mean the audit conducted by Auditor of the Hotel books and records for any Fiscal Year.

"Extraordinary Event" shall mean any of the following events, regardless of where it occurs or its duration, but only to the extent that the impact of the event can not be addressed with reasonable diligence by the affected party: acts of nature without the interference of any human agency (including hurricanes, typhoons, tornadoes, cyclones, other severe storms, winds, lightning, floods, earthquakes, volcanic eruptions, fires, explosions, disease, or epidemics); fires and explosions caused wholly or in part by human agency; acts of war, attack, invasion or other acts of hostility by foreign enemies; civil war, rebellion, revolution, insurrection or usurpation of sovereign power; riots or other civil commotion; terrorism (including hijacking, sabotage, bombing, murder, assault and kidnapping); strikes or similar labor disturbances; shortage of critical materials or supplies; action of governmental authorities having jurisdiction over the Hotel (including the imposition of restrictions on room rates, Hotel Employee wages, or other material aspects of operation); restrictions on the right of expatriate personnel (including from time to time, where required, foreign experts or technicians) needed to

205961v6                                  6

operate the Hotel to enter and work in the country in which the Hotel is located, to be compensated reasonably and to freely convert and repatriate such compensation; and any other events beyond the reasonable control of the party claiming the Extraordinary Event (but excluding: (i) failure to obtain financing and other shortages of funds or (ii) economic or market factors).

"Fee Agreement" shall mean the Amended and Restated Fee Agreement executed as of the Effective Date among Owner, Manager, Marriott and MWC, as amended, restated or supplemented from time to time.

"FF&E" shall mean all furniture, furnishings, wall coverings, fixtures, equipment and systems located at, or used in connection with the Hotel; however, no item included in Fixed Asset Supplies or included as part of the Hotel Building shall constitute FF&E.

"Fiscal Year" shall mean Manager's fiscal year which now begins on 1 January and ends at midnight on 31 December in each calendar year.  For purposes of this Agreement, (i) any period of less than 365 days beginning on the first day of Manager's fiscal year and ending on the date of termination either shall be included as part of the last Fiscal Year or shall constitute a separate last Fiscal Year, as Manager may determine, and (ii) "full Fiscal Year" means a Fiscal Year of at least 365 days that begins on the first day or ends on the last day of Manager's fiscal year.  If Manager's fiscal year is changed in the future, appropriate adjustment to this Agreement's reporting and accounting procedures shall be made; however, no such adjustment shall alter the Term or change the distributions of funds hereunder except in such manner as may be appropriate under the circumstances.

"Fixed Asset Supplies" shall mean supply items included within "Property and Equipment" under the Uniform System, including linen, china, glassware, silver, uniforms, and similar items, except to the extent reserve stocks of such items are included in Inventories.

"Foreclosure" shall mean any exercise of the remedies available to a Mortgagee, upon a default under the Mortgage held by such Mortgagee, which results in a transfer of title to or possession of the Hotel.  The term "Foreclosure" shall include, without limitation, any one or more of the following events, if they occur in connection with a default under a Mortgage:  (i) a transfer by judicial foreclosure; (ii) a transfer by deed in lieu of foreclosure; (iii) the appointment by a court of a receiver to assume possession of the Hotel; (iv) a transfer of either ownership or control of the Owner, by exercise of a stock pledge or otherwise; (v) if title to the Hotel is held by a tenant under a ground lease, an assignment of the tenant's interest in such ground lease; or (vi) any similar judicial or non-judicial exercise of the remedies held by the Mortgagee.

"Frigate Bay Building" shall mean the main building of the Hotel that contains among other things, the Hotel's main check in desk, Guest Rooms, administrative offices, a full service spa, retail space and restaurants.

"GAAP" shall mean generally accepted accounting principles in effect in the United States of America.

MI - 00011

"Guarantor" shall mean Marriott International Hotels Inc. or any approved successor guarantor under that certain Guarantee in favor of Owner dated as of the date of this Agreement.

"Guest Room" shall mean a separately keyed lodging unit sold as part of the Hotel and shall not mean any Renovation Unit, Private Unit or Vacation Club Unit. During the period a Villa Building is subject to the Vacation Club Villa Building Lease, and is not a Renovation Building, the units therein will be Guest Rooms.

"Hazardous Materials" shall mean any substance or material containing one or more of the following: hazardous material, hazardous waste, hazardous substance, regulated substance, petroleum, pollutant, contaminant, or asbestos, as such terms are defined in any applicable Environmental Law, or otherwise generally understood, in such concentrations or amounts as may require clean-up, removal, monitoring or other liability under any Environmental Law or that may present a significant risk of harm to guests, invitees, or Hotel Employees.

"Hotel" shall mean (i) all the buildings, facilities, structures and improvements on the Resort Complex that comprise the St. Kitts Marriott Resort or such other name as may be designated by MWC in accordance with its customary policy and protocols for identifying Marriott Chain hotels and approved by Owner (ii) all FF&E, Fixed Asset Supplies, and Inventories installed therein, and (iii) Owner's fee simple interest in the Site. However, the Hotel shall not include those buildings, facilities, structures and improvements comprising the Private Units, the Vacation Club Property, the Casino, the Cogeneration Plant and all FF&E, Fixed Asset Supplies, and Inventories installed in the same. In addition the Hotel shall not include the following facilities owned or controlled by Owner and located on St. Kitts: the Golf Course, the Wastewater Treatment Facility, the Desalination Facility and Staff Housing. Throughout the Term, the Hotel shall be known as a "Marriott Hotel" or shall be called "Marriott" together with other identifying names for first-class, full-service international hotels in the Marriott Chain. If there shall occur a merger, acquisition or other business combination involving Manager or Marriott pursuant to which the name of the Hotel shall be changed to a name which does not include the name "Marriott," then Owner agrees to approve such new name so long as substantially all of the first-class, full service international hotels in the Marriott Chain are known by the same name.

"Hotel Building" shall mean the building or buildings constituting the physical components of the Hotel (including all roof coverings and exterior facades and any walkways and bridges) and all structural, mechanical, electrical, heating, ventilating, air conditioning, sanitation, sewage treatment and disposal, plumbing, and vertical transportation elements of such building or buildings.

"Hotel Employee" shall mean any individual employed at the Hotel in connection with the Hotel's business.

"Hotel Sale" shall mean any sale, assignment, transfer, or other conveyance (including a lease or sublease), in a single transaction or a series of related transactions, for value or otherwise, voluntary or involuntary, (i) of any portion of Owner's interest in the Hotel, or (ii) that results in a change of Control of Owner.

205961v6                                                    8

MI - 00012

"Impositions" shall mean all real estate and personal property taxes, rates, levies, assessments, impact fees, imposts, stamp duties or taxes (including stamp duties on the Marriott Agreements) and similar charges on or relating to the Hotel imposed by any governmental authority having jurisdiction over the Hotel, including taxes on the Hotel's operations but excluding any income, capital, franchise or similar tax imposed on Owner or Manager.  No assessment or charge due to any CC&R shall be construed as an Imposition.

"Incentive Fee"                    **REDACTED**

"Initial Term" has the meaning given such term in Section 4.01 A.

"Insurance Retention" shall mean the amount of any loss or reserve that is allocated to the Hotel under Manager's or any of its Affiliate's blanket insurance or self-insurance programs, not to exceed the higher of (i) the maximum per occurrence limit established for similar hotels participating in such programs which limit shall not be more than the limit established for similar hotels owned by the owner of the greatest number of hotels in the Marriott Chain, or (ii) the insurance policy deductible on any loss which may fall within high hazard classifications (e.g., earthquake, flood, windstorm on coastal properties, etc.) as mandated by the insurer providing the Hotel's property insurance at the relevant time.

"Intellectual Property" shall mean (i) all Software, including the data and information processed or stored thereby; (ii) all manuals, brochures, directives and other information issued by Manager to any of the Hotel Employees, or otherwise developed by Manager or one of its Affiliates and used in the operation of the Hotel or any other hotel in the Marriott Chain; (iii) customer information, customer lists and personal guest profiles and information regarding guest preferences (including, without limitation, any information derived from or contained in any frequent traveler program, but excluding general demographic information related to the Hotel (other than guest/customer information and other proprietary information) and information related to the Casino and all information provided to Manager by Owner or Owner's Affiliates); (iv) all Marriott Trademarks; and (v) all Marriott (and Marriott Affiliate) trade secrets, proprietary information, and all other information, materials, and copyrightable or patentable subject matter developed, acquired, licensed by Marriott, Manager or any of their Affiliates in the operation of the Hotel, or in any other hotel in the Marriott Chain. The foregoing shall apply regardless of the form or medium involved (e.g., paper, electronic, tape, tangible or intangible).  Marriott (or an Affiliate of Marriott) is the sole owner of all right, title and interest to Intellectual Property (including copyrights and patent rights), and this Agreement will not be deemed to convey any rights in Intellectual Property, including any rights to receive royalties or other fees for the use thereof by Marriott or any Affiliate of Marriott.

"Interest Rate" shall mean LIBOR plus three percentage points, with the applicable rate to be set for each Accounting Period based on the closing rate quoted in the Published Source on the last business day of the preceding Accounting Period.

"International Services Agreement" shall mean the Amended and Restated International Services Agreement executed as of the Effective Date by Owner and Marriott, as amended, restated or supplemented from time to time.

MI - 00013

Inventories" shall mean "Inventories" as defined in the Uniform System, including food, beverage and merchandise held for resale; guest room and other supplies (other than Fixed Asset Supplies); stocks of fuel; reserve stocks of china, glassware, silver, linen and uniforms; and similar items.

"Legal Requirement(s)" shall mean any law, statute code, rule, ordinance, ruling regulation or order of any governmental authority, court, agency or instrumentality of any level (including, without limitation, any national, federal, provincial, state, county, local, or municipal governmental entity, or governmental entity of any other political subdivision), or any quasi-governmental entity or body, having jurisdiction over the business or operation of the Hotel or the matters which are the subject of this Agreement, including, without limitation, the following: (i) any building, zoning or use laws, ordinances, regulations or orders; and (ii) Environmental Laws.

"LIBOR" shall mean the London interbank offered rate for U.S. Dollar deposits of three months.

"License and Royalty Agreement" shall mean the Amended and Restated License and Royalty Agreement executed as of the Effective Date by Owner and MWC, as amended, restated or supplemented from time to time.

"Litigation" shall mean the following to the extent related to the Hotel: (i) any cause of action (including, without limitation, bankruptcy or other debtor/creditor proceedings) commenced in a federal, state or local court, or other court of competent jurisdiction; or (ii) any claim brought before an administrative agency or body (for example, without limitation, employment discrimination claims).

"Major Hotel Building Expenditures" shall mean capital expenditures requested by Manager or required by any law, regulation or order of a competent government authority or are otherwise required for the continued safe operation of the Hotel and incurred (A) as part of new construction or an extraordinary alteration or addition or renovation project which is not part of Manager's planned periodic repair, refurbishment or replacement programs, (B) in the repair or replacement of the Hotel's roof or structural components or (C) in the replacement of any major Hotel Building systems.

"Major Hotel Building Expenditures Estimate" has the meaning given such term in Section 6.03 A.

"Manager" has the meaning given such term in the introductory paragraph to this Agreement and includes its legal successors and permitted assigns.

"Marriott" shall mean Marriott International, Inc., a corporation organized and existing under the laws of the State of Delaware, United States of America, and its legal successors and permitted assigns.

"Marriott Agreements" shall mean this Agreement, the Amended and Restated International Services Agreement, the Amended and Restated License and Royalty Agreement,

the Amended and Restated Fee Agreement, the Auxiliary Services Agreement, and each Non-Disturbance and Attornment Agreement as they may be amended from time to time.

"Marriott Chain" shall mean the chain of first class, full-service hotels operated under the brand name "Marriott" as part of a distinctive group, which group is known as "Marriott Hotels, Resorts and Suites" as of the Effective Date, but which name may change in the future to another full-service brand name so long as substantially all of the hotels in the Marriott Chain are also changed to the same full-service brand name as the Hotel.

"Marriott Companies" shall mean Manager, Marriott, and any Affiliates of Manager or Marriott.

"Marriott Trademarks" shall mean (i) the name and mark "Marriott"; (ii) the "M" logo, attached hereto as **Exhibit A**; and (ii) all other trademarks, service marks, trade names, symbols, logos, slogans and designs (including restaurant names, lounge names, or other outlet names) registered by MWC or any of its Affiliates; whether used alone or in connection with any other words, trademarks, service marks, trade names, symbols, logos, slogans, and designs.

"Mortgage" shall mean, as the context permits, (i) any loan, financing or other indebtedness secured by Owner's interest in the Hotel or (ii) any mortgage, deed of trust, or similar instrument and any related documents evidencing and securing the interest of the holder thereof in the Hotel.

"Mortgagee" shall mean any Person who holds a Mortgage.

"MVCI" shall mean MVCI St. Kitts Company Limited, a limited liability company organized and existing under the laws of the Federation of St. Christopher and Nevis, and includes its legal successors and assigns.

"MWC" shall mean Marriott Worldwide Corporation, a corporation organized and existing under the laws of the State of Maryland, United States of America, and its legal successors and permitted assigns.

"Non-Disturbance and Attornment Agreement" has the meaning given such term in Section 3.03.

"Opening Date" shall mean April 1, 2003.

"Operating Funds" shall mean funds which are reasonably necessary for the day-to-day operation of the Hotel.

"Operating Loss" shall mean a negative Adjusted House Profit.

"Owner" has the meaning given such term in the introductory paragraph to this Agreement and includes its legal successors and permitted assigns.

"Owner's Priority" shall mean, with respect to each Fiscal Year, the amount of **REDACTED** provided that such

amount shall be increased permanently as of the close of each Fiscal Year by an amount equal to 6.5% times the amount of any Major Hotel Building Expenditures incurred during such Fiscal Year (except to the extent funded from the Reserve or covered by insurance). In addition the Owner's Priority with respect to any Fiscal Year shall be increased further for such Fiscal Year by 6.5% of the amount of the cumulative net Operating Losses (beginning with Fiscal Year 2006), if any, experienced by the Hotel as of the close of the preceding Fiscal Year (i.e. the aggregate amount of Operating Losses in each Fiscal Year in the Term since Fiscal Year 2006 to such date in excess of the aggregate amount of funds distributed to Owner pursuant to Sections 5.02(B)(1) or (4) through the Term to such date). "Owner's Priority shall be pro-rated in the Fiscal Year this Agreement is terminated if such Fiscal Year is less than a full Fiscal Year. Notwithstanding anything to the contrary in this Agreement, the Owner's Priority as of the Effective Date is **REDACTED**

"Person" shall mean an individual (and the heirs, executors, administrators, or other legal representatives of an individual), partnership, joint venture, firm, company, corporation, government (or any department or agency or instrumentality thereof), trustee, trust, or any other legal entity of whatever kind or nature.

"Phase" shall mean a phase in the Phasing Schedule.

"Phasing Schedule" shall mean the following schedule of phases that each begin with the date that all Guest Rooms in certain Villa Buildings are removed from Hotel Guest Room inventory and ending on the date the conversion of such Villa Building to a Vacation Club Building is completed: Phase I beginning on or after June 1, 2006 and ending no later than November 30, 2006 involving the Villa Buildings identified on **Exhibit F** as Jessup House (800), Camp Bay House (900); Phase II beginning on or after June 1, 2007 and ending no later than November 30, 2007 involving the Villa Buildings identified on **Exhibit F** as Brimstone House (300) and Canada House (1000); Phase III beginning on or after June 1, 2009 and ending no later than November 30, 2009 involving the Villa Buildings identified on **Exhibit F** as Palmetto House (600), Westbury House (700); and Phase IV beginning on or after June 1, 2010 and ending no later than November 30, 2010 involving the Villa Buildings identified on **Exhibit F** as Turtle Bay House (400), Trinity House (500). Upon written notice to Manager, Owner may adjust the Phasing Schedule only to the extent the start day of a phase or an entire phase is moved to a later date, provided any construction involved in converting the Villa Building to a Vacation Club Building takes place between June 1 and November 30 of the applicable year. Once Manager receives notice of an adjustment to the Phasing Schedule, it will add the affected Guest Rooms back into Manager's sales channels to reflect the additional days such Guest Rooms will remain in Guest Room inventory.

"Private Units" shall mean certain units located in the Villa Buildings that are owned by Owner and more specifically identified on **Exhibit C**, to which Owner may grant certain Persons certain occupancy rights. The Private Units are not part of the Hotel and are used and maintained pursuant to the terms of the Resort Integration Agreement, the Auxiliary Services Agreement and as specifically noted in this Agreement.

"Procurement Affiliate" shall mean (i) Manager, (ii) any Affiliate of Manager, or (iii) any Person supplying goods or services to the Hotel that also has a contractual relationship

with Manager or its Affiliates, or in which Manager or one of its Affiliates has an ownership or other financial interest.

"Prospectus" has the meaning given such term in Section 15.05 B.

"Published Source" shall mean The Wall Street Journal (Eastern Edition), or if it is no longer published or is otherwise unavailable for the days in question, such other internationally recognized publication as Manager shall determine reasonably.

"Renewal Term" has the meaning given such term in Section 4.01 A.

"Renovation Building" shall mean one of the Villa Buildings identified on Exhibit F as Brimstone House (300), Turtle Bay House (400), Trinity House (500), Palmetto House (600), Westbury House (700), Jessup House (800), Camp Bay House (900), or Canada House (1000) and certain real property surrounding such Villa Building (as more specifically identified in the Resort Integration Agreement) during such period that begins with the first day of the relevant Phase and continuing until MVCI has accepted such Villa Building as a Vacation Club Building.

"Renovation Units" shall mean the individual units in a Renovation Building that are being converted from Guest Rooms into Vacation Club Units. The Renovation Units will also be considered Private Units unless specifically noted otherwise.

"Reserve" has the meaning given such term in Section 6.02 A.

"Resort Complex" shall mean the real estate and improvements comprising the Hotel, the Private Units, the Casino and the Vacation Club Property. A diagram of the Resort Complex, showing the approximate location of the various parts of the Resort Complex, is attached hereto as Exhibit F and incorporated herein by reference.

"Resort Integration Agreement" shall mean that certain Resort Integration Agreement entered into as of the Effective Date between Owner, MVCI, St. Kitts Beach Club Condominium Owners Association and Manager, as amended, restated, or supplemented from time to time, whereby such parties agree that certain facilities be shared, certain services be integrated and the costs related to the operation of such facilities and provision of such services be shared between Owner, MVCI and Association so that the Hotel, the Private Units, and the Vacation Club Property are operated from both a commercial and a hotel guest/owner perspective as an integrated resort.

"Resort Reciprocal Easement Agreement" shall mean that agreement setting forth various reciprocal easements between the Hotel, Vacation Club Property and the Private Units dated as of the Effective Date between MVCI, Association and Owner and consented to by Manager as amended, restated or supplemented from time to time as agreed to by MVCI, Association, and Owner and consented to by Manager.

"Restricted Area" shall mean that certain specific geographic area depicted on Exhibit E and known as of the Effective Date as the Federation of St. Christopher and Nevis comprised of two islands known as St. Kitts and Nevis, respectively.

MI - 00017

"Restricted Hotel" shall mean (A) prior to the 10th anniversary of the Opening Date, any hotel (other than the Hotel) operated under or including the brand name "Marriott" or "J.W. Marriott" and (B) on or following such 10th anniversary date, any hotel (other than the Hotel) operated under or including the brand name "Marriott" or "J.W. Marriott," excepting, however, subsidiary chain references to Marriott Chain branded hotels other than first or luxury class hotels, such as Courtyard by Marriott, Fairfield Inn by Marriott, Fairfield Suites by Marriott, Residence Inn by Marriott and TownePlace Suites by Marriott. In no event shall Restricted Hotels include: (i) Ramada International, Ritz-Carlton, Renaissance, New World, Conference Center by Marriott, Marriott Executive Apartments serviced apartments, Marriott Vacation Clubs International time-share units, or any other non-lodging product or lodging product which is not operated as a Marriott Chain hotel; or (ii) any other lodging products or brands developed or acquired by Manager or its Affiliates after the Effective Date that are not operated under or including the brand name "Marriott" or "J.W. Marriott."

"Routine Capital Expenditures" shall mean (i) ordinary course alterations, improvements, replacements, renewals, and additions to FF&E and (ii) routine repairs and maintenance to the Hotel that are normally capitalized in accordance with GAAP (e.g., interior repainting, and resurfacing interior walls, floors, and ceilings, and parking areas) but which are not Major Hotel Building Expenditures. All Routine Capital Expenditures will be conducted in accordance with the Routine Capital Expenditures Estimate and otherwise in accordance with Manager's policies as generally implemented throughout the Marriott Chain.

"Routine Capital Expenditures Estimate" has the meaning given such term in Section 6.02 D.

"Site" shall mean the parcel of land described in Exhibit B.

"Software" shall mean all computer software and accompanying documentation (including all future upgrades, enhancements, additions, substitutions and modifications thereof), other than computer software that is commercially available, which are used by Manager in connection with operating the Hotel, including, without limitation, the property management system, the reservation system and the other electronic systems used by Manager in connection with operating the Hotel.

"Staff Housing" shall mean the four three story buildings built and owned by Owner adjacent to the Resort Complex which as of the Effective Date are used for housing staff of the Hotel, Auxiliary Facilities and Golf Course.

"System Standards" shall mean any one or more (as the context requires) of the following three (3) categories of standards: (i) the operational standards (for example, services offered to guests, quality of food and beverages, cleanliness, staffing and employee compensation and benefits, Chain Services, frequent traveler programs such as the Marriott Rewards Program and other similar programs, etc.); (ii) the physical standards (for example, quality of the Hotel Building, FF&E, and Fixed Asset Supplies, frequency of FF&E replacements, etc.); and (iii) the technology standards used in the operation of the Hotel (including, without limitation, those relating to software, hardware, telecommunications, and systems security). Each of such standards shall be the standard which is generally prevailing as

part of a chain-wide program at other comparable hotels in the Marriott Chain, including all services and facilities in connection therewith that are customary and usual at such comparable hotels in the Marriott Chain.

"Term" shall mean the Initial Term plus all Renewal Terms.

"Total Project Cost" shall mean the total cost of building and rebuilding the Hotel including, but not limited to, financing, hard and soft costs, capital expenditures, and operating account shortfall funding by Owner or Manager pursuant to the terms of this Agreement.

"Total Revenue" shall mean all revenues and receipts of every kind (whether from cash or credit transactions), determined on an accrual basis, derived from operation of the Hotel (but specifically excluding any revenue generated by components of the project not constituting part of the Hotel and any services provided by Owner). Total Revenue shall include revenues and receipts from the following: the rental of rooms, offices, stores, and other retail space, and exhibit or sales space of every kind; revenues generated from providing any Hotel services to the Casino, the Vacation Club Property and the Private Units; parking lot and garage operations; telephone, telefax, and telex charges; license, lease and concession fees and rentals; income from vending machines; health and leisure club membership, use and other fees (but not buy-in charges for condominium owners or owners of other memberships sold by Owner); food and beverage sales; wholesale and retail sales of merchandise; miscellaneous services provided by the Hotel; any service charges on the foregoing items (to the extent not actually received by Hotel Employees); and any proceeds from business interruption or other loss of income insurance. Total Revenue shall **not include**: tips, service charges, or gratuities to Hotel Employees to the extent actually received by the Hotel Employees; proceeds from the sale of FF&E; proceeds under insurance policies described in Section 9.01 A, Section 9.01 B, and Section 9.02; gross receipts of licensees, lessees and concessionaires; value added, room, head, excise, goods and services, sales, or use taxes or similar charges collected directly from patrons or guests or included as part of the sales price of any rooms, goods or services; any revenue of the Casino or of any golf facility; the proceeds of any condemnation award, settlement of claims for loss or theft or damage to personal property, or any other such loss of a capital asset; any proceeds or other economic benefit of any borrowings of Owner whether or not secured by the Hotel or any furnishings and equipment; discounts, allowances, refunds or credits to patrons or guests; any security deposits of Hotel tenants, subtenants or concessionaires and any payments by such tenants, subtenants or concessionaires for taxes, repairs, maintenance and utilities; any funds furnished by Owner including, without limitation, payments by Owner for working capital or otherwise to the Hotel operating account or any reserve account; actual bad debts; proceeds of collection of accounts receivable to the extent the amount of any receivable was previously included in Total Revenue; interest or other investment income on amounts held in the Reserve account and any other accounts established by or for the Hotel (provided, however, that interest or other investment income on amounts held in the Hotel operating account(s) shall be included in Total Revenue); payments made under warranties and guaranties from providers of goods or services to the Hotel, whether received by Owner or by manager on Owner's behalf; other income from capital transactions which are not related to the operation of the Hotel; payments of those costs incurred by Hotel and allocated to Vacation Club Property and/or Private Units pursuant to the Resort Integration Agreement or the Resort Reciprocal Easement Agreement; payments to Hotel for providing Employee Services pursuant to the Auxiliary Services Agreement; or payments to Hotel for those services provided by Hotel pursuant to the Auxiliary

205961v6

15

Services Agreement on a cost reimbursement basis.

"Uniform System" shall mean the Uniform System of Accounts for the Lodging Industry, Ninth Revised Edition, 1996, as published by the Educational Institute of the American Hotel & Motel Association, as revised from time to time, to the extent such edition or revision has been generally implemented within the Marriott Chain at any given time.

"Vacation Club Building(s)" shall mean a Renovation Building that has been renovated by Resort Owner and accepted by MVCI pursuant to Phasing Schedule and the terms of the Amended MVCI Contract for Sale.

"Vacation Club Property" shall mean the vacation ownership resort developed by MVCI and located within the Resort Complex consisting of no less than two Vacation Club Buildings.

"Vacation Club Sales Activity Lease "shall mean that certain agreement dated as of the Effective Date between MVCI, Owner and Manager granting MVCI, among other rights, certain space in the Hotel to market and sell interests in the Vacation Club Property.

"Vacation Club Units" shall mean one of the separately keyed units in a Vacation Club Building where timeshare interests in such unit will be owned and sold by MVCI as part of the Vacation Club Property. It is anticipated that there will be eleven (11) Vacation Club Units in each Vacation Club Building. Because of the Phasing Schedule, the number of Vacation Club Units at any time will depend upon the number of Vacation Club Buildings at such time.

"Vacation Club Villa Building Lease" shall mean that certain agreement between MVCI and Owner.

"Villa Building" shall mean one of the various three-floor buildings on the Site which may include Guest Rooms, Private Units, or Vacation Club Units and which are identified on Exhibit "F" as the Pembroke House (100), Basseterre House (200), Brimstone House (300), Turtle Bay House (400), Trinity House (500), Palmetto House (600), Westbury House (700), Jessup House (800), Camp Bay House (900), Canada House (1000), Tabernacle House (1100), Newton House (1200), Cockleshell House (1300), Coral House (1400), Ocean House (1500), Caribe House (1600), and Cable Bay House (1700), Middle Island House (1800) and Royal House (1900).

"Wastewater Treatment Facility" shall mean that certain wastewater treatment plant owned by Owner or an Affiliate of Owner and that has serviced the Hotel Building since the Opening Date, including all related land, equipment, pipes and facilities.

1.02    Interpretation

A.      Unless otherwise stated, references to the Recitals, Articles, Sections, Exhibits, Schedules and Addenda are to the Recitals, Articles, Sections, Exhibits, Schedules and Addenda of or to this Agreement, and all such Exhibits, Schedules and Addenda are hereby incorporated herein by reference.

205961v6                                    16

MI - 00020

B.   Words indicating the singular include the plural and vice versa as the context may require.  Words indicating a gender include every gender as the context may require.

C.   Unless otherwise defined, references to days, months, and years are to calendar days, calendar months, and calendar years, respectively.

D.   The headings to the Articles and Sections are for convenience only and have no legal effect.

E.   The words "include," "included" and "including" shall be terms of enlargement or example and shall not imply any restriction or limitation unless the context clearly requires otherwise.

F.   The word "or" shall not indicate exclusivity and shall be interpreted to mean both "and" and "or" unless the context clearly requires otherwise.

G.   "Dollars," "$," and "U.S.$" mean the lawful currency of the United States of America.

H.   When used with reference to this Agreement, the word "termination" shall mean the expiration of the Term or prior termination of this Agreement, unless the context clearly requires otherwise.

## ARTICLE II
## HOTEL MANAGEMENT AND OPERATION

2.01   Appointment

A.   Subject to the limitations set forth in this Agreement, Owner hereby appoints Manager as Owner's exclusive manager to supervise, direct, and control the management and operation of the Hotel beginning as of the Opening Date and continuing throughout the Term. Owner hereby grants to Manager the full scope of authority necessary to perform its obligations under this Agreement.  Manager accepts the appointment and agrees to manage and operate the Hotel during the Term in accordance with the terms and conditions set forth herein.  The performance of all activities by Manager hereunder shall be conducted in a commercially reasonable and prudent manner on behalf of and for the account of Owner.

B.   Manager, at its own expense, shall arrange for the provision of routine corporate and regional services outside of the country in which the Hotel is located for the benefit of the Hotel and the other hotels in the Marriott Chain, which services include: (i) executive supervision and support from Marriott international headquarters and from the appropriate Marriott regional office(s), including the supervision and support services of the appropriate regional officials; (ii) general expertise and general technical and operational assistance in areas such as executive supervision, employee relations, strategic planning and policy-making, research and development, energy management, retail shop operation, quality assurance, insurance, life safety, menu planning, food preparation and service, accounting controls, and internal auditing; and (iii) general advice and general consultation on finance, legal, tax and similar matters.

205961v6                                              17

C.     Manager shall provide services to the Auxiliary Facilities and Vacation Club Property pursuant to the terms of the Resort Integration Agreement, the Resort Reciprocal Easement Agreement, and the Auxiliary Services Agreement.

D.     The Casino, although located in the Hotel, shall not be managed by Manager but shall be managed either by the Owner directly or through a management agreement or lease with a Casino Operator.  The Casino shall be separately serviced by and metered for utilities.

E.     The Hotel, Vacation Club Property and the Casino shall cooperate in good faith in purchasing activities in order to achieve economies of scale.

F.     The Vacation Club Property, although located on the Site, will be managed separately by MVCI and Manager, subject to the terms of the Resort Integration Agreement.

G.     During the period that MVCI may require Owner to convert a Villa Building to a Vacation Club Building, Manager shall manage the inventory of Guest Rooms available for sale pursuant to the Phasing Schedule.

2.02   Delegation of Authority

A.     Except as otherwise specified in this Agreement, the management and operation of the Hotel shall be under the exclusive supervision and control of Manager, and Manager shall be responsible for management and operation of the Hotel.  Except as otherwise specified in this Agreement, Manager shall have the authority to perform, free from interference, interruption, or disturbance, all matters relating to the management and operation of the Hotel, including: charges for rooms and commercial space; credit policies; food and beverage services; employment policies; granting of concessions or leasing of shops and agencies within the Hotel; receipt, holding, and disbursement of funds; maintenance of bank accounts; procurement of inventories, supplies and services; promotion and publicity; and such other activities as are specifically provided for elsewhere in this Agreement or are otherwise reasonably necessary for the management and operation of the Hotel.  In no event shall any party to this Agreement borrow money in the name of another party.

B.     Manager's engagement under this Agreement (subject to the current Annual Operating Projection approved by Owner and the limitations set forth in this Agreement) specifically shall include, but not be limited to, the responsibility and authority, on behalf of and at the expense of Owner to:

(i)     Employ, train, supervise, discharge and determine and pay the compensation, fringe benefits, pension and retirement plans and other policies and terms of employment of all personnel as may be reasonably required to provide proper operation, supervision, and management of the Hotel in a professional manner suitable to the character of the Hotel;

(ii)    In accordance with the approved Annual Operating Projection, determine all terms for guest admittance to the Hotel and establish all prices, price schedules, rates and rate

MI - 00022

schedules for rooms, and other amenities and services provided at or in connection with the Hotel;

(iii)    Develop, revise, and implement entertainment and amusement policies, together with related policies and procedures;

(iv)    Select for purchase and installation all FF&E, Inventories and Fixed Asset Supplies for the Hotel;

(v)    Negotiate and enter into a credit card service contract with the Bank of Nova Scotia (or another institution providing comparable services approved by Owner and Manager), and other service contracts on Owner's behalf which are necessary or desirable in the ordinary course of business in operating the Hotel, including, without limitation, contracts for provision of electricity, gas, water, telephone and other utility services, cleaning services, security services, vermin extermination, trash removal, elevator and boiler maintenance, air conditioning maintenance, master television service, laundry and dry cleaning, entertainment satellite systems and other services which Manager deems advisable, provided that any contracts in place as of the Effective Date shall remain in effect, subject to Manager's reasonable review and approval;

(vi)    Institute and defend in the name of Manager or Owner (or both), utilizing legal counsel selected by Owner, any and all legal actions or proceedings which Owner shall deem necessary or proper in connection with the operation of the Hotel;

(vii)    Subject to Section 3.07(A) below, separate the identity and physical operations of the Casino from the Hotel by any reasonable means, but excluding locking and/or eliminating any common internal ingress/egress between the Casino and the Hotel or other steps materially harmful to or rendering Casino operations impracticable, as a result of a material deviation by the Casino Operator from the quality and services standards of the Casino as it relates to a first-class, full-service international resort as set forth in Section 3.07.A, below;

(viii)    Although Manager shall have the right to engage in collective bargaining with the bargaining representative or representatives of Hotel Employees, and to enter into collective bargaining agreements, Manager shall keep Owner advised on a current basis of the status of such collective bargaining negotiations, shall consult with Owner with respect thereto and shall, in good faith, follow Owner's suggestions and recommendations. Representatives of Owner shall be entitled to attend any and all negotiations concerning collective bargaining agreements and union contracts and confer on an immediate basis with the person or persons selected by Manager to negotiate with representatives of a labor union during the course of any labor negotiations;;

(ix)    Engage such persons, as have been approved by Owner for providing services of a specialist nature (such as legal counsel and independent accountants) related to matters within Manager's responsibility under this Agreement;

(x)    Use diligence and best business practices in the collection of all Total Revenue;

205961v6                                         19

MI - 00023

(xi)    Perform (or cause to be performed and supervised) (i) such maintenance and repairs to the Hotel as shall be required by the Annual Operating Projection and/or any loan documents or applicable law or as shall be necessary to maintain the Hotel in a professional manner suitable to the character of the Hotel, and (ii) such other obligations under any Mortgage which are applicable to the operation and management of the Hotel;

(xii)    Pay all operating expenses, taxes and property insurance and comply with all applicable laws, rules, regulations, requirements, orders, notices, determinations and ordinances of any federal, provincial or local authority and the requirements of insurance companies which are applicable to the operation and management of the Hotel;

(xiii)    Upon request by Owner (provided, however, that Manager shall immediately notify Owner if there are insufficient funds in the Hotel operating account), pay, as and when due, all payments due under any loans relating to the Hotel;

(xiv)    Operate and/or lease to third parties approved by Owner the food and beverage, banquet and room service facilities; and

(xv)    Do any and all other acts and things as Manager may deem necessary and appropriate to carry out its responsibilities under the terms of this Agreement.

C.    Manager shall have no authority on behalf of Owner to do any of the following in connection with the Hotel without Owner's prior written approval in each instance:

(i)    Borrow money, guaranty the debts of any third person, or mortgage, pledge, grant a security interest in or otherwise encumber all or any part of the Hotel;

(ii)    Enter into any lease for the use of any item of FF&E or other property;

(iii)    Enter into any agreement, lease, license or concession agreement for office, retail, lobby or other commercial space at the Hotel;

(iv)    Incur any liabilities or obligations to third parties which are unrelated to the operation, maintenance and security of the Hotel or to the performance of Manager's responsibilities under this Agreement;

(v)    [reserved];

(vi)    Except for an "Excluded Transaction" and subject to the provisions of this Agreement regarding contracts with Affiliates of Manager, Manager shall not, without the consent of Owner, enter into any contract or other arrangement (or series of related contracts or arrangements) if the expenditures thereunder would, or are reasonably anticipated to, exceed $25,000 in the aggregate, or if the term of such contract has a term in excess of one year. For purposes hereof, the term "Excluded Transaction" means (1) any contracts subject to competitive bidding in which the lowest bid is accepted; and (2) contracts or expenditures required in cases of emergency or casualty, which expenditures are required to protect life and safety, or in order to comply with legal requirements.

205961v6                                        20

(vii)   Settle any casualty and insurance claims which involve, or which are reasonably estimated to involve, amounts in excess of $25,000, and any condemnation awards;

(viii)   Institute or defend any legal or equitable proceedings with respect to the Hotel, including the selection of counsel other than routine collection litigation and similar matters involving ordinary day-to-day operations of the Hotel involving amounts in controversy of less than $25,000;

(ix)   Employ any professional firm (other than legal counsel and accountants) for more than $25,000 in the aggregate except as set forth in the Annual Operating Projection, or enter into any arrangement for the employment of any attorney or accountant (other than legal counsel retained to collect accounts receivable);

(x)   Prosecute or settle any Owner tax claims or appeals;

(xi)   Purchase goods, supplies and services from itself or any Affiliate of Manager, or enter into any other transaction with an Affiliate of Manager, unless prior to the consummation of such transaction all of the prices and other terms thereof and the identity of the vendor and its relationship to Manager shall have been disclosed to and approved by Owner, which approval may be unreasonably withheld by Owner, it being agreed that any such proposed transaction shall be submitted to independent third parties for competitive bidding, and Manager shall promptly provide the results of such bidding to Owner;

(xii)   Provide complimentary rooms or services to any guests, employees or other persons, consistent with reasonable operating policies and procedures, for which the business purpose for the benefit of the Hotel is not properly documented, and in any event, the value of such complimentary services shall not exceed the amount allocated in the approved Annual Operating Projection for such complimentary services;

(xiii)   Acquire on behalf of Owner any land or any interest therein;

(xiv)   Acquire any capital assets of the Hotel or any interest therein;

(xv)   Consent to any condemnation or participate in any condemnation proceeding relating to the Hotel, the Site or any portion thereof;.

(xvi)   Sell, transfer or otherwise dispose of all or any portion of the Hotel except for dispositions of FF&E which are expressly provided for either in the Annual Operating Projection, Routine Capital Expenditures Estimate or Major Hotel Building Expenditures Estimate;

(xvii)   Perform any alterations to the Hotel or any portion thereof except to the extent Manager's performance of any such alteration shall be expressly provided for in either the Annual Operating Projection, Routine Capital Expenditures Estimate or Major Hotel Building Expenditures Estimate; and

(xviii)   Take any other action which, under the terms of this Agreement, is prohibited or requires the approval of Owner.

205961v6

21

MI - 00025

2.03   Standard of Care

In fulfilling its obligations hereunder, Manager shall (i) act as a professional, reasonable and prudent operator of the Hotel, having regard to the status of the Hotel and taking into account its expertise as an operator of destination resort hotels, and (ii) at all times act in a manner which preserves the character, standards, and reputation of the Hotel.

2.04   Marriott Chain Standards

Owner acknowledges that the Hotel's compliance with System Standards is critical to the success of the Hotel and the Marriott Chain. Owner shall take such actions as are necessary to enable the Hotel to comply with such System Standards (including any quality assurance program that may apply to the Hotel).

2.05   Licenses and Permits

Upon request, Owner and Manager shall cooperate fully with each other in obtaining licenses, permits, approvals, and other instruments necessary for management and operation of the Hotel, including signing promptly and without charge all relevant applications. Manager shall maintain all licenses and permits necessary for it to conduct business in the jurisdiction of the Hotel in accordance with this Agreement.

### ARTICLE III
### OWNERSHIP, ENCUMBRANCE AND USE OF HOTEL

3.01   Ownership of Hotel

A.   Owner represents and warrants that as of the Effective Date it shall have, and covenants that at all times thereafter during the Term it shall maintain, good and marketable fee title free and clear of any and all liens, encumbrances, or other charges, except as follows:

1.   Easements or other encumbrances (other than those described in Sections 3.01.A.2) that do not adversely affect the operation of the Hotel by Manager and are not prohibited by Section 3.02.

2.   Any Mortgage which (a) contains provisions that (i) none of the Marriott Agreements shall be subject to forfeiture or termination other than in accordance with the terms of each of the Marriott Agreements and the relevant Non-Disturbance and Attornment Agreement, notwithstanding a default under such Mortgage, and (ii) subject to the terms of the pertinent Non-Disturbance and Attornment Agreement, any Person acquiring ownership of the Hotel or other form of control of the Hotel as a result of foreclosure, receivership or similar proceedings shall be considered Owner's successor as Owner of the Hotel and shall be bound by the terms of each of the Marriott Agreements, or (b) in aggregate with all other Mortgages (i) secures financing on reasonable commercial terms, (ii) for which the aggregate principal amounts do not exceed 75% of the fair market value of the Hotel, as of the date any amount is borrowed, and (iii) for which the annual debt service payments (principal and interest) shall never exceed an

MI - 00026

amount obtained by dividing the projected annual Adjusted House Profit plus Casino net operating income by 1.2. Owner and Manager shall use all reasonable efforts to agree on such fair market value; failing agreement, either may request that an Expert make a determination of such fair market value. Manager shall have the right to review the terms of each Mortgage and each related document to satisfy itself that each Mortgage complies with the requirements of this Agreement.

      3.    Liens for taxes, assessments, levies, or other public charges which are not yet due or are being contested diligently in good faith by appropriate proceedings.

      4.    The Resort Integration Agreement, the Resort Reciprocal Easement Agreement, the Vacation Club Sales Activity Lease and the Vacation Club Villa Building Lease Agreement.

      5.    The Existing Mortgage.

      B.    Owner shall pay and discharge any and all installments of principal and interest and all other fees and expenses due and payable upon any Mortgage to the extent of any (i) cash available in the Hotel operating account that otherwise would have been paid to Owner pursuant to Sections 5.02 (B) (1) or (4) at or prior to the debt service due date and (ii) net cash flow to Owner from the operations of the Casino in the calendar month immediately preceding the debt service due date and shall indemnify, defend, and hold harmless Manager from and against all Damages based on or arising from the failure to make such payments as and when required. If Owner fails to make any such payment within 14 days of the due date, then so long as there is no executed Non-Disturbance and Attornment Agreement and there is cash in the Hotel operating account that otherwise would have been paid to Owner pursuant to Sections 5.02 (B) (1) or (4), Manager may make such payment on Owner's behalf and deduct such payment from such amounts otherwise to be paid to or as directed by Owner pursuant to Article V.

      C.    Manager acknowledges that this Agreement is a contract for services which does not create any interest of Manager in the Hotel or a lien or encumbrance on the Hotel of any kind and does not run with the land. Manager specifically and irrevocably waives any right to file, register or record a claim of any interest in the Hotel.

3.02    <u>Covenants, Conditions and Restrictions</u>

      A.    Owner represents and warrants that on the Effective Date and covenants that throughout the Term there shall be no covenants, conditions, or restrictions, including reciprocal easement agreements, common area assessments or cost-sharing arrangements (individually or collectively "CC&R(s)") applicable to the Hotel or the management or operation thereof other than those that Manager shall have approved. Manager consents to the Resort Reciprocal Easement Agreement and the Resort Integration Agreement as it exists as on the Effective Date. Owner shall not consent to or permit to exist any CC&R which would (i) impose or purport to impose any material financial obligation on the Hotel, (ii) prohibit or limit Manager from managing and operating the Hotel or any part of the Hotel (including any facilities or services customarily provided by a first class, full-service international hotel), (iii) allow any Hotel facilities (e.g., parking spaces) to be used by Persons other than Hotel guests, invitees or Hotel Employees in any material fashion, or (iv) adversely affect the amount of Total Revenue which

MI - 00027

the Hotel otherwise would have achieved or the amount of any fees that any of the Marriott Companies otherwise would have received pursuant to any of the Marriott Agreements in the absence of such CC&R.

B.      All financial obligations imposed on or allocated to the Hotel or Private Units or Manager or any of its Affiliates pursuant to or as a result of any CC&R shall be paid by Owner from its own funds, and not from Total Revenue or from the Reserve, unless with respect to such CC&R's that are benefiting the Hotel and for which Manager has given its prior written consent to such CC&R as well as to the payment of such obligations from Total Revenue or from the Reserve.

3.03    Non-Disturbance and Attornment Agreement

A.      Owner shall not enter into or grant a Mortgage on the Hotel unless the Mortgage satisfies the requirements of Section 3.01.A.2(b), above, or each Mortgagee, Owner, and the Marriott Companies enter into an agreement ("Non-Disturbance and Attornment Agreement") reasonably satisfactory in all respects to Manager and such Mortgagee, which shall be recordable in the jurisdiction where the Hotel is located, pursuant to which:

1.      This Agreement and any extensions, renewals, replacements or modifications thereto, and all right and interest of Manager in and to the Hotel, shall be subject and subordinate to such Mortgage;

2.      Manager shall be obligated to each of the Subsequent Owners (as defined below) to perform all of the terms and conditions of this Agreement for the balance of the remaining Term hereof, with the same force and effect as if such Subsequent Owner were the Owner; and

3.      In the event that there is a foreclosure of such Mortgage (or a deed in lieu of foreclosure), or other exercise by such Mortgagee (or its successor) of its remedies in the event of default, in connection with which title or possession of the Hotel is transferred to the Mortgagee (or its designee) or to a purchaser at foreclosure or to a subsequent purchaser from the Mortgagee (or from its designee) (all of the foregoing shall collectively be referred to as "Subsequent Owners"), Manager shall not be disturbed in its rights under this Agreement so long as Manager is not in Default hereunder.

4.      Manager shall provide the Mortgagee with customary notice and opportunities to cure any defaults of Owner under the Marriott Agreements, Manager will agree to enter into a new set of agreements with a Subsequent Owner if the Marriott Agreements are terminated by bankruptcy rejection or other operation of law, Subsequent Owners shall bear no liability for any prior accrued defaults of Owner, deferred fees or liabilities of Owner and Manager shall agree to such other undertakings as are then customary in nondisturbance subordination agreements between hotel chain operators and institutional mortgage lenders.

5.      If any Mortgagee of Owner or ground lessor shall request in writing copies of any and all financial or other information which Manager, pursuant to the terms and provisions of this Agreement, is obligated to deliver to Owner, Manager shall deliver

MI - 00028

same to the Mortgagee or ground lessor as often as the Mortgagee or ground lessor may reasonably request. Manager shall allow, upon request of Owner, any Person designated in writing by the Mortgagee or the ground lessor to examine, audit, inspect and copy all Hotel records.

      6. Manager will not unreasonably refuse to consent to any requested modifications or amendments to this Agreement if required by a proposed Mortgagee or ground lessor as a condition to making a mortgage loan to Owner on its interests in Hotel or entering into a ground lease, as the case may be, so long as such modification or amendment does not diminish the fees or reimbursements becoming due to Manager or its Affiliate under the Marriott Agreements, and does not otherwise materially and adversely affect Manager's or its Affiliate's rights and interests under the Marriott Agreements.

B. In the event that the Non-Disturbance and Attornment Agreement contains provisions requiring Manager (upon a default under the Mortgage, or upon various other stipulated conditions) to pay certain amounts which are otherwise due to Owner under this Agreement to the Mortgagee or its designee (rather than to Owner), Owner hereby gives its consent to such provisions, which consent shall be deemed to be irrevocable until the entire debt secured by the Mortgage has been discharged or the Mortgagee rescinds the direction.

C. Prior to encumbering the Hotel or the Site with any Mortgage, Owner shall be obligated to exercise reasonable and diligent efforts to obtain from the proposed Mortgagee an executed, recordable Non-Disturbance and Attornment Agreement. Manager agrees to execute such Non-Disturbance and Attornment Agreement for the benefit of such proposed Mortgagee. If Owner encumbers the Hotel or the Site with a Mortgage (other than the Existing Mortgage) without first exercising reasonable and diligent efforts to obtain such a Non-Disturbance and Attornment Agreement from the Mortgagee it shall be a Default of Owner under this Agreement, entitling Manager to all of the remedies set forth in Article XII. A failure to obtain such a Non-Disturbance and Attornment Agreement from the Mortgagee after the exercise of reasonable and diligent efforts, however, shall not be a Default so long as the Mortgage satisfies the requirements of Section 3.01(2)(B).

D. Every Non-Disturbance and Attornment Agreement shall be registered or recorded promptly in the jurisdiction where the Hotel is located if such registration or recordation is or becomes permissible.

MI - 00029

3.04    Impositions

All Impositions which arise out of the operations of the Hotel shall be Deductions. All other Impositions shall be paid by Owner (and shall not be Deductions) before any fine, penalty, or interest is added thereto or lien placed upon the Hotel or this Agreement, unless payment is being contested diligently in good faith by appropriate proceedings and enforcement is stayed. In the event of such contest, Owner shall periodically inform and consult with Manager regarding developments in and resolution of each such contest. Within the earlier of 30 days after payment or completion of each such contest or three days following a request by Manager, Owner shall deliver to Manager copies of official tax bills and assessments and evidence of payment or contest of such bills and assessments.

3.05    Unencumbered Management and Protection of Rights

Owner covenants that (i) Manager shall quietly hold, occupy, and enjoy the Hotel throughout the Term free from hindrance, ejection, or molestation by Owner or any other Person claiming under, through, or by right of Owner, (ii) Owner shall take all commercially reasonable actions to safeguard and protect the rights and privileges conferred on Manager by this Agreement, and (iii) Owner shall neither (a) take action nor (b) refrain from taking action required by this Agreement, which may infringe or prejudice such rights and privileges of Manager unless so required by any law or by a court of competent jurisdiction. Subject to Owner's express rights under this Agreement, Owner and its agents shall not interfere with the operation of the Hotel or the rights of Hotel guests, invitees, licensees, lessees or concessionaires.

3.06    Use: Legal Compliance

A.    Manager shall use the Hotel solely for the operation of a hotel (including all activities and facilities which are customary to such an operation) and manage the Hotel in accordance with System Standards and all applicable Legal Requirements (except for those Legal Requirements, as are described in Section 3.06.B, that are Owner's responsibility) pertaining to its operation and management of the Hotel; however, Manager shall have the right (but not the obligation) in its reasonable discretion to contest by appropriate proceedings any such Legal Requirement, subject to the limitations on Manager's authority set forth in this Agreement. All costs and expenses of such compliance and/or such contesting shall be Deductions.

B.    Owner represents and warrants that the Hotel Building and all improvements on the Site comply with applicable building, zoning or use laws, ordinances, regulations or orders, and Environmental Laws. Owner shall have the right (but not the obligation) in its reasonable discretion to contest by appropriate proceedings any Building Code or Environmental Law violations. All costs and expenses of such compliance and/or such contesting shall be borne solely by Owner and shall not be paid from Total Revenue or the Reserve.

3.07    Casino

**REDACTED**

# REDACTED

B. Casino Operation.

# REDACTED

MI - 00031

# REDACTED

C.   <u>Notification of Certain Events</u>.  Upon becoming aware of any of the following events, Owner shall report promptly, and shall require any other Casino Operator to report promptly, to Manager in writing any of the following events:

1.  Any criminal investigation in which Owner, Casino Operator, or any of their shareholders, principals, directors, officers or managerial or department head employees is a subject;

2.  Any criminal charge against Owner, Casino Operator, or any of their shareholders, principals, directors, officers or managerial or department head employees;

3.  Any charge filed by any gaming regulatory agency with jurisdiction over the Casino alleging violation of any statute, rule, or regulation applicable to the Casino;

4.  Any action taken by any gaming regulatory agency with jurisdiction over the Casino affecting any license or approval issued by that agency authorizing Owner and/or Casino Operator to operate the Casino or any game;

5.  Any charge or action taken by any gaming regulatory agency with jurisdiction over the Casino Operator, its affiliates, or any of its controlling shareholders, directors, officers, or management employees alleging violations of any statue, rule, or regulation which either may affect, or has affected, any license applied for, or issued, to conduct gaming activity or any finding of suitability; or

6.  Any material litigation filed against Owner or Casino Operator.  For purposes of this sub-section, litigation shall be considered material if it may adversely affect the operation or financial condition of the Casino or the ability of the Casino to maintain its gaming licenses and approvals.

MI - 00032

D.   Name.

1.     During the Term, the combined name of the Hotel and Casino resort will be the "St. Kitts Marriott Resort and the Royal Beach Casino" and such combined name may appear in the logo of the Resort and the advertising by Manager of the Hotel and Casino together.  The term "Royal" shall be used only in connection with the Casino or the combined name of the Hotel and Casino as provided above, and not in connection with the Hotel alone.  The name of the Casino shall be the "Royal Beach Casino", or any variation thereof, provided that Owner may revise the name from time to time so long as (a) the name does not include the name "Stellaris" and (b) Manager approves any new or modified name, which approval shall not be unreasonably withheld or delayed.

2.     Owner represents that it is the owner of all right, title, and interest in and to the trademark "Royal Beach Casino" ("Owner's Trademark") or has the right to grant the use thereof to Marriott and its Affiliates in accordance with this Agreement, and Owner shall take all steps reasonably necessary to preserve and protect the ownership and validity of Owner's Trademark.  Owner shall promptly file and diligently prosecute an application to register the "Royal Beach Casino" mark for gaming services on the St. Kitts Trademark Register.

3.     Owner hereby grants to Marriott and its Affiliates for the length of the Term, a non-exclusive, worldwide royalty-free license to use Owner's Trademark in connection with their performance under the Marriott Agreements.

4.     This Agreement does not grant to Owner, and shall not be construed to grant to Owner, any right to use the combined name of the Resort or the Marriott Trademarks in connection with the operation or promotion of the Casino.

5.     Owner acknowledges and agrees that it shall not acquire any right to or ownership of the Marriott Trademarks as a result of the combined usage of the Marriott Trademarks and the Owner's Trademark. Owner further acknowledges and agrees that all goodwill associated with the Marriott Trademarks generated by the combined usage of the Marriott Trademarks and the Owner's Trademark shall inure to Marriott and its Affiliates. Manager for itself and on behalf of Marriott and its Affiliates acknowledges and agrees that they shall not acquire any right to or ownership of the Owner's Trademark as a result of the combined usage of the Marriott Trademarks and the Owner's Trademark. Marriott further acknowledges and agrees that all goodwill associated with the Owner's Trademark generated by the combined usage of the Marriott Trademarks and the Owner's Trademark shall inure to Owner.

6.     Neither party shall file or make any registration in a public register of the combined name "St. Kitts Marriott Resort and the Royal Beach Casino" or other combination of the Owner's Trademark and the Marriott Trademarks except where required by the laws of any governing body and such registration shall be subject to the prior written approval of Manager.  Owner shall immediately withdraw or assign to Manager or its designee any such registration upon termination of the Management Agreement. Owner shall withdraw or assign to Manager or its designee any unauthorized registration upon the request of Manager.

MI - 00033

7.      Owner shall defend and indemnify Marriott and its Affiliates for any and all liabilities, costs and expenses that may be incurred (whether in St. Kitts or elsewhere) as a result of any claims by third parties arising out of or relating to Marriott's use of any Owner's Trademark in connection with the Hotel and Casino, including without limitation attorneys' fees and other litigation costs, costs of changing signage, logos, advertising, written materials and similar costs.

E.      Compliance Audits.                              **REDACTED**

F.      Advertising.  In connection with Owner's advertising of the Casino, Owner may use the name "Marriott" but (i) only to indicate the location of the Casino at the Hotel, (ii) only in the same type-face and font as substantially all the other words in the location part of the advertisement, which type-face or font shall not correspond with or be in any way look similar to the Marriott Trademark type-face, and (iii) only in the same size print as substantially all the other words in the location part of the advertisement.  Owner shall not use any Marriott Trademarks (other than the name "Marriott" as permitted under Section 3.07) in connection with its advertising of the Casino.  So long as a Casino advertisement by Owner complies with this Section 3.07.B.6, Owner may use such Casino advertisement.  But if a Casino advertisement does not comply with this Section 3.07.B.6, then such Casino advertisement must be approved by Marriott prior to the use of the advertisement.

G.      Internet Gaming Activities.                     **REDACTED**

H.      Manager Not Responsible for Casino.  Manager shall not perform any services at the Casino relating to the gaming operations or security and surveillance, nor will Manager receive any revenue tied to the profitability of the gaming operations at the Casino.  Owner acknowledges that Manager has no responsibility for the Casino's receipt, holding and disbursement of funds, bank accounts, employment practices, and all other activities which are necessary for the operation and management of the Casino.  All gaming revenues derived from the Casino shall be to the sole and exclusive account of the Owner and/or Casino Operator and shall not be included in Total Revenues to be shared with Manager.  All costs and expenses related to the Casino shall be borne exclusively by Owner and/or Casino Operator and shall not be Deductions except to the extent that Casino is paying Hotel for certain services expressly set forth herein or in the Auxiliary Services Agreement.

MI - 00034

3.08   The Private Units

A.   The Private Units are an integral part of the Site and therefore their exteriors must be maintained and the grounds around them must be maintained to present to Hotel guests and Casino guests a seamless management of the Resort Complex. Manager shall provide certain goods and services to the Private Units and allow access to the Hotel amenities to occupants of the Private Units and Owner shall pay for the same all as set forth in the Resort Integration Agreement and the Auxiliary Services Agreement.

B.   Owner will obligate any individual to whom it grants usage rights to a Private Unit, to comply with the rules and regulations of conduct imposed by the Hotel on hotel guests and to not take any actions that would frustrate Owner, Manager or MVCI's obligations under the Resort Integration Agreement, the Resort Reciprocal Easement Agreement or the Auxiliary Services Agreement.

3.09   Casino Reservations and Casino Reserved Patron Charges

A.   Definitions. The following terms shall have the following meanings when used in this Section 3.09:

"High Demand Periods" shall mean the nights the correlate with the following holidays or events:  Christmas and New Year's Vacation, Super Bowl Weekend, Presidents Day (United States) weekend and Spring Break (Canada).  Manager will notify the Casino as far in advance as reasonably possible what dates constitute such holidays or events in any given year.

"Casino" shall mean the Casino management.

"Casino Block Period" shall mean a period that begins one year before the first day of a particular block of Room Nights for a particular date or for consecutive dates.

"Casino Discount Rate" shall mean:

# REDACTED

"Casino Reserved Patron" shall mean a individual that uses a Guest Room pursuant to a reservation made by the Casino for a Room Night in a Casino Room Block.

MI - 00035

"Casino Room Block" shall mean a one or more Room Nights for one night or for consecutive nights that are removed from the Manager's sales channels and designated for use by the Casino.

"Casino Room Nights" shall mean the Room Nights that are i) the Room Nights that were not released by Casino after Manager requested such release pursuant to Section 3.09 C. and ii) the Room Nights for which Casino notified Manager it would pay on behalf of a Casino Reserved Patron or another Hotel guest pursuant to Section 3.09 D.

"Second Option Group Sales Contract" shall mean a group sales contract between the Hotel and a Hotel customer for a block of ten (10) or more Room Nights per night for one night or for consecutive nights that will become effective upon the release by Casino of certain Room Nights in a Casino Room Block.

"Room Night " shall mean the right to use a Guest Room for a night.

"Unqualified Rate"                                    **REDACTED**

B.      Reservation of Casino Room Blocks.

    1.      As of the Effective Date, Manager shall automatically create Casino Room Blocks in all future High Demand Periods based upon the historic Casino Room Nights during the 2005-2006 High Demand Periods. After notifying Casino, Manager shall adjust such Casino Room Blocks in each year based upon the actual use by Casino during the previous year's High Demand Period.

    2.      At anytime during the Casino Block Period, Casino may request that Manager establish or expand Casino Room Blocks by notifying Manager in writing of the number of Room Nights per night and the dates it would like to have Manager create a Casino Room Block or add Room Nights to an existing Casino Room Block. Manager will confirm either 1) that all the Room Nights requested are available and that a Casino Room Block has been created or expanded in response to Casino's request or 2) that because some of the Room Nights requested were unavailable because they had previously been reserved through Manager's channels, a Casino Room Block has been created but with a specified adjustment to the Room nights requested by Casino. However, if during the Casino Block Period, Casino requests either a new Casino Room Block or an expansion of an existing Casino Room Block and the Room Nights requested are during High Demand Periods, such Room Nights will be reserved in a Casino Room Block only if such Room Nights meet the minimum stay requirements imposed upon transient guests wishing to make Room Night reservations at the Hotel for the same date.

C.      Release of Room Nights in Casino Room Blocks. Manager will release a Room Night in a Casino Block if Casino does not agree to pay Hotel the Casino Discount Rate for such Room Night, whether or not actually used by a Casino Reserved Patron, within seventy two (72) hours after Manager requests that Casino release such Room Night because either i) Manager has a Second Option Group Sales Contract that requires such Room Night or ii) the percentage of

MI - 00036

Room Nights available for sale on the date of such Room Night, including all Casino Room Blocks for such night, is five percent (5%) or less.

     D.    <u>Establishment of Credit for and Guest Room Folio Charges of Casino Reserved Patrons</u>

# REDACTED

     E.    <u>Payment by Casino Reserved Patrons.</u>  Hotel will request each Casino Reserved Patron pay all amounts set forth on such Casino Reserved Patron's guest room folio except those charges for which Casino has notified Manager it will pay on such Casino Reserved Patron's behalf.

MI - 00037

F.   Payment by Casino.   Manager shall submit to Owner and Casino a weekly statement of the amounts due to the Hotel for:

1.   an amount equal to the applicable Casino Discount Rate multiplied by the total Casino Room Nights that have not previously been paid for by Casino;

2.   an amount equal to all guest room folio charges for stays that ended prior to the statement date and for which Casino notified Manager, that it would pay on such Casino Reserved Patron's or other Hotel guest's behalf.

# REDACTED

G.   Each year Casino Operator and Manager shall meet to negotiate the amount, if any, of a discount that may be applied to restaurant charges of Casino Patrons that are paid by Casino.                    **REDACTED**

ARTICLE IV
TERM; TRANSITION PROCEDURES

4.01   Term

A.   The initial term ("Initial Term") of this Agreement shall commence with the Effective Date and, unless sooner terminated as herein provided, shall end on December 31, 2022.  Manager thereafter has the option to renew this Agreement on the same terms and conditions for three (3) periods of ten (10) Fiscal Years each (each a "Renewal Term").  Manager shall be deemed to have elected to exercise such option to renew unless it shall give Owner notice that it does not elect to renew at least 11 months prior to the expiration of the Initial Term or the then-current Renewal Term.

B.   Notwithstanding the provisions stated in Section 4.01 A, this Agreement is coterminous with the International Services Agreement and the License and Royalty Agreement.  If either of the International Services Agreement or the License and Royalty Agreement is terminated, this Agreement shall be immediately and automatically terminated.

C.   Owner and Manager acknowledge that the Term specified herein is material to this Agreement, and neither shall contest or challenge the validity of this Section 4.01.  Owner and Manager further acknowledge that the Amended and Restated Performance Side Letter executed between Owner and Manager dated February 25, 2003 is hereby terminated and shall be of no further effect.

205961v6                                    34

4.02   <u>Transition Procedures</u>

In connection with termination of this Agreement, the following actions shall be taken:

A.     Manager shall, within ninety (90) days after termination, prepare and deliver to Owner a final accounting statement with respect to the Hotel, as more particularly described in Section 7.01 and including a statement of any sums due from Owner to Manager pursuant to this Agreement, dated as of the date of termination. Within thirty (30) days of the receipt by Owner of such final accounting statement, Owner and Manager shall make whatever cash adjustments are necessary pursuant to such final statement. The cost of preparing such final accounting statement shall be a Deduction. If Owner elects to have an External Audit performed as of the date of termination, within 30 days of the receipt by Owner and Manager of such External Audit, Owner and Manager shall make whatever cash adjustments are necessary pursuant to such External Audit. If certain adjustments cannot be made because of unavailable information at the time of the final accounting or final External Audit, Owner and Manager shall make the necessary cash adjustments when such information becomes available; in all events, all accounts shall be deemed final twelve (12) months after termination.

B.     Manager shall release and transfer to Owner or any other Person designated by Owner any of Owner's funds which are held or otherwise controlled by Manager with respect to the Hotel (except for funds to be held in escrow pursuant to Sections 9.04 and 10.01 or otherwise in accordance with this Agreement).

C.     Manager shall make available to Owner such books and records regarding the Hotel (including those from prior years, subject to statutory retention requirements and Manager's reasonable records retention policies) as shall be needed by Owner to prepare the accounting statements for the Hotel for the year in which termination occurs and for any subsequent year. Such books and records shall not include (i) employee records which are confidential under applicable Legal Requirements or reasonable corporate policies of Manager, and (ii) any Intellectual Property, and (iii) information regarding prior group bookings, and (iv) prior reservation lists.

D.     Manager shall to the extent permitted by Legal Requirements assign to Owner or to the new manager all operating licenses, permits, approvals, and other instruments which have been issued in Manager's name for use in operation of the Hotel. If Manager has expended any of its own funds in the acquisition or renewal of any such licenses, permits, approvals, or other instruments, Owner shall reimburse Manager therefor if Owner has not already done so.

E.     Various other actions shall be taken, as described in this Agreement, including the actions described in Sections 8.01, 8.02, 8.03 C, 9.04 C, and 10.01 G.

F.     Manager shall peacefully vacate and surrender the Hotel to Owner.

G.     Deliver to Owner any and all of Owner's properties and assets within the possession of Manager, including keys, locks and safe combinations, files, correspondence, prospective group bookings, prospective reservation lists, ledgers, bank statements for the Hotel operating account and reserve accounts, accounting books and records, all non-proprietary

MI - 00039

electronic data maintained by Manager relating to the Hotel (which data shall be delivered on computer disc in a format that is accessible and readable by Owner's then current computer systems), insurance policies, bonds and the as-built or record set plans relating to the operation of the Hotel, provided that Manager may retain possession of copies of any of the foregoing;

H.  Cooperate and assist with, and do all things reasonably necessary or advisable to effectuate, the proper and smooth transition of operations of the Hotel from Manager to Owner or its designee.

I.  The provisions of this Section 4.02 shall survive termination.

4.03  Condition to Termination

As a condition to termination for reasons other than an Event of Default by Manager, Owner shall pay to Manager or an Affiliate of Manager the Alternate Additional Incentive Fee as of the date of termination. Notwithstanding such termination and any other contrary provision herein, this Agreement shall be extended automatically until Manager or an Affiliate of Manager has received such payment unless Manager or an Affiliate of Manager otherwise notifies Owner.

## ARTICLE V
## COMPENSATION OF MANAGER

5.01  Management Fee

In consideration of services to be performed during the Term, Owner (except as otherwise provided in this Section) shall pay the Incentive Fee to Manager. The balance of Adjusted House Profit, after payment of the Owner's Priority, the Incentive Fee, the Additional Incentive Fee and any other amounts required or permitted pursuant to this Agreement to be paid by Manager on Owner's behalf, shall be paid to or as directed by Owner as provided in Section 5.02.

5.02  Accounting and Distribution of Adjusted House Profit

A.  Within 20 days after the close of each Accounting Period, Manager shall submit an interim accounting to Owner for such Accounting Period showing Total Revenue, Deductions, departmental profits, Adjusted House Profit, variances to the Annual Operating Projection, distributions to Owner and Manager, and such other financial and operating reports as Owner may reasonably request. With each interim accounting, Manager shall pay to or as directed by Owner any interim amount due to Owner (subject to meeting existing or anticipated needs for Operating Funds, less any amounts due to Manager for insurance costs allocated to Casino, Cogeneration Plant and Private Units pursuant to Section 9.05 A and less any amounts that were not paid to Hotel when due pursuant to i) Section 3.09 hereof, ii) the Auxiliary Services Agreement and iii) the Resort Integration Agreement or Reciprocal Easement Agreement for amounts allocated to the Private Units), and any interim amounts due Manager, including a prorated portion of the Incentive Fee for each such Accounting Period based on Manager's good faith estimate of the Incentive Fee payable for the full Fiscal Year (taking into account the payment priorities set forth in Subsection B below. Such interim accounting and

MI - 00040

interim payments shall be subject to the annual accounting (and External Audit) and distributions provided for in Section 5.02 D.

B.     For each Accounting Period during the Term, the priority of payments from Adjusted House Profit shall be as follows:

1.     First, in payment of Owner's Priority;
2.     Second, in payment of Incentive Fee;
3.     Third, in payment of any Additional Incentive Fee; and
4.     Fourth, to Owner.

If, and to the extent that Adjusted House Profit in any Fiscal Year is not sufficient to pay the Incentive Fee with respect to such Fiscal Year in full, Manager shall waive and forfeit as the Incentive Fee the amount by which the Incentive Fee exceeds the available Adjusted House Profit; provided that such waiver and forfeiture shall have no effect on the collection or calculation of any other fees under this Agreement.

C.     If Manager in its sole discretion defers the payment of any Incentive Fee due and for which there is sufficient Adjusted House Profit for any period to provide Operating Funds or for any other reason, the U.S. Dollar equivalent of the amount so deferred shall be determined by using the appropriate currency exchange rate quoted in the Currency Cross Rates table (or successor table thereto) in the Published Source for the last business day of the most recent Accounting Period for which the Published Source quotes such exchange rates. When payment is made thereafter, the U.S. Dollar equivalent of the amount actually paid (determined by using the appropriate currency exchange rate quoted in the Currency Cross Rates table (or successor table thereto) in the Published Source for the last business day prior to payment for which the Published Source quotes such exchange rates) shall be no less than the previously determined U.S. Dollar equivalent. Manager shall not design or construct the repayment of a prior Incentive Fee deferral with the intent to profit from any difference in exchange rates.

D.     Within 120 days after the close of each Fiscal Year, Manager shall submit to Owner an annual accounting for such Fiscal Year in accordance with Section 7.01. Such annual accounting shall be controlling over the interim accountings of Total Revenue, Adjusted House Profit, Incentive Fees and all other items accounted for on an interim basis, and any adjustments required by such annual accounting shall be made promptly by Owner and Manager. Similarly, the accounting made pursuant to any External Audit shall be controlling over such annual accounting, and any adjustments required by an External Audit shall be made promptly by Owner and Manager. No adjustment shall be made with respect to any Fiscal Year for any negative Adjusted House Profit in a preceding or subsequent Fiscal Year.

## ARTICLE VI
### REPAIRS, MAINTENANCE, AND REPLACEMENTS

6.01   Routine Repairs and Maintenance

Manager shall make or cause to be made such routine repairs, routine maintenance, and minor alterations, the cost of which can be expensed in accordance with GAAP, as it deems

205961v6                                         37

necessary to maintain the Hotel in good repair and condition, consistent with the Annual Operating Projection and in compliance with applicable Legal Requirements. The cost of such repairs, maintenance, and alterations shall be Deductions. Repairs, maintenance, and alterations to the Hotel or its FF&E which are not expensed in accordance with GAAP shall be paid and accounted for as described in Sections 6.02 and 6.03.

6.02   Reserve

A.      Manager shall establish in Owner's name a separate interest-bearing bank account ("Reserve") in a bank designated by Owner and approved by Manager to cover the cost of Routine Capital Expenditures. Owner at its option may exchange any or all of the cash in the Reserve for demand letter of credit provided by Owner in form and substance reasonably approved by Manager for the amount by which Owner decreases the Reserve and drawn against a reputable bank approved by Manager (the "LC"). Withdrawals from the Reserve and/or draws on the LC shall be made only by authorized representatives of Manager, and the authorized signatories with respect to the Reserve and the LC shall not be changed without the prior consent of Owner and Manager. Major Hotel Building Expenditures shall be funded either by Owner or, if Owner and Manager agree, from the Reserve or the LC. Routine Capital Expenditures shall be funded from the Reserve or the LC, provided that if a repair, alteration, improvement, renewal, replacement, or addition costs less than Ten Thousand U.S. Dollars (US$10,000) (and is not part of a program of such renewals or replacements costing in excess of such amount), then such repair, alteration, improvement, renewal, replacement, or addition (each an "Expensed Item") shall be expensed as a Deduction, and shall be funded from Total Revenues and not the Reserve. Owner shall not (a) pledge the Reserve or the LC as security for any debt if such pledge would materially adversely affect either the amount of funds in the Reserve or the LC or Manager's access to or use of funds in the Reserve or the LC, or (b) permit any restrictions to exist on expenditures from the Reserve other than as set forth herein.

B.      Subject to Section 6.02 E, the Reserve shall be funded in an amount equal to four and one-half percent (4.5%) of Total Revenue for each Accounting Period between April 1, 2006 and March 31, 2007, five percent (5%) of Total Revenue for each Accounting Period between April 1, 2007 and March 31, 2008, and for each Accounting Period thereafter five and one-half percent (5.5%) of Total Revenue for such Accounting Period unless the Total Revenue for the Fiscal Year prior to the Fiscal Year of such Accounting Period was less than REDACTED in which case five percent (5%). All amounts to be paid into the Reserve shall be paid pursuant to Article V (i.e., before the payment of the priorities set forth in Section 5.02(B)); if such amounts are insufficient, Owner shall pay any shortfalls in such required amounts. If Owner fails to make any such payment within 14 days after the end of the Accounting Period for which it is due, Manager shall be entitled to make such payment on Owner's behalf and to deduct such payment from the amounts otherwise to be paid to or as directed by Owner pursuant to Article V.

C.      Manager shall make such Routine Capital Expenditures as it deems necessary and in accordance with the current Routine Capital Expenditures Estimate, up to the balance in the Reserve. At the end of each Fiscal Year, any amounts remaining in the Reserve shall be carried forward to the next Fiscal Year. All interest earned on funds in the Reserve shall be deposited in and credited to the Reserve. Net Proceeds from the sale of FF&E shall be distributed to Owner.

MI - 00042

D.   At the same time the Annual Operating Projection is submitted to Owner, and together with the Major Hotel Building Expenditures Estimate as one inclusive capital expenditures estimate, Manager shall submit to Owner an estimate ("Routine Capital Expenditures Estimate") of the expenditures necessary for Routine Capital Expenditures during the ensuing Fiscal Year.

E.   1.   Before Manager may incur a Routine Capital Expenditure or Major Hotel Building Expenditures which would cause the actual total amount of such Routine Capital Expenditures or Major Hotel Building Expenditures for any Fiscal Year to be greater than One Hundred percent (100%) but less than One Hundred Five percent (105%) of the amount set forth in the estimates submitted for such Fiscal Year, Manager must first provide to Owner written notice of such Routine Capital Expenditure or Major Hotel Building Expenditure. Within five (5) business days after Owner's receipt of such notice, Owner may request a meeting with a representative of Manager who is knowledgeable about the proposed Routine Capital Expenditure or Major Hotel Building Expenditure, which must be scheduled within thirty (30) days of Owner's receipt of such notice, at a mutually convenient time and place for Owner and Manager. At or before such meeting, Manager shall provide Owner with all information reasonably requested by Owner and delivered to Manager in writing at least fifteen (15) days prior to such meeting between Owner and Manager.

2.   Before Manager may incur a Routine Capital Expenditure or a Major Hotel Building Expenditure which would cause the actual total amount of such expenditure for any Fiscal Year to be One Hundred Five percent (105%) or more of the amount set forth in the estimate for such Fiscal Year, Manager must first obtain Owner's prior written approval with respect to such expenditure.

6.03   Major Hotel Building Expenditures

A.   At the same time the Annual Operating Projection is submitted to Owner, and together with the Routine Capital Expenditures Estimate as one inclusive capital expenditures estimate, Manager shall submit for Owner's approval an annual estimate ("Major Hotel Building Expenditures Estimate") of the expenses necessary for Major Hotel Building Expenditures. Manager shall not make any Major Hotel Building Expenditure without the prior consent of Owner, provided that Owner shall not withhold consent to the extent that any expenditure is required by any law, regulation, or order of a competent government authority or are otherwise required for the continued safe operation of the Hotel. In such event, Manager shall promptly notify Owner of such requirement and shall be authorized to take appropriate remedial action without Owner's approval if Owner fails to take appropriate remedial action immediately. The costs of all Major Hotel Building Expenditures made in accordance with this Section 6.03 A shall be borne by Owner (unless Manager approves the use of Reserve funds pursuant to Section 6.02). If any such costs have not been paid within 30 days after being invoiced to Owner, Manager shall be entitled to deduct such unpaid costs from the amounts otherwise to be paid to or as directed by Owner pursuant to Article V.

B.   If Owner does not approve the Major Hotel Building Expenditures Estimate submitted by Manager within 30 days after it has been submitted, Manager may (i) accept Owner's position, or (ii) refer the matter to an Expert, provided that Owner's approval or disapproval of Major Hotel Building Expenditures described in clause (A) of the definition of

Major Hotel Building Expenditures shall be a matter of Owner's discretion and not subject to Expert review. If the matter is referred to an Expert, the Expert shall determine which Major Hotel Building Expenditures set forth in the Major Hotel Building Expenditures Estimate are necessary to maintain the standard of the Hotel as a first-class, full-service international hotel that is part of the Marriott Chain. The Expert's fees and expenses shall be borne by the party against whom the Expert decides.

C.      Notwithstanding the provisions of Section 6.03.A, Manager shall be authorized to take appropriate remedial action (including making any necessary Major Hotel Building Expenditures) without receiving Owner's prior consent in the following circumstances: (i) if there is an emergency threatening the Hotel, its guests, invitees or employees; or (ii) if the continuation of the given condition would subject Manager and/or Owner to civil or criminal liability, and if Owner has either failed to remedy the situation or has failed to take appropriate legal action to stay the effectiveness of any applicable Legal Requirement. Manager shall cooperate with Owner in the pursuit of any such action and shall have the right to participate therein. Owner shall, upon written request by Manager, promptly reimburse all expenditures made by Manager pursuant to this Section 6.03.C which are not otherwise payable from Total Revenue as Deductions or payable from the Reserve.

D.      The cost of all Major Hotel Building Expenditures (including the expenses incurred by either Owner or Manager in connection with any civil or criminal proceeding described above) shall be borne solely by Owner, unless it is agreed by Manager to be paid from the Reserve.

E.      With respect to Major Hotel Building Expenditures which are anticipated on the combined annual capital expenditures estimate or otherwise are emergency or otherwise unanticipated expenditures for which Reserve funds are not available but which are necessary for the protection of health or safety and which shall not be paid entirely from amounts in the Reserve, it shall be an Event of Default by Owner if Owner: (a) fails to provide funding for any such approved or emergency Major Hotel Building Expenditure as and when reasonably requested by Manager and following reasonable prior written notice in light of the timing and cash needs of the Major Hotel Building Expenditure.

F.      It is understood that "alterations," "improvements," or "additions" which (a) increase or decrease the number of guestrooms in the Hotel by more than a de minimis amount, (b) involve significantly changing the architectural footprint of the Hotel, or (c) involve other significant changes in the structural design of the Hotel, are beyond the scope of this Section 6.03, and would require an amendment of this Agreement prior to implementation by either party.

G.      On a monthly basis, Manager shall report to Owner whether there exists or whether Manager anticipates any adverse deviation from the combined annual capital expenditures estimate, and shall provide Owner with a list of any expected extraordinary expenditures unanticipated in such combined annual capital expenditures estimate.

6.04    Liens

Owner and Manager shall use commercially reasonable efforts to prevent any liens or other security interests from being filed against the Hotel which arise from any Routine Capital

MI - 00044

Expenditures or Major Hotel Building Expenditures. Owner and Manager shall cooperate fully in obtaining the release of any such liens or other security interest, and the cost thereof, if the lien or other security interest was not caused by the fault of a party hereto, shall be treated the same as the cost of the matter to which it relates. If the lien or other security interest arises as a result of the fault of a party hereto, then the party at fault shall bear the cost of obtaining the release.

6.05   Determinations Regarding and Ownership of Capital Items

Manager shall exercise good faith and consistent business practices in the determination of whether particular items constitute routine repairs, routine maintenance, and minor alterations; Routine Capital Expenditures; or Major Hotel Building Expenditures. Unless Manager specifically approves otherwise, all FF&E shall be owned (not leased) by Owner, free and clear of all liens and security interests other than any permitted Mortgage. All Routine Capital Expenditures and Major Hotel Building Expenditures shall be the property of Owner.

6.06   Renovation and Replacement Standards

A.   All Routine Capital Expenditures and Major Hotel Building Expenditures shall be conducted in accordance with the Routine Capital Expenditures Estimate and the Major Hotel Building Expenditures Estimate and shall conform to System Standards, including the standards set forth in the "Marriott Hotels Design Standards - International" or such successor document as specifies the design and construction standards applicable to comparable Marriott Chain hotels at such time. Manager's substantial completion of any such Major Hotel Building Expenditure shall constitute Manager's acknowledgment that any such expenditures will conform with such standards.

B.   Owner shall endeavor to comply with all applicable Legal Requirements pertaining to the Site, the Hotel Building or other improvements, or Owner's ownership interest in the Hotel. Owner shall have the right (but not the obligation) in its reasonable discretion to contest by appropriate proceedings any such Legal Requirements. Any operational costs and expenses of such compliance and/or such contesting shall be paid from Total Revenue as Deductions or from the Reserve. All other costs and expenses of such compliance and/or such contesting shall be borne solely by Owner and shall not be paid from Total Revenue or the Reserve.

ARTICLE VII
BOOKKEEPING AND BANK ACCOUNTS

7.01   Books and Records

A.   Except as otherwise provided herein, Manager shall keep the books of control and account on the accrual basis and in material respects in accordance with the Uniform System.

B.   Within 120 days following the close of each Fiscal Year, Manager shall deliver to Owner a reasonably detailed statement, certified as true and correct by Manager, summarizing the Hotel operations for such Fiscal Year. At Owner's election, an Auditor chosen by Owner may conduct an External Audit on a periodic basis and the auditor's fee shall be paid from Total Revenue up to an amount of Fifty Thousand U.S. Dollars ($50,000) which amount shall be

205961v6                                      41

MI - 00045

adjusted for inflation annually using the Consumer Price Index. If Owner requests certain clarifications or otherwise questions such certified statement, Manager shall respond or request the Auditor to respond as soon thereafter as reasonably practical. The Auditor shall be required to complete such External Audit within 90 days of Owner's receipt of the certified statement. If Owner or Manager questions any such External Audit, the Auditor shall be instructed to respond within 15 days of such request or as soon thereafter as reasonably practical. At all times, the books and records of the Hotel shall be consistent with the terms of this Agreement. If an External Audit is conducted with respect to any period, Owner may challenge Manager's certified statement or statements with respect to such period during the 12-month period subsequent to such External Audit. Owner's right to challenge any Manager's statement with respect to a period for which an External Audit was not conducted shall expire 5 years following delivery of the statement.

7.02   Hotel Accounts; Expenditures

   A.   All funds derived from operation of the Hotel shall be deposited by Manager in Hotel bank accounts in a bank designated by Owner and approved by Manager. Withdrawals from the bank accounts shall be made only by authorized representatives of Manager, and the authorized signatories with respect to such bank accounts shall not be changed without the prior consent of Manager and Owner. Owner shall, at the request of Manager, promptly execute resolutions, certificates, powers of attorney, and such other instructions and instruments as the bank may require to authorize representatives of Manager as signatories on the bank accounts or to otherwise enable Manager to operate the Hotel bank accounts in accordance with the authority afforded to Manager in this Agreement. Reasonable petty cash funds shall be maintained at the Hotel.

   B.   All payments made by Manager under this Agreement shall be made from authorized bank accounts or petty cash funds. Manager shall not be required to make any advance or payment to or for the account of Owner except out of such funds, and Manager shall not be obligated to incur any liability or obligation for Owner's account without adequate assurances that necessary funds for the discharge thereof shall be provided by Owner. If such funds are insufficient and Manager, after at least 10 days' prior notice to Owner, in its sole discretion chooses to advance its own funds to make payments under this Agreement on behalf of Owner, Owner shall promptly repay to Manager the funds so advanced, plus interest at the Interest Rate. Subject to Section 15.22 below, debts and liabilities incurred by Manager as a result of its management and operation of the Hotel, whether asserted before or after termination, shall be paid by Owner to the extent funds are not available for that purpose from the operation of the Hotel so long as such debts and liabilities are consistent with the approved Annual Operating Projection. If Owner does not promptly repay advances made by Manager, Manager shall have the right to deduct such advances (including interest) from amounts otherwise to be paid to or as directed by Owner.

7.03   Annual Operating Projection

   A.   Manager shall submit to Owner for its approval (which shall not be unreasonably withheld or delayed), at least forty-five (45) days prior to the beginning of each Fiscal Year which begins after the Opening Date, a preliminary draft of an annual operating projection (the "Annual Operating Projection") of the estimated financial results of the operation of the Hotel

MI - 00046

during the next Fiscal Year. Owner's approval shall be deemed to have been given if Manager has received no written notice from Owner to the contrary within forty-five (45) days after Owner's receipt of such preliminary draft of the Annual Operating Projection. Such Annual Operating Projection shall project the estimated Total Revenues, departmental profits, Deductions, and Adjusted House Profit for the forthcoming Fiscal Year for the Hotel. In preparing the Annual Operating Projection for each Fiscal Year, Manager's goal will be the maximization of the current and long-term Adjusted House Profit of the Hotel, in keeping with the System Standards and the general standards of the hotel industry for similar properties, while also striving to keep expenses down. If there are material items in any given Annual Operating Projection which have been budgeted at significantly different amounts from the amounts actually experienced (or projected) for the same items in the preceding Fiscal Year, Manager agrees to take reasonable steps to ensure that, at Owner's request, qualified personnel from Manager's staff are available to explain these differences to Owner. A meeting (or meetings) for such purpose shall be held, at Owner's request, within a reasonable period of time after the submission to Owner of the preliminary draft of the Annual Operating Projection. Manager will at all times give good faith consideration to Owner's suggestions regarding any Annual Operating Projection. Manager shall thereafter submit to Owner, by no later than thirty (30) days after the beginning of such Fiscal Year, the final Annual Operating Projection.

      B.    The preliminary draft of the Annual Operating Projection shall include

# REDACTED

      C.    Owner shall not be entitled to withhold its approval of any Annual Operating Projection based on its objection to: (i) Manager's reasonable projections of either Total Revenue or the components thereof; (ii) projected costs and expenses which are "systems charges" (that is, costs and expenses which are uniform throughout substantially all Marriott Chain hotels, such as: the charges for Chain Services; the costs of the Frequent Traveler Program and other chain-wide marketing programs; employee benefits and other compensation programs); (iii) costs and expenses which are not within the control of either Owner or Manager, such as Impositions and the cost of certain utilities or (iv) increases in projected costs and expenses of operating the Hotel, to the extent such increases are primarily caused by projected increases in Total Revenues. If Owner and Manager fail to mutually agree on the Annual Operating Projection within forty-five (45) days after the submission to Owner of the preliminary draft described in the first sentence of 7.01.A, either party shall have the right to submit to an Expert (in accordance with Section 15.12) the issue of whether or not the disputed expenditures in Manager's proposed Annual Operating Projection are reasonably necessary,

given the goals which are set forth in the fourth sentence of Section 7.03.A. While such Expert proceedings are pending, Manager shall operate the Hotel, (i) with respect to disputed expenditures before the Expert, based on the Annual Operating Projection for the preceding Fiscal Year, with adjustments for inflation using the Consumer Price Index, and (ii) with respect to undisputed expenditures, based on the Annual Operating Projection for the current Fiscal Year.

     D.    Each Annual Operating Projection will constitute a standard to which Manager shall use its reasonable best efforts to adhere. It is understood, however, that the Annual Operating Projection is an estimate only and that unforeseen circumstances such as, but not limited to, the costs of labor, materials, services and supplies, casualty, operation of law, or economic and market conditions may make adherence to the Annual Operating Projection impracticable, and Manager shall be entitled to depart therefrom for such reasons up to and including one hundred five percent (105%) of the Annual Operating Projection; provided, however, that nothing herein shall be deemed to authorize Manager to take any action prohibited by this Agreement nor to reduce Manager's other rights or obligations hereunder. Before Manager may exceed one hundred five percent (105%) of the Annual Operating Projection, Manager must obtain Owner's prior written approval therefor.

     E.    Manager shall notify Owner of any significant variations from the Annual Operating Projection promptly after Manager learns of the same, but in no event later than the date on which Manager is required to give Owner the Accounting Period Statement covering the period in which such variation occurs. Any such notice shall set forth in reasonable detail the nature, extent and, if known by Manager, the cause of such variation, and recommendations of appropriate actions, either to correct the variation or to prevent or minimize the occurrence or effect. Owner and Manager shall, at Owner's request, meet to review such variations and to take appropriate action with respect thereto.

     F.    When finalizing the Annual Operating Projection for the current Fiscal Year, Manager shall take into consideration the final actual audited amounts from the prior Fiscal Year that were not reflected in the preliminary Annual Operating Projection.

     G.    Manager shall promptly make such adjustments to the Annual Operating Projection as may be necessary to conform to the Expert's decision unless the Owner and Manager otherwise agree.

7.04   Currency

     A.    Manager shall cause to be made such lawful expenditures in foreign currencies as may be necessary in its judgment to operate and manage the Hotel as a first class, full-service international hotel. Upon request by Manager, Owner shall join Manager without charge in making any required applications to appropriate exchange or currency control authorities and otherwise use commercially reasonable efforts so that such currency is available to Manager at non-discriminatory rates of exchange and with permission to remit the same to such place or places as Manager may designate. Manager shall not design or construct the payment of any expenditure with the intent to profit from any difference in exchange rates.

MI - 00048

B.     If any governmental authority with jurisdiction over the Hotel imposes restrictions on the transfer of funds or currency to places outside the country in which the Hotel is located and such restrictions result in Manager or any of its Affiliates not receiving payments pursuant to this Agreement or any other Marriott Agreement in a timely fashion, Manager shall have the following options, each or all of which may be exercised at any time thereafter in its sole discretion:  (i) Manager may direct Owner to deposit all payments required under this Agreement to such accounts in the country in which the Hotel is located as Manager may designate and Owner shall take such other action as Manager may reasonably request to cause payment of such accumulated amounts to be made (in the applicable currency) as Manager may direct as soon as possible thereafter and Owner shall continue to deposit such payments and take such other action for the lesser of (a) the time during which such restriction remains in effect, and (b) a period of up to one hundred eighty (180) days, and (ii) if after the expiration of such one hundred eighty- (180-) day period set forth in (i)(b), above, such restriction remains in effect, Manager may terminate this Agreement upon one hundred eighty (180) days notice (or such longer period as may be required pursuant to a Legal Requirement).

7.05    Operating Funds

Upon request of Manager, Owner shall promptly advance any additional funds necessary to maintain Operating Funds at levels contemplated in the Annual Operating Projection to be necessary to satisfy the needs of the Hotel as its management and operation may from time to time require, including funds required to fund any Operating Loss.  In addition to, or in lieu of, making such request, Manager may at its option defer cash distributions to or as directed by Owner, which deferred amounts may be used as Operating Funds.  Operating Funds shall remain the property of Owner throughout the Term, subject to the needs of the Hotel operation.

7.06    Regular Meetings

At Owner's request, Owner and Manager shall have meetings periodically (but not more frequently than on a monthly basis) at the Hotel and at mutually convenient times.  Manager shall be represented by the General Manager and such other members of the executive committee at the Hotel as Owner may request.  The purpose of the meeting shall be to exchange information and opinions on all aspects of management of the Hotel, including any variations from the Annual Operating Projection for the preceding month.

## ARTICLE VIII
### HOTEL NAME AND MARRIOTT TRADEMARKS;
### COMPUTER SOFTWARE AND EQUIPMENT

8.01    Hotel Name and Marriott Trademarks

The Hotel shall be named and identified as the St. Kitts Marriott Resort and otherwise in accordance with MWC's customary policy and protocols for identifying Marriott Chain Hotels and which name shall be approved by Owner.  Throughout the Term the Hotel shall be known as a "Marriott Hotel" or shall be called "Marriott" together with other identifying names for first-class, full-service international hotels in the Marriott Chain.  If there shall occur a merger, acquisition or other business combination involving Manager or Marriott pursuant to which the name of the Hotel shall be changed to a name which does not include the name "Marriott," then

MI - 00049

Owner agrees to approve such new name so long as substantially all of the first-class, full service international hotels in the Marriott Chain prior to such event are known by the same name. The Marriott Trademarks in all events shall remain the exclusive property of MWC, Marriott, or any of their respective Affiliates. Nothing in this Agreement or in the License and Royalty Agreement shall confer on Owner the right to use the Marriott Trademarks other than in strict accordance with the terms of this Agreement and the License and Royalty Agreement. Nothing in this Agreement or the License and Royalty Agreement shall permit Owner to confer on any other Person any right to use the Marriott Trademarks. All use of the Marriott Trademarks under this Agreement and the License and Royalty Agreement and any goodwill associated with such use inures solely to the benefit of the owner(s) of the Marriott Trademarks, whether or not the Marriott Trademarks are registered. Except as provided in Section 8.02, Owner's use and right to use the Marriott Trademarks shall cease upon termination, and Owner shall promptly remove from the Hotel any signs, similar items, Fixed Asset Supplies, and Inventories which contain any of the Marriott Trademarks.

8.02   Purchase of Inventories and Fixed Asset Supplies

Manager or an Affiliate designated by Manager shall have an option exercisable within 30 days after the date of termination to purchase at their then book value any items of the Hotel's Inventories and Fixed Asset Supplies as may be marked with any Marriott Trademarks. If Manager or any of its Affiliates does not fully exercise such option, Owner may use any unpurchased items only in connection with the operation of the Hotel until the then existing supply is exhausted, provided that (i) prior to termination or as soon as possible thereafter, such Marriott Trademarks shall be removed, covered or otherwise permanently hidden from the view of Hotel customers and guests, and (ii) in no event shall the use of such items continue for more than six months after the date of termination.

8.03   Intellectual Property; Computer Software and Equipment

A.   All right, title, and interest (including copyright and patent rights) to Intellectual Property shall at all times be proprietary to Manager (or any other Marriott Company) and shall in all events be the exclusive property of Manager (or any other Marriott Company), and this Agreement shall not be deemed to convey to Owner any rights in the Intellectual Property or any benefits derived from the use thereof by any Marriott Company. Owner shall not have any rights to any Intellectual Property and shall not use any Intellectual Property for any purpose whatsoever, except with respect to the Marriott Trademarks, as specifically provided herein or in the License and Royalty Agreement.

B.   During the Term, Manager shall be entitled to take all reasonable steps to ensure that Intellectual Property remains confidential and is not disclosed to anyone other than Manager's employees or such Hotel Employees as Manager shall determine in its sole discretion.

C.   Upon termination, Manager shall have the right to remove from the Hotel, without compensation to Owner, all Intellectual Property. Manager also shall have the right at such time to remove from the Hotel any proprietary computer equipment provided that Manager reimburses Owner for previous expenditures made by Owner to purchase such equipment less a reasonable allowance for depreciation.

MI - 00050

D.    All right, title, and interest (including copyright and patent rights) to the name "Royal" and any other name developed exclusively by Owner and used in connection with the Hotel, shall at all times be proprietary to Owner and shall in all events be the exclusive property of Owner, and this Agreement shall not be deemed to convey to Manager any rights in such right, title or interest or any benefits derived from the use thereof by Owner.

8.04    Breach of this Article; Survival

In case of breach of any provision of this Article by Owner or any Affiliate of Owner or any other Person claiming under, through or by right of Owner, Manager or its Affiliates shall be entitled to injunctive relief and to any other right or remedy available at law or in equity. This Article shall survive termination.

## ARTICLE IX
## INSURANCE

9.01    Property Insurance.

A.    Manager will procure and maintain, at Owner's expense, the following insurance for the Private Units, Casino, Cogeneration Facility, and Hotel:  property insurance, including boiler and machinery coverage, against loss or damage by fire, lightning, and all other risks as commonly covered by an "all-risk of physical loss" policy of insurance, including, but not limited, to windstorm, sprinkler leakage, vandalism and malicious mischief, water damage, explosion of steam boilers, pressure vessels and other similar apparatus, and other hazards generally included under extended coverage, in an amount not less than the full replacement cost (less excavation and foundation costs) of contents (excluding contents of Private Units), signs, awnings, canopies, gazebos, fences and retaining walls.  Such coverage shall include an agreed value provision, waiver of co-insurance, landscape improvements coverage of not less than the replacement cost value of such improvements to the Facilities, and law and ordinance coverage in an amount not less than twenty-five percent (25%) of the replacement value or Ten Million Dollars ($10,000,000), whichever is greater.  Coverage for the Casino and Private Units shall include the Casino and Private Units component parts, but does not include the improvement and betterments and personal property within either, including any furniture, fixtures, and equipment.

B.    Manager will procure and maintain, at Owner's expense, the following insurance for the Hotel:  business interruption insurance covering at least two (2) years' loss of profits, rental income, and necessary continuing expenses for interruptions at the Hotel caused by any occurrence covered by the insurance referred to in Section 9.01 A. Key personnel payroll shall also be insured to the extent covered by Manager at similar resorts;

C.    Such other insurance in amounts as Manager and Owner deem advisable for protection against Damages arising out of or connected with the ownership of the Hotel.

9.02    Operational Insurance

Manager shall procure and maintain a minimum of the following insurance:

205961v6                                          47

MI - 00051

A.    (i)    Commercial general liability insurance providing worldwide defense and indemnity against claims for bodily injury, death, personal injury or property damage occurring on, in, or about the Hotel or in connection with the business of the Hotel or the provision of services of the Hotel by Manager to Private Units, Vacation Club Property or Casino (such insurance shall be written on an occurrence form and include contractual liability coverage);

(ii)    Automobile liability insurance on vehicles owned or operated by or in conjunction with the Hotel (such insurance shall include coverage for automobile physical damage as customarily covered by Manager at similar hotels); and

(iii) employers liability insurance covering all hotel employees.

All such insurance shall provide worldwide defense and indemnity with a combined single limit for each occurrence of not less than One Hundred Million United States Dollars (U.S.$100,000,000) and if not available, an amount for which Manager and Owner mutually agree;

B.    Workers' compensation coverage including employers' liability that complies with the applicable workers' compensation laws, or such similar employee benefit insurance covering all Hotel Employees as maybe required by any applicable law for which this agreement applies;

C.    Fidelity bond insurance, including Comprehensive Crime coverage with reasonable limits to be determined by Manager (but to not be less than US$5,000,000), covering Hotel Employees in job classifications normally bonded in Marriott Chain hotels directly operated by Manager, Marriott, or any of their Affiliates or as otherwise required by law, and

D.    Such other insurance in amounts as Manager and Owner mutually deem advisable for protection against Damages arising out of or in connection with the operation of the Hotel.

9.03    General Insurance Provisions

A.    All insurance described in Section 9.01 and Section 9.02 will be consistent with such insurance customarily procured by Manager at similar hotels and may be obtained by Manager by endorsement or equivalent means under its and/or any of its Affiliates' blanket insurance programs, provided that such blanket programs fulfill the requirements specified herein and are reasonably acceptable to the Owner;

B.    The blanket insurance programs may include deductibles or risk retention levels; however, the Hotel's responsibility for such deductibles or risk retention levels shall be limited to the Insurance Retention as defined in Section 9.04.C.

C.    All insurance required under Sections 9.01 and Section 9.02 shall be placed in the name of Manager and/or of any of its Affiliates, as Manager deems appropriate.  Such insurance shall include Owner and any Mortgagees specified by Owner as additional insureds.  Any property losses covered by Section 9.01 insurance shall be payable to the respective parties as their interests may appear.  Any Mortgage on the Hotel shall contain provisions to the effect that proceeds of the insurance required by Section 9.01A shall be available for repair and restoration of the Hotel.

D.    Manager shall deliver to the Owner certificates of insurance evidencing the

48

224573 Substitution Page

insurance coverage; with respect to all policies so procured and in the case of insurance policies about to expire, Manager shall deliver to Owner certificates with respect to the renewal thereof. All insurance required herein shall be underwritten by an insurer or insurers reasonably acceptable to the Owners. All such certificates of insurance shall, to the extent obtainable, state that the insurance shall not be canceled or materially changed without at least ninety (90) days prior written notice to the certificate holder.

9.04    Costs and Expenses

A.    The prorated share of the Private Units, Casino and Cogeneration Facility of the costs of (i) insurance premiums, (ii) other insurance costs and expenses (including any insurance deductible), and (iii) uninsured reserves, losses, costs, and expenses for the insurance of Section 9.01A shall be paid by Owner directly to Manager within thirty (30) days of invoice, and not as a Deduction. Each prorated share shall be calculated using the ratio of the individual replacement cost value of the applicable facility to sum of the individual replacement cost values of the Hotel, Casino, Private Units, and Cogeneration Facility as determined by a physical replacement cost appraisal to be conducted by a industry recognized appraiser selected by Marriott International, Inc, at Owner's Expense.

B.    With respect to the Hotel's allocated share of the insurance required in Section 9.01 A and the insurance required in Sections 9.01 B, 9.01 C and 9.02 and/or self-insurance, all (i) insurance premiums, (ii) other insurance costs and expenses (including any insurance deductible), and (iii) uninsured reserves, losses, costs, and expenses shall be treated as costs of such insurance and shall be Deductions.

C.    Upon termination of this Agreement, an escrow fund in an amount acceptable to Manager and Owner shall be established from Total Revenue (or, if Total Revenue is insufficient, with funds provided by Owner) to cover the amount of any insurance deductible and all other costs which may eventually have to be paid by Manager, including those claims which arise after such termination for causes arising during the Term.   "Insurance Retention" means the insurance policy deductible; however for any insurance obtained through the blanket insurance programs, "Insurance Retention" means the Hotel's per occurrence limit for any loss or reserve as established for the Hotel, which limit shall be the same as other similar hotels participating in the blanket insurance programs, or such higher amount if mandated by the insurer for high hazard risks such as earthquake, flood and wind. This paragraph shall survive termination of this Agreement.

9.05    Owner's Option to Obtain Certain Insurance.

Owner may from time to time, at its option, by written notice to Manager procure and maintain any of the insurance specified in Section 9.01.A  and 9.02.B subject to the following terms and conditions which shall control over any contrary provisions in Section 9.01:

A.    If Owner elects to remove the Hotel from Manager's property insurance program and to procure its own property insurance for the Hotel, Owner shall provide Manager written notice of such election at least ninety (90) days prior to the next renewal date of coverage under Manager's property insurance program (which is currently April 1st of each calendar year). If Owner fails to timely provide such notice and procures its own property insurance for the Hotel, Owner shall pay (from its own funds and not as a Deduction) to Manager an amount equal to ten

205961v6                                          49

(10%) of the annual premium under Manager's property insurance program to cover all fixed costs and expenses incurred by Manager for the placement of such property insurance. If the Hotel's participation in Manager's property insurance program terminates on a date that is other than the date on which the then-current coverage expires, then (i) the premiums under each of Manager's property insurance program and Owner's replacement property insurance program shall be prorated as of the date on which Manager receives and approves certificates of insurance evidencing Owner's replacement property insurance coverage in compliance with the requirements of this Section 9.05, and (ii) Owner shall pay to Manager the amount described in the immediately preceding sentence. If Owner terminates the Hotel's participation in Manager's property insurance program in accordance with the foregoing provisions, Owner may subsequently elect to have the Hotel participate in Manager's property insurance program only upon Manager's prior written approval, which Manager may withhold in its sole and absolute discretion.

B.     All insurance procured by Owner pursuant to this Section 9.05 shall be obtained from reputable insurance companies of recognized responsibility and financial standing reasonably acceptable to Manager. All such insurance shall comply with the requirements of Sections 9.01 A and B.

C.     All such policies of insurance shall be carried in the name of Owner, with Manager and its designated Affiliates as additional insureds. Any proceeds there under shall be payable to the respective parties as their interests may appear. The documentation with respect to each Mortgage shall contain provisions to the effect that proceeds of the insurance policies described in Section 9.01 A and B shall be available for repair and restoration of the Hotel.

D.     Owner shall deliver to Manager (i) certificates of insurance for such insurance upon Manager's request, and, (ii) in the case of insurance policies about to expire, certificates with respect to the renewal(s) thereof. All such certificates of insurance shall state that the insurance shall not be cancelled, nonrenewed or materially changed without at least thirty (30) days' prior written notice to the certificate holder.

9.06   Waiver of Subrogation

A.     Owner agrees to waive its rights of subrogation against Manager, its Affiliates which are parties to any Marriott Agreement, and their respective employees, directors and officers for loss or damage to the Hotel, Casino, Private Units and Cogeneration Facility and the equipment therein, improvements thereto, and other related property thereto to the extent of any property insurance coverage obtained by Owner pursuant to this Agreement. If any policies of insurance require an endorsement to effect a waiver of subrogation, the Owner shall cause them to be so endorsed.

B.     Manager agrees to waive its rights of subrogation against Owner, its Affiliates which are party to any Marriott Agreement, and their respective employees, directors and officers for loss or damage to the Hotel, Casino, Private Units and Cogeneration Facility and the equipment therein, improvements thereto, and other related property thereto to the extent of any property insurance coverage obtained by Manager pursuant to this Agreement. If any policies of insurance require an endorsement to effect a waiver of subrogation, the Manager shall cause them to be so endorsed.

205961v6                                  50

ARTICLE X
HOTEL EMPLOYEES

10.01   Hotel Employees

A.    All Hotel Employees shall at all times be the employees of Owner or an Affiliate of Owner except for certain key Hotel Employees who at Manager's election may be employees of Manager or any of its Affiliates.

B.    Manager shall have absolute discretion to hire, terminate, promote, supervise, direct and train all Hotel Employees, to fix their compensation, and generally to establish and maintain all employment policies and practices, including the assignment from time to time of Hotel Employees to work at other hotels within a "cluster" of hotels that includes the Hotel (provided that the related costs are properly allocated). Manager's employment policies and practices shall comply with all applicable Legal Requirements. Each General Manager replacing an out-going General Manager shall be approved by Owner. Manager shall present Owner with two (2) qualified General Manager candidates and Owner shall choose one (1) to be the General Manager of the Hotel.

C.    The payroll and related costs for all Hotel Employees, including salaries, wages, workers' compensation contributions, social security and other taxes and charges, and fringe benefits (including employer contributions to retirement plans, stock incentive plans, tax equalization benefits, overseas premiums, cost of living allowances, mobilization and relocation costs (subject to reasonableness and limitations in frequency), fees and costs related to visas, residence and work permits for Hotel Employees and their dependents, vacations, automobiles, housing for Hotel Employees and their dependents, and schooling for dependents, and including only the allocable portion of the salary and other employee costs of any personnel assigned to a "cluster" of hotels that includes the Hotel), shall be expressed in the Annual Operating Projection and shall be Deductions. Payroll and related costs of Hotel Employees shall not include salaries, wages and other compensation of any corporate, regional office or headquarters office employees of Manager (other than a reasonably allocated portion of the salaries of regional sales personnel), any expenses of Manager's principal or branch offices (other than a reasonably allocated portion of expenses of regional sales offices), and Manager's other corporate general and administrative expenses.

D.    Owner shall (i) sign any required applications for visas, permits to stay, and work permits for Hotel Employees and their dependents, (ii) provide all supporting documents requested by Manager, (iii) upon the request of Manager, enter into second agreements or sponsor Hotel Employees for visas, permits to stay, and work permits, and (iv) otherwise assist and cooperate with Manager in all respects in the process of obtaining visas, permits to stay, and work permits for Hotel Employees and their dependents.

E.    Manager shall determine which, if any, Hotel Employees shall reside at the Hotel and shall ensure that such residence (1) is done in the ordinary course of the Hotel's business, (2) is done in accordance with the usual practices of the hotel industry, and (3) is not (with respect to any individual employee) for more than an aggregate of sixty (60) days in any

205961v6                                          51

MI - 00055

one Fiscal Year.  Manager shall be permitted to provide complimentary accommodations and amenities to its and its Affiliates' employees and representatives living at or visiting the Hotel in connection with the management or operation of the Hotel.  No Person shall otherwise be given gratuitous or discounted accommodations or services without prior approval of Owner and Manager except in accordance with the usual practices of the hotel and travel industry. Anticipated gratuitous and discounted accommodations and amenities for Hotel Employees, Manager's employees and Manager's Affiliates' employees shall be represented in the Annual Operating Projection, and shall be provided consistent with Marriott Chain procedures and policies.

F.       Upon termination of this Agreement, an escrow fund shall be established from Total Revenue (or if Total Revenue is insufficient, with funds provided by Owner or from the Reserve or the LC) to reimburse Manager for all Hotel Employee liability, costs and expenses incurred by Manager arising out of either the transfer or termination of employment of Hotel Employees, including severance and seniority payments, reasonable transfer costs, and unemployment compensation, and complying with any applicable Legal Requirement.   If Manager is terminated due to Manager's Default then such escrow fund shall not include any amount with respect to the key Hotel Employees (who shall be Manager's employees).  With respect to severance and seniority payments, the Hotel shall bear the cost of a reasonable allocation of such expenses based upon each Hotel Employee's time employed at the Hotel. Regarding all such transfer and termination costs and expenses, Manager and Owner shall cooperate in terminating this Agreement in order to minimize such costs and expenses.  This paragraph shall survive termination.

## ARTICLE XI
## DAMAGE, CONDEMNATION, AND EXTRAORDINARY EVENTS

11.01    Damage and Repair

A.       If the Hotel is damaged or destroyed by fire, casualty, or other cause, Owner at its cost and expense shall promptly and diligently begin, prosecute, and complete the repair, rebuilding, or replacement of the damaged or destroyed portion of the Hotel to the same condition as existed immediately prior to such damage or destruction, subject only to the limited exception set forth in Section 11.01 B.  All proceeds from the insurance described in Sections 9.01 A and 9.01 B shall be applied to such repair, rebuilding, or replacement.

B.       If it is determined by the Owner that the available insurance proceeds (exclusive of any deductible or Insurance Retention) are insufficient to pay the cost of such repair, rebuilding, or replacement, then upon Manager or an Affiliate of Manager providing Owner with sixty (60) days written notice that insurance proceeds are insufficient to repair, rebuild or replace and then subsequently obtaining Owner's written consent, Manager or an Affiliate of Manager may contribute to paying the cost of the repair, rebuilding, or replacement an amount equal to the difference between the total cost of such repair, rebuilding, or replacement and the amount of insurance proceeds available up to and including a deficit of fifteen percent (15%) of Total Project Cost.  Such contribution by Manager or an Affiliate of Manager shall be in the form of a ten- (10-) year loan to Owner at an interest rate equal to the rate of Owner's then-existing first-priority Mortgage on the Hotel, or if no such Mortgage exists on the Hotel at that time, then at an interest rate of LIBOR plus two percent (LIBOR + 2%).  If the holders of any existing Mortgages

MI - 00056

so agree, such loan shall be secured by a security interest in the Hotel, which in any event shall be subordinated to any existing debt financing or re-financing. If Manager or one of its Affiliates decline to make such loan to Owner, then Owner shall have no obligation to repair, rebuild or replace the damaged or destroyed portion of the Hotel, and then either party shall be entitled to terminate this Agreement.

If the Hotel is damaged or destroyed by fire, casualty, or other cause during the last five (5) years of the then-present Initial Term and/or Renewal Term, and it is determined by Owner that the available insurance proceeds (exclusive of any deductible or Insurance Retention) are sufficient to pay the cost of such repair, rebuilding, or replacement, then Owner, at its sole discretion, may decide not to repair, rebuild or replace such damage or destruction and this Agreement shall terminate; provided, however, that if Owner begins to repair, rebuild or replace such damage or destruction at any time prior to the end of the fortieth (40th) Fiscal Year after the Effective Date, then this Agreement shall be reinstated between Owner and Manager from the date of such termination for the remainder of the Term.

11.02   Condemnation

A.   If only a part of the Hotel shall be taken and the taking of such part does not make it financially or operationally unreasonable or imprudent, in Owner's and Manager's reasonable opinion, to operate the remaining portion as a hotel (of the standard of operation then applicable to the Hotel), this Agreement shall not terminate and out of the award to Owner so much thereof as shall be reasonably necessary to repair any damage to the Hotel or any part thereof, or to alter or modify the Hotel or any part thereof, so as to render the Hotel a complete and satisfactory architectural unit as a first-class, full-service international hotel, shall be used by Owner for such repairs, alterations or modifications.  The remainder of such award, if any, shall be retained by Owner; provided, however, that Manager may separately claim for, prove and receive an award for any separately compensable rights of Manager taken in such condemnation, except that in no event shall Manager's separate action or award result in or cause the amount of any award to Owner to be less than the sum of the cost to repair, alter or modify the Hotel as herein provided, plus the amount of the fair market value of the portion of the Hotel so taken encumbered by this Agreement.

B.   In the case set forth in Section 11.01.A, above, if it is determined by the Owner that the award proceeds are insufficient to pay the cost of repair any damage to the Hotel or any part thereof, or to alter or modify the Hotel or any part thereof, so as to render the Hotel a complete and satisfactory architectural unit as a first-class, full-service international hotel, then upon Manager or an Affiliate of Manager obtaining Owner's consent, Manager or an Affiliate of Manager may contribute to paying the cost of the repair, rebuilding, or replacement an amount equal to the difference between the total cost of such repair, rebuilding, or replacement and the aggregate amount of Owner's and Manager's award proceeds available.  Such contribution by Manager or an Affiliate of Manager shall be in the form of a ten- (10-) year loan to Owner at the Interest Rate.  Such loan shall be secured by a security interest in the Hotel and subordinated to any existing debt financing.  If Manager or one of its Affiliates decline to make such loan to Owner, then Owner shall have no obligation to repair, rebuild or replace the damaged or destroyed portion of the Hotel, and then either party shall be entitled to terminate this Agreement.

MI - 00057

C.   If only part of the Hotel shall be taken or condemned in any expropriation, compulsory acquisition or like proceeding for a temporary use (that is, for an aggregate period of time less than 30 days in any 12-month period), then this Agreement shall not terminate and the awards or other proceeds paid on account of such event (other than any portion specifically identified as compensation for lost revenue) shall be included in Total Revenue.  When the period of temporary use shall terminate, Owner shall make all such restoration, repairs and alterations as shall be necessary to restore the Hotel to its condition prior to such condemnation for temporary use. Following such period of temporary use, this Agreement and the Term hereof shall be automatically extended for a period equal to the duration of the period when the Hotel was not available for full occupancy due to such temporary condemnation.

D.   If the whole of the Hotel shall be taken or condemned in any expropriation, compulsory acquisition or like proceeding, or if such a portion of the Hotel shall be so taken as to make it imprudent or unreasonable in Owner's and Manager's opinion, to operate the remaining portion as a hotel of the standard of operation then-applicable to the Hotel, then in either event this Agreement shall be deemed to have terminated as of such time as possession of the Hotel or portion of the Hotel is surrendered or its operation is discontinued as a result of such taking or condemnation. Owner shall receive the whole of any award for any complete taking or condemnation; provided that Manager shall be entitled to receive from any award for such taking or condemnation an equitable apportionment of the portion of such award (if any) identified by the condemning authority as compensation for loss or damages for items related to the ongoing business operations of the Hotel (as opposed to compensation for the real estate and tangible personal property comprising the Hotel), to compensate Manager for the fees and charges that would have been payable in future periods.

11.03   Extraordinary Events

Notwithstanding any other provision of this Agreement to the contrary, if and to the extent that either Owner's or Manager's failure to conform to, keep, perform, fulfill, or satisfy any representation, warranty, covenant, undertaking, obligation, standard, test, or condition set forth in this Agreement is caused by one or more Extraordinary Events, such failure shall not constitute a Default or an Event of Default under this Agreement, and such failure shall not be a Default or an Event of Default for as long as the failure is caused in whole or in part by such Extraordinary Event(s); provided that the party claiming that an Extraordinary Event caused such failure must notify the other party within 60 days after the Extraordinary Event first begins to affect its performance.

ARTICLE XII
EVENTS OF DEFAULT; REMEDIES

12.01   Events of Default

Subject to Section 11.03, each of the following shall constitute an event of default ("Event of Default") to the extent permitted by applicable law:

A.   The filing of a voluntary petition under any bankruptcy, insolvency or similar law or a petition for reorganization under any bankruptcy, insolvency or similar law by any party, the

205961v6

54

MI - 00058

admission by any party that it is unable to pay its debts as they become due or the consent by any party to an involuntary petition under any bankruptcy, insolvency or similar law;

      B.    The failure to vacate, within 90 days from the date of entry thereof, any order approving an involuntary petition under any bankruptcy, insolvency or similar law by any party;

      C.    The entering of an order, judgment, or decree by any court of competent jurisdiction, on the application of a creditor, adjudicating any party as bankrupt, insolvent or similar status or approving a petition seeking reorganization or appointing a receiver, trustee, judicial manager, or liquidator of all or a substantial part of such party's assets, and such order, judgment, or decree continuing unstayed and in effect for any period of more than 90 days;

      D.    The failure of any party to pay any amount required to be paid pursuant to this Agreement within 10 business days after written notice that such amount has not been paid;

      E.    The failure of any party to procure and maintain the insurance coverage specified in Article IX, which failure shall continue for a period of 30 days after notice thereof to the defaulting party;

      F.    The occurrence of an event of default under the International Services Agreement, the License and Royalty Agreement, the Fee Agreement, or any Manager or Owner default under any Non-Disturbance and Attornment Agreement;

      G.    The failure of any party to perform, keep, or fulfill any of the other material warranties, covenants, undertakings, obligations, standards or conditions set forth in this Agreement, which failure shall continue for a period of more than 30 days following notice thereof by the non-defaulting party (or such longer period of time as is necessary to cure such Default if such failure is not susceptible to being cured within 30 days and the defaulting party shall promptly after such notice diligently begin, prosecute, and complete curing such failure within 90 days); or

      H.    Either party's failure to execute estoppel certificates within 30 days of the other party's request.

12.02  <u>Remedies</u>

      A. If an Event of Default (other than an Event of Default under Section 12.01.F) occurs and while it continues, a non-defaulting party may give to a defaulting party notice of the non-defaulting party's intention to terminate this Agreement upon the expiration of a period of 10 business days from the date of such notice, and unless such notice of termination is withdrawn before the expiration of such 10-business day period, subject to Section 4.03, if applicable, this Agreement shall terminate upon the expiration of such 10-business day period.

      B.    Upon the occurrence of an Event of Default by Owner pursuant to Sections 12.01 D (unless Owner delivers to Manager, prior to the expiration of such 10 business days set forth in Section 12.01.D, written notice of a bona fide dispute with respect to such payment) or 12.01 E, Manager may make such payments on behalf of Owner from amounts otherwise to be paid to or as directed by Owner pursuant to Article V.

MI - 00059

C.       Unless otherwise provided herein, no right or remedy conferred upon or reserved to a non-defaulting party by this Agreement is intended to be or shall be deemed to be exclusive of any other right or remedy herein or by law or equity provided or permitted, but each such right or remedy shall be cumulative of every other right or remedy.  Nothing contained herein shall bar a party's right to obtain injunctive relief under applicable equity rules (including the applicable rules for obtaining restraining orders and preliminary injunctions) against threatened conduct that may cause it to incur loss or damages.

D.       If an Event of Default occurs under Section 12.01.F and the event of default under the other Marriott Agreement leads to the termination of such agreement by the non-defaulting party, the non-defaulting party may give to a defaulting party notice of the non-defaulting party's intention to terminate this Agreement upon the expiration of a period of 10 business days from the date of such notice, and unless such notice of termination is withdrawn before the expiration of such 10-business day period, this Agreement shall terminate upon the expiration of such 10-business day period.

ARTICLE XIII
ASSIGNMENT

13.01   Assignment

A.       Except as otherwise provided in this Agreement, no party shall assign or transfer or permit the direct or indirect assignment or transfer of this Agreement without the prior consent of the other.

B.       Manager shall have the right without consent to assign its interest in this Agreement to any of its Affiliates so long as all necessary licenses and permits for the conduct of Manager's business are lawfully transferred to or re-issued in the name of such Affiliate, and the Affiliate assumes in writing delivered to Owner and for its benefit all of the obligations and liabilities of Manager under this Agreement, whether accrued or arising before or after the assignment of this Agreement to the Affiliate (in which case the assigning Manager shall be relieved of its obligations under this Agreement and the assignee shall be deemed to be the Manager for purposes of this Agreement) and Guarantor (and any third party Holding Owner, representations or undertakings with respect to the status of Guarantor) confirms in writing the continuing validity of the guarantee under that certain Guarantee in favor of Owner dated as of the date of this Agreement.

C.       Nothing in this Agreement shall prevent (i) the transfer of this Agreement in connection with a merger, consolidation, or sale of all or substantially all of the hotel management assets of Manager or an Affiliate that Controls Manager (in which case the assigning Manager shall be relieved of its obligations under this Agreement and the assignee shall be deemed to be the Manager for purposes of this Agreement) so long as Guarantor (and any third party affording Owner representations or undertakings with respect to the status of Guarantor) confirms in writing the continuing validity of its guarantee under that certain Guarantee in favor of Owner dated as of the date of this Agreement, or (ii) an assignment or transfer of this Agreement in connection with any Hotel Sale permitted by this Agreement, so

MI - 00060

long as the assignee or transferee assumes all of the accrued liabilities of the assignor or transferor.

D.     If any party consents to an assignment or transfer of this Agreement by the other, no further assignment or transfer shall be made without the consent of such party unless such assignment or transfer may otherwise be made without such consent pursuant to this Agreement. Unless otherwise specified in this Agreement or otherwise agreed by Owner and Manager, an assignment by either Owner or Manager of its interest in this Agreement shall not relieve the assignor from its obligations under this Agreement.

E.     Owner shall have the right to assign or transfer this Agreement to any Person unless any of the following conditions applies: (i) such Person (which shall also include the Person controlling such Person) does not have the financial resources and liquidity necessary to fulfill Owner's obligations under this Agreement; (ii) such Person (or any of its Affiliates) is by common reputation engaged in criminal activities or an associate or agent of criminals or is by common reputation Controlled by a Person or Persons engaged in criminal activities or an associate or agent of criminals; (iii) such Person (or any of its Affiliates) is commonly considered in the relevant business community to be disreputable, unethical, or dishonest; (iv) such Person owns or operates a distillery, winery or brewery or a distributorship of alcoholic beverages if such ownership or operation might reasonably impair the ability of Manager or any of its Affiliates to obtain or retain liquor licenses for any hotel, restaurant, bar, lounge or other facility (including the Hotel), now or hereafter managed or owned by Manager or any of its Affiliates; (v) Manager or its Affiliates would be prohibited by applicable law from, or would be subject to significant penalties for, doing business with such Person; or (vi) such Person directly or indirectly through any of its Affiliates (as one of its principal lines of business) operates three (3) or more hotels in competition with Manager or any of its Affiliates. (Neither an ownership nor other financial interest in any such hotel shall in and of itself constitute such competition.) If Owner and Manager disagree whether any of items (i) through (vi) apply with regard to an assignment or transfer, then the dispute shall be arbitrated in accordance with Section 15.07, below.

ARTICLE XIV
HOTEL SALE

14.01   Hotel Sale

A.     Owner shall not enter into any agreement providing for a Hotel Sale to any Person to which Owner would be prohibited from assigning or transferring this Agreement pursuant to Section 13.01 E. Owner may sell the Hotel provided that, as part of such Hotel Sale, Owner shall deposit the amount of any existing monetary Event of Default into an escrow account at a bank designated by Manager and pursuant to an escrow agreement satisfactory to Manager.

B.     No Hotel Sale shall reduce or otherwise adversely affect: (i) the then-current level of Operating Funds; (ii) the then-current amount in the Reserve; or (iii) any of the operational bank accounts maintained by Manager pursuant to this Agreement.

MI - 00061

C.     Subject to any Non-Disturbance and Attornment Agreement entered into pursuant to Section 3.03, Manager shall have the right to terminate this Agreement, on 30 days notice, if title to or possession of the Hotel is transferred by judicial or administrative process (including a Foreclosure, a sale pursuant to an order of a bankruptcy court, or a sale by a court-appointed receiver) to a Person that would not qualify as a permitted transferee under Section 13.01 E, regardless of whether such transfer is the voluntary action of the transferring Owner, or whether (under applicable law) Owner is in fact the transferor.

D.     Upon request of Manager and specifically subject to strict confidentiality in accordance with this Agreement, Owner shall deliver to Manager a list of the names and addresses or other reasonable identification of each direct and indirect owner of capital stock, partnership interest, or other ownership or equity interest in Owner, but if there is a Controlling interest or combination of interests, then Owner needs only to report such Controlling interest holder or holders.  Other than transfers between or among existing owners, and transfers to immediate family members, and transfers to family-controlled trusts, Owner shall cause each of such owners to comply with the provisions of Section 14.01 and the rights of first negotiation set forth in Section 14.02 in connection with any transfer of control of the equity interest in Owner.

E.     The terms and provisions of this Agreement shall be binding upon all successors to Owner's interest in the Site and/or the Hotel.  Subject to the terms of any Non-Disturbance and Attornment Agreement, each selling Owner shall be obligated to Manager to obtain from each buying Owner an assumption of this Agreement that is reasonably satisfactory to Manager, and this obligation of the selling Owner (as well as all other obligations under this Agreement) shall survive any Hotel Sale and any Termination of this Agreement.

14.02   Right of First Negotiation

A.     Owner shall not enter into any binding agreement with any party to consummate any Hotel Sale without first giving at least thirty (30) days prior written notice of (the " Notice") to Manager stating Owner's intent to sell the Hotel.  For a period of thirty (30) days after Manager's receipt of such notice from Owner, Manager and Owner shall engage in a good faith discussion to determine if the parties can reach agreement with respect to Manager's purchase of the Hotel.

B.     If Owner and Manager fail to reach agreement with respect to Manager's purchase of the Hotel within such thirty (30) day period, Owner shall be free to consummate a Hotel Sale with any third party at any purchase price and subject to any other terms and conditions.  Manager's rights under this Section 14.02 are in addition to, and not in lieu of or exclusive of, Manager's rights under Section 14.01.  Manager's rights under Sections 14.01 and 14.02 shall be effective from the Effective Date until the termination of this Agreement.

C.     If Owner fails to consummate a Hotel Sale within 12 months following the delivery of a Notice to Manager, Owner shall afford Manager a new Notice in accordance with Section 14.02 A before entering into any binding agreement with any party to consummate any Hotel Sale.

MI - 00062

ARTICLE XV
MISCELLANEOUS

15.01   Right to Make Agreement

A.     Each party represents, warrants and covenants, with respect to itself, that neither its execution of this Agreement nor the performance of its obligations hereunder: (i) violates any provision of law or any judgment, writ, injunction, order, or decree of any court or governmental authority having jurisdiction over it or any of its Affiliates; (ii) results in or constitutes a material breach or material default under any indenture, contract, commitment, or restriction to which it or any of its Affiliates is a party or by which it or any of its Affiliates is bound; or (iii) requires any consent, vote, or approval which has not been given or taken, or at the time of the transaction involved shall not have been given or taken. Each party represents and warrants that it has the full right and authority to enter into this Agreement. Each party represents and warrants that it and its Affiliates have and covenants that it and its Affiliates shall continue to have through the Term the full right and authority to perform its obligations hereunder.

B.     Each party represents and warrants that this Agreement constitutes a legal, valid and binding obligation of such party, enforceable against such party in accordance with its terms.

C.     Each party shall indemnify, defend, and hold harmless the other party from and against all Damages based on or arising from any breach of this Section 15.01.

15.02   Consents, Approvals, and Agreements; No Warranties

A.     Unless otherwise provided, wherever in this Agreement the consent, approval, or agreement of Owner or Manager is required, such consent, approval, or agreement shall not be unreasonably withheld, delayed, or conditioned, shall be in writing, and shall be executed by a duly authorized officer or agent of the party granting such consent, approval, or agreement. Unless otherwise provided, if either Owner or Manager fails to respond affirmatively or negatively within 30 days or as otherwise specified in this Agreement to a request by another party for a consent, approval, or agreement, such consent, approval, or agreement shall be deemed to have been given.

B.     Except as specifically provided in this Agreement, Manager makes no representation, warranty, or guarantee upon which Owner may rely.  Manager assumes no liability or obligation to Owner by providing (or denying) any waiver, approval, consent, agreement, or suggestion to Owner in connection with this Agreement.

C.     Except as specifically provided in this Agreement, Owner makes no representation, warranty, or guarantee upon which Manager may rely. Owner assumes no liability or obligation to Manager by providing (or denying) any waiver, approval, consent, agreement, or suggestion to Manager in connection with this Agreement.

MI - 00063

15.03    Relationship

        In the performance of this Agreement, Manager shall act solely as an independent contractor. Neither this Agreement nor any agreements, instruments, documents, or transactions contemplated hereby shall in any respect be interpreted, deemed or construed as making Manager a partner, joint venturer with, or agent of, Owner. Owner and Manager agree that neither party will make any contrary assertion, claim or counterclaim in any action, suit, Expert resolution pursuant to Section 15.12, arbitration or other legal proceedings involving Owner and Manager.

15.04    Procurement Affiliates

        Manager may contract with one or more Procurement Affiliates to provide goods or services to the Hotel, provided that all such contracts or arrangements are disclosed to Owner in writing, and the prices or fees paid for such goods or services are competitive with the net prices or fees charged by reputable and qualified Persons for comparable goods or services, taking into account any rebates and/or discounts for volume purchasing made available by such reputable and qualified Persons. In determining whether goods or services are comparable, Manager may consider quality, competence of provider, availability, timeliness and reliability of delivery, and other relevant factors. In determining whether such prices or fees are competitive, goods or services may be grouped in reasonable categories. The prices and/or fees paid may include overhead and the allowance of a reasonable return to Manager and its Affiliates (or companies in which Manager has an ownership interest if such interest is not sufficient to make such a company an Affiliate), provided that the all-in fees to Manager and its Affiliates are not higher than the all-in fees available from qualified competitive services. Additionally, Manager may contract for the purchase of goods and services with third parties that have contractual relationships with Manager, Marriott and their Affiliates so long as the prices charged by such third parties are competitive, taking into account any rebates and/or discounts for volume purchasing made available by such third parties. Owner acknowledges and agrees that, with respect to any purchases or services pursuant to this Section 15.04, Manager and its Affiliates may keep any allowances, credits, rebates, commissions and discounts, taking into account any rebates and/or discounts for volume purchasing in connection with such purchases or services.

15.05    Confidentiality

        A.    The parties hereto agree that the matters set forth in this Agreement and all statements, reports, projections and other information relating to the operation of the Hotel or to any other hotel in the Marriott Chain are strictly confidential, and each party shall make every effort to ensure that the information is not disclosed to any Person (including the press) other than a party hereto without the prior written consent of the other party; provided, however, Owner and Manager may disclose information relating to the Hotel to their current and prospective lenders, buyers and investors (subject to the limitations in Section 15.05.B, below), their attorneys and their consultants, and as may be required by any Legal Requirement and as may be reasonably necessary to obtain licenses, permits, and other public approvals necessary for the refurbishment or operation of the Hotel, or in connection with Owner's financing of the Hotel, a Hotel Sale, or a sale of a controlling interest in Owner, Manager, or Marriott (except any financing or sale involving a private or public offering of securities). Notwithstanding the foregoing, Manager (and any other Marriott Company) may use any Intellectual Property for any

purpose (including, without limitation, the use of such Intellectual Property at the Hotel or at other hotels in the Marriott Chain) and may use any information described in the first sentence of this Section 15.05.A to the extent reasonably necessary for the benefit of the Hotel or other hotels in the Marriott Chain.

     B.    No reference to Manager or any of its Affiliates may be made in any prospectus, private placement memorandum, offering circular, similar document, or any documentation related to any of the foregoing (collectively, "Prospectus") issued by or on behalf of Owner or any of its Affiliates, which is intended to interest potential investors or lenders in the Hotel, unless Manager has previously received and approved a copy of all such references. Regardless of whether Manager so receives and approves all such references, neither Manager nor any of its Affiliates shall be deemed a sponsor of the offering described in the Prospectus or have any responsibility for the Prospectus, and the Prospectus shall clearly state such non-sponsorship and non-responsibility. Unless Manager agrees in advance, the Prospectus shall not include any Marriott Trademarks or the text of this Agreement (or any summary thereof). Owner shall indemnify, defend, and hold Manager and its Affiliates (including their respective directors, officers, shareholders, employees and agents) harmless from and against all Damages and third party claims based on or arising from any Prospectus or the offering described therein, and this obligation shall survive termination. Owner shall comply with all applicable securities laws and regulations and related Legal Requirements relevant to any offering in connection with such Prospectus.

15.06   Applicable Law

    This Agreement is executed pursuant to, and shall be construed under and governed exclusively by, the laws of the State of New York, United States of America without regard to the conflict of law provisions thereof.

15.07   Arbitration

    Except as otherwise specified in this Agreement, any dispute, controversy, claim, breach, termination, or invalidity relating to this Agreement shall be settled by arbitration in accordance with the rules of procedures of the American Arbitration Association (or any similar successor rules thereto) as are in force on the date when a notice of arbitration is received. The appointing authority shall be the American Arbitration Association. The number of arbitrators shall be one unless a party to the arbitration requests otherwise, in which case there shall be three. The language to be used in the proceedings shall be English. The place of arbitration shall be New York, New York, United States of America. The decision of the arbitration board shall be final and binding upon the parties, and such decision shall be enforceable through any courts having jurisdiction. The costs and expenses of arbitration shall be allocated and paid by the parties as determined by the arbitrators.

15.08   Binding Character

    The terms and provisions of this Agreement shall be binding upon all successors and assigns of the parties.

MI - 00065

15.09   Notices

All notices, requests, demands, statements, approvals, consents, and other communications required or permitted to be given under the terms of this Agreement shall be in writing and delivered to the respective party (i) by hand against receipt, (ii) by a reputable overnight/international courier service with package tracking capability, or (iii) by telefax (with receipt confirmed by telephone or a copy delivered by hand or overnight international courier service) at such address as from time to time designated by notice from the respective party to the other party, which initially shall be as follows.

To Owner:

Royal St. Kitts Beach Resort Limited
P.O. Box 858
Frigate Bay, St. Kitts
West Indies
Attention:   REDACTED
Telephone :
Telefax:

With copies to:

ZZen Group
100 Zenway Blvd.
Woodbridge
Ontario L4H-2Y7
CANADA
Attention: REDACTED

Telefax Number:  REDACTED
Telephone Number:  REDACTED

Any Mortgagee identified in writing by Owner from time to time to both the Marriott entities listed below.

To Manager:

Marriott St. Kitts Management Company, Inc.
c/o Marriott International, Inc.
10400 Fernwood Road
Bethesda, MD 20817
Attn.:   REDACTED

Telefax Number:  REDACTED
Telephone Number :  REDACTED

205961v6                              62

MI - 00066

<u>With a copy to Marriott:</u>

Marriott International, Inc.
10400 Fernwood Road
Bethesda, Maryland 20817
United States of America
Attn.: Law Department
Telefax: **REDACTED**
Telephone: **REDACTED**

Any such notice or communication shall be deemed to have been given at the date and time of: (i) receipt or first refusal of delivery, if delivered by hand; (ii) the second day after dispatch, if sent via reputable overnight/international courier service with package tracking capabilities; or (iii) either the date sent (if sent during the receiving party's normal business hours) or next succeeding day on which the receiving party is normally open for business, if sent by telefax and receipt is confirmed in the manner specified above.

15.10    <u>Brokerage</u>

Each of the parties hereby represents and warrants to the other that it has not engaged any broker, consultant or similar Person in connection with the subject matter of the Marriott Agreements. Each party shall indemnify, defend, and hold harmless the other party from and against all Damages based on or arising from any third party claim based on an alleged brokerage, consultancy or similar engagement by the indemnifying party or by any of its Affiliates. Any payment from a party to a broker, consultant, or similar Person shall be borne exclusively by such party and shall not be a Deduction.

15.11    <u>Environmental Matters</u>

A.    At all times during the term of this Agreement, Manager shall fully comply with Environmental Laws applicable to the Hotel and its operations. Manager shall at all times use diligent efforts to determine if any Hazardous Material is being used, released, disposed or discharged at or from the Hotel, including, without limitation, the engagement of professional environmental engineers to perform such environmental studies or tests as may be approved by Owner. If any Hazardous Material is discovered at the Hotel, Manager shall not disturb, release or dispose of (or permit to be disturbed, released or disposed of) any such Hazardous Material except in strict compliance with a remediation and/or removal program approved by Owner. Additionally, without the prior consent of Owner, which may be withheld in its sole and absolute discretion, Manager shall not permit at the Hotel any activity generating any Hazardous Materials as waste or using Hazardous Materials, other than (i) kitchen grease traps, (ii) pool and spa chemicals, fertilizers and pesticides in reasonable quantities relative to the needs of the Hotel which are properly stored, handled and disposed of, (iii) dry cleaning services similar to those performed at other Marriott Chain hotels; and (iv) other operations customarily performed at hotels generally, so long as Manager obtains any necessary permit(s) therefor.

B.    Manager and Owner each agrees to give the other prompt written notice of (1) all liabilities arising out of the use, release, disposal or discharge of Hazardous Materials at or from the Hotel ("Environmental Liability"); (2) all pending, threatened or anticipated

205961v6                                    63

MI - 00067

proceedings, and all notices, demands, requests or investigations, relating to any Environmental Liability or relating to the issuance, revocation or change in any environmental permit or authorization required for operation of the Hotel; (3) all release or discharge of Hazardous Materials at, on, in, under or in any way affecting the Hotel, or any release or discharge of Hazardous Materials known by Owner or Manager, as the case may be, at, on, in or under any property adjacent to the Hotel; and (4) all facts, events or conditions that could reasonably lead to the occurrence of any of the above-referenced matters. Manager and Owner each agrees to defend, indemnify and save harmless the other and its Affiliates from and against any and all Environmental Liabilities to the extent that the same were caused by the intentionally wrongful or grossly negligent acts or omissions of Manager or Owner, as the case may be, or any of their employees, agents or contractors at the Hotel.

15.12    Expert Decisions

Where pursuant to the terms of this Agreement, a matter is to be referred to an Expert for determination, the following provisions shall apply to such Expert's determination:

A.    The use of the Expert shall be the exclusive remedy of the parties and neither party shall attempt to adjudicate any dispute in any other forum. The decision of the Expert shall be final and binding on the parties and shall not be capable of challenge, whether by arbitration or otherwise.

B.    Each party shall be entitled to make written submissions to the Expert and if a party makes any submission it shall also provide a copy to the other party and the other party shall have the right to comment on such submission. The parties shall make available to the Expert all books and records relating to the issues in dispute and shall render to the Expert any assistance requested of the parties. Unless otherwise provided herein, the costs of the Expert and the proceedings shall be borne as directed by the Expert, and the Expert may direct that such costs be treated as Deductions.

C.    The terms of engagement of the Expert shall include an obligation on the part of the Expert to:

1.    notify the parties in writing of his decision within 45 days from the date on which the Expert has been selected (or such other period as the parties may agree or as set forth herein);

2.    (if applicable) apply the System Standards applicable to first class, full-service international hotels that are part of the Marriott Chain and any other standards or objectives set forth in this Agreement pertinent to the matter under dispute;

3.    establish a timetable for the making of submissions and replies; and

4.    any other applicable considerations the Expert sees fit to apply.

15.13   [RESERVED]

205961v6                                   64

15.14   Projections

Owner acknowledges that any written or oral projections, pro formas, or other similar information that has been (prior to execution of this Agreement) or will (during the Term) be provided by Manager or Marriott (or any Affiliate of either) to Owner is for information purposes only, and that Manager, Marriott, and any such Affiliate do not guarantee that the Hotel will achieve the results set forth in any such projections, pro formas, or other similar information. Any such projections, pro formas, or other similar information are based on assumptions and estimates. Unanticipated events may occur subsequent to the date of preparation of such projections, pro formas, and other similar information. Owner specifically acknowledges, without affecting the express rights and obligations of the parties under this Agreement, that Manager has identified certain of the variables that may affect such performance in a memorandum from **REDACTED** to **REDACTED** dated **REDACTED** . Therefore, the actual results achieved by the Hotel are likely to vary from the estimates contained in any such projections, pro formas, or other similar information and such variations might be material. Notwithstanding the foregoing, Manager shall be obligated to exercise its expertise, market and industry knowledge and professional skills in the making of all assumptions, estimates, projections and pro formas.

15.15   [Reserved]

15.16   Waiver

The failure or delay by a party to insist upon strict performance of any provision of this Agreement or to exercise any option, right, or remedy contained in this Agreement shall not constitute a waiver or a relinquishment of such provision, option, right, or remedy for the future. No waiver by a party of any provision of this Agreement shall be deemed to have been made unless expressed in writing and signed by such party.

15.17   Partial Invalidity

The provisions of this Agreement shall be deemed independent and severable. If any provision of this Agreement or the application thereof to any Person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Agreement and the application of such provision to Persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby, and each provision shall be valid and enforceable to the fullest extent permitted by law. Any invalid or unenforceable provision shall be replaced with a provision that is valid and enforceable and most nearly reflects the original intent of the invalid or unenforceable provision.

MI - 00069

15.18   Cooperation

Upon request, Owner and Manager shall cooperate in good faith and exercise reasonable efforts to amend one or more of the Marriott Agreements or substitute one or more agreements for Marriott Agreements for tax planning purposes, provided that such amended or substituted agreement or agreements do not materially and adversely affect the rights or reduce the obligations of Owner and Manager under the Marriott Agreement in effect at such time.  The party requesting any such amendment or substitution shall be responsible for payment of the reasonable costs thereof, including such costs incurred by another party.

15.19   Territorial Restriction

A.   Starting on the Effective Date and ending on the last day of the Term (the Restricted Period"), neither Manager, Marriott nor any of Marriott's Affiliates shall directly operate any Restricted Hotel (other than the Hotel) in the Restricted Area without the consent of Owner.

B.   The restrictions stated in Section 15.19.A shall no longer be in effect as of the earlier of the end of the Restricted Period or the termination of this Agreement.

15.20   Language

A.   Owner and Manager acknowledge and agree that the Marriott Agreements have been negotiated, concluded, and executed in the English language.  In order to register the Marriott Agreements with or obtain the approval of necessary government authorities in St. Kitts and/or in the Federation of St. Christopher & Nevis, as local counsel may advise, it may be necessary to translate the Marriott Agreements, in whole or in pertinent part, into Spanish.  Manager and Owner jointly shall organize and supervise the preparation of any such translations, and the costs and expenses associated with the preparation of such translations shall be borne exclusively by Owner and shall not be Deductions.

15.21   Limitation on Recourse.

Notwithstanding any other provision of this Agreement to the contrary, the liability of Owner arising out of or in connection with this Agreement and the transactions and obligations contemplated hereby shall at all times be limited to the interest of Owner in the Hotel, and in any litigation or any other dispute, neither Manager nor any other party shall seek or have recourse to any other asset of Owner or to Owner's partners, members, associates, agents, executives or Affiliates.  Without limiting the foregoing, neither Owner nor any party associated with Owner shall have any liability in excess of Owner's interest in the Hotel for any act by Owner, including liability for the gross negligence, willful misconduct (either prior to or during the Term of or after the expiration or earlier termination of this Agreement) or breach of this Agreement by Owner.

MI - 00070

15.22   Waiver.

    Without affecting the express provisions of this Agreement or the rights and remedies of the parties arising out of the breach of this Agreement, Owner and Manager specifically waive any rights of indemnity otherwise imposed by statutory or common law.

15.23   Entire Agreement

    The following constitute the entire agreement between the parties or their respective Affiliates, supersede all prior understandings and writings, and may be changed only by a writing signed by the parties or their respective Affiliates:   (i) the Marriott Agreements; (ii) any instruments to be executed and delivered pursuant to any of the Marriott Agreements; and (iii) any other writings executed by the parties or their respective Affiliates, which writings are stated to be supplemental to or to amend or restate any of the foregoing agreements.


[The remainder of this page is intentionally blank]

MI - 00071

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed by their duly authorized representatives as of the Effective Date.

ROYAL ST. KITTS BEACH RESORT LIMITED

MARRIOTT ST. KITTS MANAGEMENT COMPANY, INC.

By: REDACTED

By: REDACTED

Name:

Name:

Title: Director

Title: Director

MI - 00072

EXHIBIT A

Marriott "M" Logo



A-1

MI - 00073

EXHIBIT B

Legal Description of the Hotel and the Site

(1) Title Book V2 Folio 41

21.584 acres of land forming part of the Frigate Bay Estate bounded as follows, that is to say by lands of Alceo Zuliani and a Road, by a Road leading to the beach by the foreshore of the Atlantic Ocean;

AND

(2) Title Book V2 Folio 304

All that lot piece or parcel of land containing by admeasurement 4.664 acres forming part of the Frigate Bay Development in the island of St. Christopher bounded and measuring as follows, that is to say by Lands of Alceo Zuliani and a Road and by an unpaved Road all as the same are more particularly described, delineated and set forth on the plan thereof by J.S. Napier, Licensed Surveyor, of Saint Christopher dated 27th June, 1996.

MI - 00074

EXHIBIT C

Private Units

Permanent Private Units

| | | |
|---|---|---|
| 1. | Coral House | Unit #14109 |
| | | Unit #14115 |
| | | Unit #14206 |
| | | Unit #14209 |
| | | Unit #14306 |
| | | Unit #14312 |
| 2. | Ocean House | Unit #15112 |
| | | Unit #15115 |
| | | Unit #15200 |
| | | Unit #15203 |
| | | Unit #15209 |
| | | Unit #15300 |
| | | Unit #15306 |
| 3 | Caribe House | Unit #16203 |
| | | Unit #16209 |
| 4. | Cable Bay House | Unit #17212 |
| | | Unit #17215 |
| | | Unit #17300 |
| | | Unit #17309 |
| | | Unit #17312 |

5.  All Renovation Units

6.  Temporary Private Units

    a.  Until November 1, 2007:

| | |
|---|---|
| Coral House | Unit #14106 |
| Caribe House | Unit #16200 |
| Caribe House | Unit #16206 |
| Caribe House | Unit #16303 |
| Caribe House | Unit #16309 |

    b.  Until November 1, 2007:  All Units in the two Three Story Buildings identified as Middle Island House (Block 1800) and Royal House (Block 1900) which as of the Effective Date are used to house management employees of the Casino and the Hotel.

As of the Effective Date, certain rooms that previously were Private Units shall become Guest Rooms. The Temporary Private Units will be used as Private Units until the date noted when such units will become part of the Hotel subject to any retrofitting or modification needed to make such units consistent with the conditions of other Hotel guest rooms located in the three

C-1

MI - 00075

story buildings of the Hotel. Any costs incurred to retrofit, clean or modify such units in order to bring any such unit into the same condition as other Hotel guest rooms, except for the labor costs of Hotel Employees and general cleaning supplies, shall be allocated to: a) the Hotel to the extent the Guest Room was primarily used to House Hotel Employees, b) the Casino to the extent the Guest Room was primarily used to House Casino Employees and c) the Owner for all other retrofitted Guest Rooms.

MI - 00076

EXHIBIT D

Casino Description

A casino comprising an aggregate area of approximately 51,596 square feet constituted as follows:

| | | | |
|---|---|---|---|
| (i) | Ground Floor | - | Administration Area – 8,096 square feet |
| (ii) | First Floor | - | Gaming Area – 26,796 square feet |
| | | - | Administration Area – 2,314 square feet |
| (iii) | Second Floor | - | Administration Area – 6,590 square feet |
| | | - | Apartment Dwellings – 7,800 square feet |

D-1

MI - 00077

EXHIBIT E

Restricted Area Map



MI - 00078

**EXHIBIT F**
**Resort Complex Diagram**



F-1

MI - 00079

EXHIBIT G
Internet Gaming Letter Agreement          REDACTED   P. 02

JAN-07-2003  18:38    MORL

# Marriott

Marriott Lodging                 Marriott Drive, Dept. 921.43
Corporate Headquarters           Washington, D.C. 20058

# REDACTED

December 27, 2002

REDACTED
Chairman                  *Royal St Kitts Beach Resort Limited*
Royal Group Technologies Ltd.
One Royal Gate Blvd.
Woodbridge, Ontario
Canada L4L 8Z7

Re: St. Kitts Marriott Resort

Dear Vic:                                         *its*

Further to our discussions regarding adding the words "and the Royal Beach Casino" in the logo of the St. Kitts Marriott Resort, we recognize the ownership's desire to modify the name to include the casino and believe we have reached a satisfactory resolution of the issues. First, we would like to confirm our understanding that neither *none of* Royal Group Technologies Ltd. nor the Owner or any of their respective Affiliates, officers, directors, or shareholders will operate or be associated with any Internet gaming during the Term of the Management Agreement *or long as Internet gaming is illegal in the United State of America.*

In addition, based on further review by our Casino Oversight Committee, Marriott is agreeable to including the words "and the Royal Beach Casino" in the logo of the St. Kitts Marriott Resort provided we are in agreement on the following conditions:

1.    Owner and Royal Group Technologies Ltd. will defend and indemnify Marriott International, Inc. and its Affiliates for any and all liabilities, costs and expenses that may be incurred (whether in St. Kitts or elsewhere) as a result of any claims by third parties arising out of or relating to Marriott's use of the Royal name and mark in connection with the Hotel and Casino , including without limitation attorneys' fees and other litigation costs, costs of changing signage, logos, advertising, written materials, etc. Owner will promptly file (or has already filed) and diligently prosecute an application to register the "Royal" mark for gaming services on the St. Kitts Trademark Register.
                          *Beach Casino*

2.    The name "Royal" will be used only in connection with the Casino and not in connection with the Hotel. The combined name of the Hotel and Casino resort will be the "St. Kitts Marriott Resort and the Royal Beach Casino," and Sections 3.07(B)(1)(f) and 8.01 of the Management Agreement regarding the naming of the Hotel and the Casino are modified accordingly. Owner hereby grants to Marriott and its Affiliates a

JAN-07-2003  19:04          RGTL                              P.02

G-1

MI - 00080

worldwide royalty-free license to use the "Royal" and "Royal Beach Casino" marks specifically in connection with the Hotel and the Casino for the term of the Management Agreement, including all renewal terms.

If you are in agreement with the conditions and understandings reflected in this letter, please countersign in the space provided below and send it back to us as soon as possible, as marketing efforts using this logo are currently on hold pending resolution of these issues.

Sincerely,

REDACTED

Vice President

CONFIRMED AND AGREED:

REDACTED

Royal Group Technologies Ltd.
For itself and for Royal St. Kitts Beach Resort Limited ("Owner")

By: REDACTED

TOTAL P.03

JAN-07-2003 18:04

G-2

MI - 00081

# EXHIBIT 2

# FEDERATION OF

# ST. CHRISTOPHER AND NEVIS

---

THE COMPANIES ACT, 1996

---

*A PRIVATE COMPANY LIMITED BY SHARES*

---

# MEMORANDUM

AND

# ARTICLES OF ASSOCIATION

OF

MARRIOTT ST. KITTS MANAGEMENT COMPANY, INC.

Incorporated the *16th* day of *January* , ~~19~~ *2001*

---

KELSICK, WILKIN & FERDINAND
Chambers,
Independence Square South,
Basseterre,
St. Kitts, W.I.



SAINT CHRISTOPHER AND NEVIS

THE COMPANIES ACT, 1996 (No. 22 of 1996)

MEMORANDUM OF ASSOCIATION

OF

MARRIOTT ST. KITTS MANAGEMENT COMPANY, INC.

### CONSTITUTION

The Company is to be formed as a private company limited by shares under the Companies Act, 1996, of Saint Christopher and Nevis, as standing amended by any modification or re-enactment thereof for the time being in force and including every Act and Order supplemental thereto or made thereunder.

### Company Name

1.   The name of the Company is **MARRIOTT ST. KITTS MANAGEMENT COMPANY, INC.**

### Limitation of Liability

2.   The liability of the members of the Company is limited to the amount, if any, unpaid on the shares respectively held by each of them.

3.   The Company is a private Company.

4.   The Company is of unlimited duration.

### SHARE CAPITAL

### Authorised Capital

5.   The Company shall have the authority to issue **100** shares of a stated value of **US$10.00** each with power for the Company, insofar as is permitted by the Act, to redeem or purchase any of its shares and to increase or reduce the said capital subject to the provisions of the Act and the Articles of Association of the Company and to issue any part of the capital, whether original, redeemed or increased, with or without any preference, priority or special privilege or subject to any postponement of rights or to any conditions or restrictions and so that unless the conditions of issue shall otherwise expressly declare every issue of shares whether declared to be preference or otherwise shall be subject to the powers hereinbefore contained.

1

### Payment of Shares

6.  The amount payable on the issue of any shares in the capital of the Company in respect of the stated value of such shares and the premium (if any) shall be paid for according to the terms of allotment or otherwise by calls as the directors of the Company shall think fit.

7.  Any shares in the capital of the Company may be issued in payment or part payment of the purchase consideration for any property or rights acquired by the Company or in consideration for services rendered in or about the conduct of the Company's business and for shares so allotted and issued no money payment shall be made or required, save in so far as by the terms and provisions under which any of such shares may respectively be allotted and issued, a money payment therefor may be required.

### OTHER PROVISIONS

### Registered Office

8.  The Company shall at all times have a registered office in the Federation and on incorporation the situation of its registered office shall be that specified in the statement required to be given to the Registrar of Companies pursuant to section 8 of the Act.

9.  The Company may change the situation of its registered office from time to time by giving notice to the Registrar of Companies.

### Capacity of Company

10. The Company has the capacity to engage in any lawful acts or activities.

11. The Company shall have a Common Seal to be affixed in accordance with the Articles of Association.

### Amendment of Memorandum

12. Subject to the Act, the Company may from time to time by special resolution alter or amend this memorandum of association in whole or in part.

2

I, **ELIZABETH A KELSICK** the person whose name and address is subscribed, am desirous of being formed into a company, in pursuance of this Memorandum of Association, and I agree to take the number of shares in the capital of the company set opposite my name.

Dated this 15th day of January 2001.

| NAME AND ADDRESS OF SUBSCRIBER | SHARES |
|---|---|
| ELIZABETH A KELSICK<br>of Frigate Bay<br>St. Kitts<br><br>Solicitor<br>*EMelrin* | ONE |

WITNESS to the above signature:

Signature: *Emile Ferdinand*

Name: *J. EMILE FERDINAND*

Address: *SHADWELL*

*ST. KITTS*

Occupation: *SOLICITOR*

3



SAINT CHRISTOPHER AND NEVIS

THE COMPANIES ACT, 1996 (No. 22 of 1996)



ARTICLES OF ASSOCIATION

OF

MARRIOTT ST. KITTS MANAGEMENT COMPANY, INC.

PRELIMINARIES

Table A

1. The articles contained in Table A shall not apply to the Company.

Interpretation

2. In these presents the words standing in the first column of the table next hereinafter contained, shall bear the meanings set opposite to them respectively in the second column thereof, if not inconsistent with the subject or context.

| Words | Meanings |
|---|---|
| accounting date | The 31st day of December in every year, or such other date as the Board shall appoint. |
| the Act | The Companies Act, 1996, of Saint Christopher and Nevis including any statutory modification or re-enactment thereof for the time being in force. |
| board | A meeting of the directors duly called and constituted or, as the case may be, the directors assembled at a meeting. |
| class of shares | Shall include series of shares. |
| clear days | In relation to the period of a notice means that period excluding the day when the notice is given or deemed to be given and the day for which it is given or on which it is to take effect. |
| debenture | Shall include debenture stock. |

4

| directors | The directors of the Company for the time being or, as the case may be, the directors assembled at a board. |
|---|---|
| the Company | Shall mean the abovenamed Company. |
| executed | Includes any mode of execution. |
| the Federation | The Federation of Saint Christopher and Nevis. |
| holder | In relation to shares means the member who is the holder of the shares. |
| in writing | Written, printed or lithographed or represented by any other substitute for writing, or partly one and partly another. |
| may | Shall be construed as permissive. |
| member | A person who (being an individual or corporation) is the holder of shares in the Company. |
| month | Calendar month. |
| notice | A written notice unless otherwise specifically stated. |
| office | The registered office for the time being of the Company. |
| officers | Any one or more persons (being each an individual) appointed by the directors and for the time being acting as manager or managers (as the case may be) of the Company pursuant to these presents. |
| ordinary resolution | A resolution of the Company in general meeting adopted by a simple majority of the votes cast at the meeting. |
| paid up | Shall include credited as paid up. |
| these presents | The memorandum and articles of association of the Company in their present form or as from time to time altered. |

5

| register | The register of members to be kept pursuant to the Act. |
| seal | The common seal of the Company. |
| secretary | Any one or more officers appointed by the directors to perform any of the duties of secretary of the Company as provided in these presents (including a principal, deputy, assistant, or temporary secretary). |
| shall | Shall be construed as imperative. |
| signed | Includes a signature or representation of a signature affixed by mechanical means. |
| special resolution | Has the meaning given to it by Section 90 of the Act. |

3.   In these presents, unless there be something in the subject or context inconsistent with such construction:-

   (a)   words importing the plural number shall be deemed to include the singular number and words importing the singular number shall be deemed to include the plural number;

   (b)   words importing a particular gender shall include as well any other gender;

   (c)   words importing persons shall include companies or associations or bodies of persons whether corporate or unincorporate;

4.   Words or expressions contained in these presents shall bear the same meaning as in the Act but excluding any statutory modification thereof not in force when these presents become binding on the Company.

5.   The headings herein are for convenience only and shall not affect the construction of these presents.

### Start of Business

6.   The preliminary expenses incurred in forming the Company shall be the first charge on the funds of the Company.

7.   The business of the Company shall be commenced as soon after incorporation of the Company as the directors think fit.

8. Any branch or kind of business which by these presents is either expressly or by implication authorised to be undertaken by the company may be undertaken by the directors at such time or times as they shall think fit, and further may from time to time be suffered by them to be in abeyance, whether such branch or kind of business may have been actually commenced or not, so long as the directors may deem it expedient not to commence or proceed with such branch or kind of business.

### SHARE CAPITAL

### Alteration of Share Capital

9. Subject to the Act, the Company may by altering its memorandum

(a) increase its share capital by creating new shares of such amount and in such currency or currencies as it thinks expedient;

(b) consolidate and divide all or any of its shares (whether issued or not) into shares of larger amount than its existing shares;

(c) convert all or any of its fully paid shares into stock, and re-convert that stock into fully paid shares of any denomination;

(d) sub-divide its shares, or any of them, into shares of smaller amount than is fixed by the memorandum;

(e) convert any of its fully paid shares the stated amount of which is expressed in one currency into fully paid shares of a stated amount of another currency; and

(f) cancel shares which, at the date of the passing of the resolution to cancel them, have not been taken or agreed to be taken by any person, and diminish the amount of the company's share capital by the amount of the shares so cancelled.

10. Unless otherwise directed by the Company in general meeting all new shares to be allotted shall be offered to the members in proportion to the existing shares held by them. Such offer shall be made by notice specifying the number of shares to which the member is entitled and limiting a time within which the offer, if not accepted, will be deemed to be declined. All such shares, if offered to the members and not taken up by them, shall be disposed of by the directors in such manner as they think most beneficial to the Company.

7

## Variation of Class Rights

11.   Whenever the capital of the Company is divided into different classes of shares, the special rights attached to any class, unless otherwise provided by the terms of issue of that class may be varied if, but only if

   (a)   the holders of two-thirds in stated value of the shares of the class consent in writing to the variation; or

   (b)   a special resolution passed at a separate meeting of the holders of that class sanctions the variation.

12.   To every such separate meeting all the provisions of these presents relating to general meetings or to the proceedings thereat shall, mutatis mutandis, apply.   If any proposed amendment would alter or otherwise change the powers, preferences, rights, qualifications, limitations or restrictions (as the case may be) of one or more series of any class of shares, but shall not so affect the entire class of shares, then only the shares of the series affected by the amendment shall be considered a separate class of shares for the purpose of this article.

13.   Any alteration of a provision in these presents for the variation of the rights attached to a class of shares, or the insertion of any such provision into these presents is itself to be treated as a variation of those rights.

14.   If the rights attached to any class of shares are varied, the holders of not less in the aggregate than one-tenth in stated value of shares of the class (being persons who did not consent to, or vote in favour of a resolution for the variation) may apply to the Court to have the variation cancelled and, if such an application is made, the variation has no effect unless and until it is confirmed by the Court.

## Issue of Shares

15.   Subject to the provisions of the Act -

   (a)   without prejudice to any rights attached to any issued shares, any share may be issued with such rights or restrictions as the Company may by ordinary resolution direct, or subject to or in default of any such direction, as the directors may determine;

   (b)   the Company may -

8

(i)   issue, or

(ii)  convert any existing non-redeemable shares, whether issued or not, into

shares which are to be redeemed, or are liable to be redeemed at the option of the Company or the shareholder, on such terms and in such manner as may be determined by special resolution;

(c)   subject to **articles 9 and 10**, unissued shares shall be at the disposal of the directors who may allot, grant options over or otherwise dispose of them to such persons and on such terms as the directors think fit, provided always, that no share shall be issued at a discount to its stated value.

16.   The Company may by ordinary resolution –

(a)   make arrangements on the allotment of shares for a difference between the shareholders in the amounts and times of payments of calls on their shares;

(b)   accept from a member the whole or a part of the amount remaining unpaid on shares held by him, although no part of that amount has been called up;

(c)   pay dividends in proportion to the amount paid up on each share where a larger amount is paid up on some shares than on others.

17.   The Company may exercise the powers of paying commissions conferred by the Act.  Subject to the provisions of the Act, any such commission may be satisfied by the payment of cash or by the allotment of fully or partly paid shares or partly in one way and partly in the other.

18.   Except as required by law, no person shall be recognised by the Company as holding any share upon any trust and (except as otherwise provided by the articles or by law) the Company shall not be bound by or recognise any interest in any share except an absolute right to the entirety thereof in the holder.

**Share Certificates**

19.   Every member, upon becoming the holder of any shares, shall be entitled without payment to one certificate for all the shares of each class held by him (and, upon transferring a part of his holding of shares of any class, to a certificate for the

9

balance of such holding) or several certificates each for one or more of his shares upon payment for every certificate after the first of such reasonable sum as the directors may determine. Every certificate shall be sealed with the seal and shall specify the number, class and distinguishing numbers (if any) of the shares to which it relates. The company shall not be bound to issue more than one certificate for shares held jointly by several persons and delivery of a certificate to one joint holder shall be a sufficient delivery to all of them.

20.   If a share certificate is defaced, worn out, lost or destroyed, it may be renewed on such terms (if any) as to evidence and indemnity and payment of the expenses reasonably incurred by the Company in investigating evidence as the directors may determine but otherwise free of charge, and (in the case of defacement or wearing out) on delivery up of the old certificate.

21.   Where the Company is authorised under the Act to issue bearer certificates for fully paid registered shares such certificates may be issued by the Company upon such terms and subject to such conditions as shall be determined by the directors.   The provisions of the articles with respect to transfer and transmission of shares shall not apply in respect of the shares to which a bearer certificate relates.

Lien

22.   The Company shall have a first and paramount lien on every share (not being a fully paid share) for all moneys (whether presently payable or not) payable at a fixed time or called in respect of that share.   The directors may at any time declare any share to be wholly or in part exempt from the provisions of this article.   The company's lien on a share shall extend to any amount payable in respect of it.

23.   The Company may sell in such manner as the directors determine any shares on which the Company has a lien if a sum in respect of which the lien exists is presently payable and is not paid within 14 clear days after notice has been given to the holder of the share or to the person entitled to it in consequence of the death or bankruptcy of the holder, demanding payment and stating that if the notice is not complied with the shares may be sold.

24.   To give effect to a sale the directors may authorise some person to execute an instrument of transfer of the shares sold to, or in accordance with the directions of, the purchaser. The title of the transferee to the shares shall not be affected by an irregularity in or invalidity of the proceedings in reference to the sale.

10

25.  The net proceeds of the sale, after payment of the costs, shall be applied in payment of so much of the sum for which the lien exists as is presently payable, and any residue shall (upon surrender to the Company for cancellation of the certificate for the shares sold and subject to a like lien for any moneys not presently payable as existed upon the shares before the sale) be paid to the person entitled to the shares at the date of the sale.

### Calls on Shares and Forfeiture

26.  Subject to the terms of allotment, the directors may make calls upon the members in respect of any moneys unpaid on their shares (whether in respect of stated value or premium) and each member shall (subject to receiving at least 14 clear days' notice specifying when and where payment is to be made) pay to the Company as required by the notice the amount called on his shares.  A call may be required to be paid by instalments.  A call may, before receipt by the Company of any sum due thereunder, be revoked in whole or part and payment of a call may be postponed in whole or part.  A person upon whom a call is made shall remain liable for calls made upon him notwithstanding the subsequent transfer of the shares in respect whereof the call was made.

27.  A call shall be deemed to have been made at the time when the resolution of the directors authorising the call was passed.

28.  The joint holders of a share shall be jointly and severally liable to pay all calls in respect thereof.

29.  If a call remains unpaid after it has become due and payable the person from whom it is due and payable shall pay interest on the amount unpaid from the day it became due and payable until it is paid at the rate fixed by the terms of allotment of the share or in the notice of the call or at such rate not exceeding ten per cent per annum as the directors may determine but the directors may waive payment of the interest wholly or in part.

30.  An amount payable in respect of a share on allotment or at any fixed date, whether in respect of stated value or premium or as an instalment of a call, shall be deemed to be a call and if it is not paid the provisions of the articles shall apply as if that amount had become due and payable by virtue of a call.  The company may accept from a member the whole or a part of the amount remaining unpaid on shares held by him, although no part of that amount has been called up.

31. Subject to the terms of allotment, the Directors may make arrangements on the issue of shares for a difference between the holders in the amounts and times of payment of calls on their shares.

32. If a call remains unpaid after it has become due and payable the directors may give to the person from whom it is due not less than 14 clear days' notice requiring payment of the amount unpaid together with any interest which may have accrued. The notice shall name the place where payment is to be made and shall state that if the notice is not complied with the shares in respect of which the call was made will be liable to be forfeited.

33. If the notice is not complied with any share in respect of which it was given may, before the payment required by the notice has been made, be forfeited by a resolution of the directors and the forfeiture shall include all dividends or other moneys payable in respect of the forfeited shares and not paid before the forfeiture.

34. Subject to the provisions of the Act, a forfeited share may be sold, re-allotted or otherwise disposed of on such terms and in such manner as the directors determine either to the person who was before the forfeiture the holder or to any other person and at any time before sale, reallotment or other disposition, the forfeiture may be cancelled on such terms as the directors think fit. Where for the purposes of its disposal a forfeited share is to be transferred to any person the directors may authorise some person to execute an instrument of transfer of the share to that person.

35. A person any of whose shares have been forfeited shall cease to be a member in respect of them and shall surrender to the Company for cancellation the certificate for the shares forfeited but shall remain liable to the Company for all moneys which at the date of forfeiture were presently payable by him to the Company in respect of those shares with interest at the rate at which interest was payable on those moneys before the forfeiture, or at such rate not exceeding ten per cent per annum as the directors may determine, from the date of forfeiture until payment, but the directors may waive payment wholly or in part or enforce payment without any allowance for the value of the shares at the time of forfeiture or for any consideration received on their disposal.

36. A declaration under oath by a director or the secretary that a share has been forfeited on a specified date shall be conclusive evidence of the facts stated in it as against all

persons claiming to be entitled to the share and the declaration shall (subject to the execution of an instrument of transfer if necessary) constitute a good title to the share and the person to whom the share is disposed of shall not be bound to see to the application of the consideration, if any, nor shall his title to the share be affected by any irregularity in or invalidity of the proceedings in reference to the forfeiture or disposal of the share.

## Transfer of Shares

37. The instrument of transfer of a share may be in any usual form or in any other form which the directors may approve and shall be executed by or on behalf of the transferor and, unless the shares are fully paid, by or on behalf of the transferee.

38. The directors may refuse to register the transfer of a share which is not fully paid to a person of whom they do not approve and they may refuse to register the transfer of a share on which the Company has a lien.  They may also refuse to register a transfer unless the instrument of transfer -

   (a) is lodged at the office or at such other place as the directors may appoint and is accompanied by the certificate for the shares to which it relates and such other evidence as the directors may reasonably require to show the right of the transferor to make the transfer;

   (b) is in respect of only one class of shares; and

   (c) is in favour of not more than four transferees.

39. If the directors refuse to register a transfer of a share, they shall within 2 months after the date on which the instrument of transfer was lodged with the Company send to the transferor and the transferee notice of the refusal.

40. The registration of transfers of shares or of transfers of any class of shares may be suspended at such times and for such periods (not exceeding 30 days in any year) as the directors may determine.

41. No fee shall be charged for the registration of any instrument of transfer or other document relating to or affecting the title to any share.

42. The company shall be entitled to retain any instrument of transfer which is registered, but any instrument of transfer which the directors refuse to register shall be returned to the person lodging it when notice of the refusal is given.

13

## Transmission of Shares

43. If a member dies, the survivor or survivors where he was a joint holder, and his personal representatives where he was a sole holder or the only survivor of joint holders, shall be the only persons recognised by the Company as having any title to his interest; but nothing herein contained shall release the estate of a deceased member from any liability in respect of any share which had been jointly held by him.

44. A person becoming entitled to a share in consequence of the death or bankruptcy of a member may, upon such evidence being produced as the directors may properly require, elect either to become the holder of the share or to have some person nominated by him registered as the transferee. If he elects to become the holder he shall give notice to the Company to that effect. If he elects to have another person registered he shall execute an instrument of transfer of the share to that person. All the articles relating to the transfer of shares shall apply to the notice or instrument of transfer as if it were an instrument of transfer executed by the member and the death or bankruptcy of the member had not occurred.

45. A person becoming entitled to a share in consequence of the death or bankruptcy of a member shall have the rights to which he would be entitled if he were the holder of the share, except that he shall not, before being registered as the holder of the share, be entitled in respect of it to attend or vote at any meeting of the Company or at any separate meeting of the holders of any class of shares in the Company.

## Consolidation of Shares

46. Whenever as a result of a consolidation of shares any members would become entitled to fractions of a share, the directors may, on behalf of those members, sell the shares representing the fractions for the best price reasonably obtainable to any person (including, subject to the provisions of the Act, the Company) and distribute the net proceeds of sale in due proportion among those members, and the directors may authorise some person to execute an instrument of transfer of the shares to, or in accordance with the directions of, the purchaser. The transferee shall not be bound to see to the application of the purchase money nor shall his title to the shares be affected by any irregularity in or invalidity of the proceedings in reference to the sale.

14

## MEETINGS OF MEMBERS

### General Meeting

47. All general meetings other than annual general meetings shall be called extraordinary general meetings.

48. The Company shall in each year hold a general meeting as its annual general meeting in addition to any other meetings in that year, provided that not more than 22 months shall elapse between the date of one annual general meeting and the date of the next, and provided further that if all members of the Company agree in writing that an annual general meeting shall be dispensed with, then so long as the agreement has effect, it shall not be necessary for the Company to hold an annual general meeting.

49. The directors may call general meetings and, on the requisition of members holding at the date of the deposit of the requisition not less than one-tenth in the stated value of the shares which at that date carry the right of voting at the meeting requisitioned, they shall forthwith proceed to call a general meeting for a date not later than 2 months after the receipt of the requisition.

50. The requisition must state the objects of the meeting, and must be signed by or on behalf of the requisitionists and deposited at the office, and may consist of several documents in similar form each signed by or on behalf of one or more requisitionists.

51. If the directors do not within 21 days from the date of the deposit of the requisition proceed duly to call a meeting to be held within 2 months of that date, the requisitionists, or any of them representing more than one half of the total voting rights of all of them, may themselves call a meeting, but a meeting so called shall not be held after 3 months from that date.

52. A general meeting called as aforesaid by requisitionists shall be called in the same manner, as nearly as possible, as that in which meetings are to be called by directors.

53. If there are not sufficient directors to call a general meeting, any director or any member of the Company may call such a meeting.

### Notice of General Meeting

54. An annual general meeting or a general meeting called for the passing of a special resolution or a resolution appointing a

15

person as a director shall be called by at least 21 clear days' notice.  All other meetings shall be called by at least 14 clear days' notice but a general meeting may be called by shorter notice if it is so agreed –

(a)  in the case of an annual general meeting, by all the members entitled to attend and vote thereat; and

(b)  in case of any other meeting by a majority in number of the members having a right to attend and vote at the meeting being a majority together holding not less than 95 per cent in stated value of the shares giving that right.

55.  The notice shall specify the day, time and place of the meeting and the general nature of the business to be transacted and, in the case of an annual general meeting, shall specify the meeting as such.

56.  Subject to the provisions of the articles and to any restrictions imposed on any shares, the notice shall be given to all the members, to all persons entitled to a share in consequence of the death or bankruptcy of a member and to the directors and auditors, if any.

57.  The accidental omission to give notice of a meeting to, or the non-receipt of notice of a meeting by, any person entitled to receive notice shall not invalidate the proceedings at the meeting.

### Proceedings at General Meetings

58.  If a member is by any means in communication with one or more other members so that each member participating in the communication can hear what is said by any other of them, each member so participating in the communication is deemed to be present at a meeting with the other members so participating.

59.  In the case where a company has only one member, or where all the issued shares of any class of shares in any company are held by only one member, that member present in person or by proxy shall be deemed to constitute a meeting.  In any other case, no business shall be transacted at any meeting unless a quorum is present and, subject as hereinafter otherwise provided, one person entitled to vote upon the business to be transacted, such person being a member or a proxy for a member or a duly authorised representative of a body corporate, shall be a quorum.

60. If a quorum is not present within half an hour from the time appointed for the meeting, or if during a meeting such quorum ceases to be present, the meeting shall stand adjourned to the same day in the next week at the same time and place or such day, time and place as the directors may determine. If at such adjourned meeting, a quorum is not present within half an hour from the time appointed for the meeting, or if during such adjourned meeting a quorum ceases to be present, then those members present in person or by proxy shall be a quorum.

61. The chairman, if any, of the board of directors or in his absence some other director nominated by the directors shall preside as chairman of the meeting, but if neither the chairman nor such other director (if any) is present within 15 minutes after the time appointed for holding the meeting and willing to act, the directors present shall elect one of their number to be chairman and, if there is only one director present and willing to act, he shall be chairman.

62. If no director is willing to act as chairman, or if no director is present within 15 minutes after the time appointed for holding the meeting, those present and entitled to be counted in a quorum shall choose one of their number to be chairman.

63. A director shall, notwithstanding that he is not a member, be entitled to attend and speak at any general meeting and at any separate meeting of the holders of any class of shares in the Company.

64. The chairman may, with the consent of a meeting at which a quorum is present (and shall if so directed by the meeting), adjourn the meeting from time to time and from place to place, but no business shall be transacted at an adjourned meeting other than business which might properly have been transacted at the meeting had the adjournment not taken place. When a meeting is adjourned for 14 days or more, at least 7 clear days' notice shall be given specifying the day, time and place of the adjourned meeting and the general nature of the business to be transacted. Otherwise it shall not be necessary to give any such notice.

65. A resolution put to the vote of a meeting shall be decided on a show of hands unless before, or on the declaration of the result of the show of hands a poll is duly demanded. Subject to the provisions of the Act, a poll may be demanded –

(a) by the chairman; or

(b) by at least two members having the right to vote on the resolution; or

(c) by a member or members representing not less than one-tenth of the total voting rights of all the members having the right to vote on the resolution; or

(d) by a member or members holding shares conferring a right to vote on the resolution being shares on which an aggregate sum has been paid up equal to not less than one-tenth of the total sum paid up on all the shares conferring that right,

and a demand by a person as proxy for a member shall be the same as a demand by the member.

66. Unless a poll is duly demanded a declaration by the chairman that a resolution has been carried or carried unanimously, or by a particular majority, or lost, or not carried by a particular majority and an entry to that effect in the minutes of the meeting shall be conclusive evidence of the fact without proof of the number or proportion of the votes recorded in favour of or against the resolution.

67. The demand for a poll may, before the poll is taken, be withdrawn but only with the consent of the chairman and a demand so withdrawn shall not be taken to have invalidated the result of a show of hands declared before the demand was made.

68. A poll shall be taken as the chairman directs and he may appoint scrutineers (who need not be members) and fix a day, time and place for declaring the result of the poll.   The result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded.

69. In the case of an equality of votes, whether on a show of hands or on a poll, the chairman shall be entitled to a casting vote in addition to any other vote he may have.

70. A poll demanded on the election of a chairman or on a question of adjournment shall be taken forthwith.   A poll demanded on any other question shall be taken either forthwith or at such day, time and place as the chairman directs not being more than 30 days after the poll is demanded.   The demand for a poll shall not prevent the continuance of a meeting for the transaction of any business other than the question on which the poll was demanded.   If a poll is demanded before the declaration of the result of a show of hands and the demand is duly withdrawn, the meeting shall continue as if the demand had not been made.

71. No notice need be given of a poll not taken forthwith if the day, time and place at which it is to be taken are announced

18

at the meeting at which it is demanded.  In any other case, at least 7 clear days' notice shall be given specifying the day, time and place at which the poll is to be taken.

### Votes of Members

72.  Subject to any rights or restrictions attached to any shares-

    (a)   on a show of hands every member present in person or by proxy shall have one vote; and

    (b)   on a poll every member present in person or by proxy shall have one vote for every share of which he is the holder.

73.  Where there are joint holders of any shares, such persons shall not have the right of voting individually in respect of such shares, but shall elect one of their number to represent them and to vote whether in person or by proxy in their name and in default of such election the vote of the joint holder whose name stands first in the register of members in respect of the joint holding who tenders a vote whether in person or by proxy shall be accepted to the exclusion of the votes of the other joint holders.

74.  A member who has appointed special or general attorneys or a member in respect of whom an order has been made by any court having jurisdiction (whether in the Federation or elsewhere) in matters concerning mental disorder may vote, whether on a show of hands or on a poll, by his said attorneys or any curator or other person authorised in that behalf appointed by that court, and any such attorney, curator or other person may, on a poll, vote by proxy.

75.  Any corporation which is a member of the Company may by resolution of its directors or other governing body authorise such person as it thinks fit to act as its representative at any meeting of the Company or of any class of members of the Company and the person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were an individual member of the Company.

76.  Evidence to the satisfaction of the directors of the authority of the person claiming under **article 73, 74 or 75** to exercise the right to vote shall be deposited at the office, or at such other place within the Federation as is specified in accordance with the articles for the deposit of instruments of proxy not less than 48 hours before the time appointed for holding the meeting or adjourned meeting at which the right to

19

vote is to be exercised and in default the right to vote shall not be exercisable.

77. No member shall vote at any general meeting or at any separate meeting of the holders of any class of shares in the Company, either in person or by proxy, in respect of any share held by him unless all moneys presently payable by him in respect of that share have been paid.

78. No objection shall be raised to the qualification of any voter except at the meeting or adjourned meeting at which the vote objected to is tendered, and every vote not disallowed at the meeting shall be valid. Any objection made in due time shall be referred to the chairman whose decision shall be final and conclusive.

### Resolutions in Writing

79. Anything that may be done by a resolution (including a special resolution but excluding a resolution removing an auditor) passed at a general meeting of a Company or at a meeting of any class of members of the Company may be done by a resolution in writing signed by or on behalf of each member who, at the date when the resolution is deemed to be passed, would be entitled to vote on the resolution if it were proposed at a meeting.

80. A resolution in writing may consist of several instruments in the same form each signed by or on behalf of one or more members and any document attached to a resolution in writing shall be deemed to have been laid before a meeting of the members signing the resolution.

81. A resolution in writing shall be deemed to be passed when the instrument, or the last of several instruments, is last signed or on such later date as is specified in the resolution, provided always, that no resolution so signed shall be deemed to be passed if it affects or limits any rule of law relating to the effectiveness of the assent of members, or any class of members, of a company given to any document, act or matter otherwise than at a meeting of them.

### Proxies

82. A member entitled to attend and vote at a meeting may appoint another person as his proxy, or one of more other persons as alternate proxies, to attend and vote instead of him; and a proxy appointed to attend and vote instead of a member has also the same right as the member to speak at the meeting; but when a proxy has conflicting instructions from more than one member, he is not entitled to vote except on a poll.

20

83. An instrument appointing a proxy shall be executed by or on behalf of the appointor and may be made in any usual or common form or in any other form approved by the directors including the following form:-

MARRIOTT ST. KITTS MANAGEMENT COMPANY, INC.

I/WE                                    of

being a Member/Members of the above named Company hereby appoint

of

or failing him
of

as my/our proxy to vote in my/our name and on my/our behalf at the Annual/Extraordinary General Meeting of the Company to be held on
the                    day of                    20  , and
at any adjournment thereof.
This form is to be used in respect of the resolutions mentioned below as follows:
Resolution No. 1 *for*against
Resolution No. 2 *for*against
*Strike out whichever is not desired
Unless otherwise instructed, the proxy may vote as he thinks fit or abstain from voting.

........................          .................
(Signature)                      (Date)

84. The instrument appointing a proxy and any authority under which it is executed or a copy of such authority certified notarially or in some other way approved by the directors may

(a) be deposited at the office or at such other place within the Federation as is specified in the notice convening the meeting or in any instrument of proxy sent out by the Company in relation to the meeting not less than 48 hours before the time for holding the meeting or adjourned meeting at which the person named in the instrument proposes to vote; or

(b) in the case of a poll taken more than 48 hours after it is demanded, be deposited as aforesaid after the poll has been demanded and not less than 24 hours before the time appointed for the taking of the poll; or

(c) where the poll is not taken forthwith but is taken not more than 48 hours after it was demanded, be delivered at the meeting at which the poll was demanded to the chairman or to the secretary or to any director;

21

and an instrument of proxy which is not deposited or delivered in a manner so permitted shall be invalid.

85. A vote given or poll demanded by proxy or by the duly authorised representative of a body corporate shall be valid notwithstanding the previous determination of the authority of the person voting or demanding a poll unless notice of the termination was received by the Company at the office or at such other place at which the instrument of proxy was duly deposited before the commencement of the meeting or adjourned meeting at which the vote is given or the poll demanded or (in the case of a poll taken otherwise than on the same day as the meeting or adjourned meeting) the time appointed for taking the poll.

86. The directors may at the expense of the Company send by post or otherwise to the members instruments of proxy (with or without provision for their return pre-paid) for use at any general meeting or at any separate meeting of the holders of any class of shares of the Company either in blank or nominating in the alternative any one or more of the directors or any other persons. If for the purpose of any meeting invitations to appoint as proxy a person or one of a number of persons specified in the invitations are issued at the Company's expense they shall be issued to all (and not to some only) of the members entitled to be sent a notice of the meeting and to vote thereat.

## DIRECTORS

### Number of Directors

87. Unless otherwise determined by ordinary resolution, the number of directors (other than alternate Directors) shall not be subject to any maximum but shall be not less than **one**.

### Appointment of Directors

88. The first directors of the Company shall be appointed in writing by the subscriber(s) of the memorandum or a majority of them.

89. No person shall be appointed a director at any general meeting unless –

(a) he is recommended by the directors; or

(b) not less than 14 nor more than 35 clear days before the date appointed for the meeting, notice executed by a

22

member qualified to vote at the meeting has been given to the Company of the intention to propose that person for appointment stating the particulars which would, if he were so appointed, be required to be included in the Company's register of directors together with notice executed by that person of his willingness to be appointed.

90. Not less than 7 nor more than 28 clear days before the date appointed for holding a general meeting notice shall be given to all who are entitled to receive notice of the meeting of any person who is recommended by the directors for appointment or reappointment as a director at the meeting or in respect of whom notice has been duly given to the Company of the intention to propose him at the meeting for appointment as a director. The notice shall give the particulars of that person which would, if he were so appointed, be required to be included in the Company's register of directors.

91. Subject as aforesaid, the Company may by ordinary resolution appoint a person who is willing to act to be a director either to fill a vacancy or as an additional director.

92. The directors may appoint a person who is willing to act as a director, either to fill a vacancy or as an additional director, provided that the appointment does not cause the number of directors to exceed any number fixed by or in accordance with the articles as the maximum number of directors. A director so appointed shall hold office only until the next following annual general meeting but shall be eligible for reappointment.

93. If the Company, at the meeting at which a director retires, does not fill the vacancy the retiring director shall, if willing to act, be deemed to have been reappointed unless at the meeting it is resolved not to fill the vacancy or unless a resolution for the reappointment of the director is put to the meeting and lost.

## Disqualification and Removal of Directors

94. The office of a director shall be vacated if –

(a) he ceases to be a director by virtue of any provision of the Act or he becomes prohibited by law from or disqualified from being a director; or

(b) he becomes bankrupt or makes any arrangement or composition with his creditors generally; or

23

(c) he resigns his office by notice to the Company; or

(d) he shall for more than six consecutive months have been absent without permission of the directors from meetings of directors held during the period and the directors resolve that his office be vacated; or

(e) the Company so resolves by ordinary resolution.

## Remuneration of Directors

95. The directors shall be entitled to such remuneration as the Board may determine and, unless the resolution provides otherwise, the remuneration shall be deemed to accrue from day to day.

## Directors' Expenses

96. The directors may be paid all travelling, hotel, and other expenses properly incurred by them in connexion with their attendance at meetings of directors or committees of directors or general meetings or separate meetings of the holders of any class of shares or of debentures of the Company or otherwise in connexion with the discharge of their duties.

## Directors' Appointments and Interests

97. Subject to the provisions of the Act, the directors may appoint one or more of their number to the office of managing director or to any other executive office under the Company and may enter into an agreement or arrangement with any director for his employment by the Company or for the provision by him of any services outside the scope of the ordinary duties of a director. Any such appointment, agreement or arrangement may be made upon such terms as the directors determine and they may remunerate any such director for his services as they think fit. Any appointment of a director to an executive office shall terminate if he ceases to be a director but without prejudice to any claim to damages for breach of the contract of service between the director and the Company.

98. Subject to the provisions of the Act, and provided that he has disclosed to the directors the nature and extent of any material interests of his, a director notwithstanding his office —

(a) may be a party to, or otherwise interested in, any transaction or arrangement with the Company or in which the Company is otherwise interested;

(b)   may be a director or other officer of, or employed by, or a party to any transaction or arrangement with, or otherwise interested in, any body corporate promoted by the Company or in which the Company is otherwise interested; and

(c)   shall not, by reason of his office, be accountable to the Company for any benefit which he derives from any such office or employment or from any such transaction or arrangement or from any interest in any such body corporate and no such transaction or arrangement shall be liable to be avoided on the ground of any such interest or benefit.

99.   For the purposes of **article 98** –

(a)   a general notice given to the directors that a director is to be regarded as having an interest of the nature and extent specified in the notice in any transaction or arrangement in which a specified person or class of persons is interested shall be deemed to be a disclosure that the director has an interest in any such transaction of the nature and extent so specified; and

(b)   an interest of which a director has no knowledge and of which it is unreasonable to expect him to have knowledge shall not be treated as an interest of his.

### Directors' Gratuities and Pensions

100.  The directors may provide benefits, whether by the payment of gratuities or pensions or by insurance or otherwise, for any person who has held but no longer holds any executive office or employment with the Company or with any body corporate which is or has been a subsidiary of the Company or a predecessor in business of the Company or of any such subsidiary, and for any member of his family (including a spouse and a former spouse) or any person who is or who was dependent on him, and may (as well before as after he ceases to hold such office or employment) contribute to any fund and pay premiums for the purchase or provision of any such benefit and may include rights in respect of any such benefit in the terms of engagement of any such person notwithstanding that he may be or may have been a director of the Company.

### Powers of Directors

101.  Subject to the provisions of the Act, the memorandum and the articles, the business of the Company shall be managed by the directors who may exercise all the powers of the Company.   No

25

alteration of the memorandum or articles shall invalidate any prior act of the directors which would have been valid if that alteration had not been made.   The powers given by this article shall not be limited by any special power given to the directors by the articles and a meeting of directors at which a quorum is present may exercise all powers exercisable by the directors.

102. The directors may, by power of attorney or otherwise, appoint any person to be the agent of the Company for such purposes and on such conditions as they determine, including authority for the agent to delegate all or any of his powers.

### Delegation of Directors' Powers

103. The directors may delegate any of their powers to any committee consisting of one or more directors and (if thought fit) one or more other persons, but a majority of the members of the committee shall be directors.   No resolution of the committee shall be effective unless a majority of those present when it is passed are directors.   They may also delegate to any managing director or any director holding any other executive office such of their powers as they consider desirable to be exercised by him.   Any such delegation may be made subject to any conditions the directors may impose, and either collaterally with or to the exclusion of their own powers and may be revoked or altered.   Subject to any such conditions, the proceedings of a committee with two or more members shall be governed by the articles regulating the proceedings of directors so far as they are capable of applying.

### Alternate Directors

104. Any director (other than an alternate director) may appoint any other director, or any other person approved by resolution of the directors and willing to act, to be an alternate director and may remove from office an alternate director so appointed by him.

105. An alternate director shall be entitled to receive the same notice of meetings of directors and of all meetings of committees of directors of which his appointor is a member as his appointor is entitled to receive, to attend and vote at any such meeting at which the director appointing him is not personally present, and generally to perform all the functions of his appointor as a director in his absence, but shall not be entitled to receive any remuneration from the Company for his services as an alternate director.

26

106. An alternate director shall cease to be an alternate director if his appointor ceases to be a director, but, if a director is reappointed, any appointment of an alternate director made by him which is in force immediately prior to his reappointment shall continue after his reappointment.

107. Any appointment or removal of an alternate director shall be by notice to the Company signed by the director making or revoking the appointment and may be made in any usual or common form or in any other form approved by the directors including the following form:-

### MARRIOTT ST. KITTS MANAGEMENT COMPANY, INC.

I,                                    of

being a Director of the above named Company, in pursuance of the power in that behalf contained in the Articles of Association of the Company, do hereby *appoint *remove (*Strike out which ever is not applicable)

of
as my Alternate Director.


. . . . . . . . . . . . . . . . . . . . . .              . . . . . . . . . . . . . . . . . . . . . .
(Signature)                                    (Date)

108. Save as otherwise provided in the articles, an alternate director shall be deemed for all purposes to be a director and shall alone be responsible for his own acts and defaults and he shall not be deemed to be the agent of the director appointing him.

### Proceedings of Directors

109. Subject to the provisions of the articles, the directors may regulate their proceedings as they think fit. A director may, and the secretary at the request of a director shall, call a meeting of the directors. If a director is by any means in communication with one or more other directors so that each director participating in the communiction can hear what is said by any other of them, each director so participating in the communication is deemed to be present at a meeting with the other directors so participating.

110. Subject to the Act, where the subscribers to the memorandum or a majority of them have appointed only one director or where the Company has by special resolution determined that the maximum number of directors shall be one, that director present in person shall constitute a meeting. In any other

case, the quorum for the transaction of the business of the directors shall be two or such higher number as may be fixed by the directors. A person who holds office only as an alternate director shall, if his appointor is not present, be counted in the quorum.

111. The continuing directors or a sole continuing director may act notwithstanding any vacancies in their number, but, if the number of directors is less than the number fixed as the quorum, the continuing directors or director may act only for the purpose of filling vacancies or of calling a general meeting.

112. The directors may appoint one of their number to be the chairman of the board of directors and may at any time remove him from that office. Unless he is unwilling to do so, the director so appointed shall preside at every meeting of directors at which he is present. If there is no director holding that office, or if the director holding it is unwilling to preside or is not present within five minutes after the time appointed for the meeting, the directors present shall appoint one of their number to be chairman of the meeting.

113. Questions arising at a meeting shall be decided by a majority of votes. In the case of an equality of votes, the chairman shall have a second or casting vote. A director who is also an alternate director shall be entitled in the absence of his appointor to a separate vote on behalf of his appointor in addition to his own vote.

114. All acts done by a meeting of directors, or of a committee of directors, or by a person acting as a director shall, notwithstanding that it be afterwards discovered that there was a defect in the appointment of any director or that any of them were disqualified for holding office, or had vacated office, or were not entitled to vote, be as valid as if every such person had been duly appointed and was qualified and had continued to be a director and had been entitled to vote.

115. A resolution in writing signed by all the directors entitled to receive notice of a meeting of directors or of a committee of directors shall be valid and effectual as if it had been passed at a meeting of directors or (as the case may be) a committee of directors duly convened and held and may consist of several documents in the like form each signed by one or more directors; but a resolution signed by an alternate director need not also be signed by his appointor and, if it is signed by a director who has appointed an alternate director, it need not be signed by the alternate director in that capacity.

28

116. Save as otherwise provided by the articles, a director shall not vote at a meeting of directors or of a committee of directors on any resolution concerning a matter in which he has, directly or indirectly, an interest or duty which is material and which conflicts or may conflict with the interests of the Company unless his interest or duty arises only because the case falls within one or more of the following paragraphs –

    (a) the resolution relates to the giving to him of a guarantee, security, or indemnity in respect of money lent to, or an obligation incurred by him for the benefit of, the Company or any of its subsidiaries;

    (b) the resolution relates to the giving to a third party of a guarantee, security or indemnity, in respect of an obligation of the Company or any of its subsidiaries for which the director has assumed responsibility in whole or part and whether alone or jointly with others under a guarantee or indemnity or by the giving of security;

    (c) his interest arises by virtue of his subscribing or agreeing to subscribe for any shares, debentures or other securities of the Company or any of its subsidiaries, or by virtue of his being, or intending to become, a participant in the underwriting or sub-underwriting of an offer of any such shares, debentures, or other securities by the Company or any of its subsidiaries for subscription, purchase or exchange;

    (d) the resolution relates in any way to a retirement benefits scheme which has been approved, or is conditional upon approval, by the Comptroller of Income Tax for taxation purposes;

    (e) the resolution relates to an agreement for the benefit of employees of the Company or any of its subsidiaries which does not accord to him any privilege or advantage not generally accorded to the employees to whom the arrangement relates.

117. A director shall not be counted in the quorum present at a meeting in relation to a resolution on which he is not entitled to vote.

118. The company may by ordinary resolution suspend or relax to any extent, either generally or in respect of any particular matter, any provisions of the articles prohibiting a director from voting at a meeting of directors or of a committee of directors.

119. Where proposals are under consideration concerning the appointment of two or more directors to offices or employments with the Company or any body corporate in which the Company is interested the proposals may be divided and considered in relation to each director separately and (provided he is not for another reason precluded from voting) each of the directors concerned shall be entitled to vote and be counted in the quorum in respect of each resolution except that concerning his own appointment.

120. If a question arises at a meeting of directors or of a committee of directors as to the right of a director to vote, the question may, before the conclusion of the meeting, be referred to the chairman of the meeting and his ruling in relation to any director other than himself shall be final and conclusive.

## OFFICERS

### Executive Officers

121. The directors may appoint –

    (a)   one of their number to the office of President of the Company; and

    (b)   one or more of their number to the office of Executive Vice-President of the Company.

122. The director may enter into an agreement or arrangments with any director for his employment by the Company or for the provision by him of any service outside the scope of the ordinary duties of a director. Any such appointment, agreement or arrangement may be made upon such terms as the directors determine and they may remunerate any such director for his services as they think fit.

123. Any appointment of a director to an executive office shall terminate if he ceases to be a director but without prejudice to any claim to damage for breach of the contract of service between the director and the Company.

124. Any director holding an executive office shall not be subject to retirement by rotation if these presents should be amended to include retirement by rotation of the directors.

### Company Secretary

125. Subject to the provisions of the Act, the secretary shall be appointed by the directors for such term, at such remuneration and upon such conditions as they may think fit; and any secretary so appointed may be removed by them.

30

### Other Officers

126. The directors may appoint any one or more persons to the office of Vice-President of the Company and the following provisions with regard to any such appointment or appointment shall have effect:-

(a) the appointment, tenure of office, remuneration (if any) and scope of duties of a Vice-President shall be determined from time to time by the directors with full power to make such arrangements as they think fit, and the directors shall have the right to enter into any contracts on behalf of the Company or transact any business of any description without the knowledge or approval of a Vice-President, except that no act shall be done that would impose any personal liability on any Vice-President except with his full knowledge and consent.

(b) the directors may also from time to time remove any Vice-President from office and if they so decide appoint another in his place, but any removal shall take effect without prejudice to the rights of either party under any agreement between the Vice-President and the Company.

(c) the appointment of a person to be a Vice-President may be in place of or in addition to his employment by the Company in any other capacity but unless otherwise expressly agreed between him and the Company the appointment as Vice-President shall not affect the terms and conditions of his employment by the Company in any other capacity whether as regards duties, remuneration, pension or otherwise. The office as a Vice-President shall be vacated if he becomes of unsound mind or bankrupt or makes any arrangement or composition with his creditors generally, or becomes prohibited by law from being concerned or taking part in the management of the Company, or if he resigns his office or is removed from office by a resolution of the directors.

(d) a Vice-President shall not be or be deemed to be an executive officer within the meaning of the term as used in these presents and no Vice-President shall be entitled to attend or be present at any meetings of the directors or of any committee of directors unless he is also the secretary or the directors shall require him to be in attendance.

31

## FINANCIAL

### Dividends

127. Subject to the provisions of the Act, the Company may by ordinary resolution declare dividends in accordance with the respective rights of the members, but no dividend shall exceed the amount recommended by the directors.

128. Subject to the provisions of the Act, the directors may pay interim dividends if it appears to them that they are justified by the profits of the Company available for distribution. If the share capital is divided into different classes, the directors may pay interim dividends on shares which confer deferred or non-preferred rights with regard to dividend as well as on shares which confer preferential rights with regard to dividend, but no interim dividend shall be paid on shares carrying deferred or non-preferred rights if, at the time of payment, any preferential dividend is in arrear. The directors may also pay at intervals settled by them any dividend payable at a fixed rate if it appears to them that the profits available for distribution justify the payment. Provided the directors act in good faith, they shall not incur any liability to the holders of shares conferring preferred rights for any loss they may suffer by the lawful payment of an interim dividend on any shares having deferred or non-preferred rights.

129. Except as otherwise provided by the rights attached to shares, all dividends shall be declared and paid according to the amounts paid up on shares on which the dividend is paid. All dividends shall be apportioned and paid proportionately to the amounts paid up on the shares during any portion or portions of the period in respect of which the dividend is paid, but, if any share is issued on terms providing that it shall rank for dividend as from a particular date, that share shall rank for dividend accordingly.

130. A general meeting declaring a dividend may, upon the recommendation of the directors, direct that it shall be satisfied wholly or partly by the distribution of assets and, where any difficulty arises in regard to the distribution, the directors may settle the same and in particular may issue fractional certificates and fix the value for distribution of any assets and may determine that cash shall be paid to any member upon the footing of the value so fixed in order to adjust the rights of members and may vest any assets in trustees.

131. Any dividend or other moneys payable in respect of a share may be paid by cheque or by warrant sent by post to the registered

address of the person entitled or, if two or more persons are the holders of the share or are jointly entitled to it by reason of the death or bankruptcy of the holder, to the registered address of one of those persons who is first named in the register of members or to such person and to such address as the person or persons entitled may in writing direct. Every cheque or warrant shall be made payable to the order of the person or persons entitled or to such other person as the person or persons entitled may in writing direct and payment of the cheque or warrant shall be a good discharge to the Company. Any joint holder or other person jointly entitled to a share as aforesaid may give receipts for any dividend or other moneys payable in respect of the share.

132. No dividend or other moneys payable in respect of a share shall bear interest against the Company unless otherwise provided by the rights attached to the share.

133. Any dividend which has remained unclaimed for 10 years from the date when it became due for payment shall, if the directors so resolve, be forfeited and cease to remain owing by the Company.

### Capitalisation of Profits

134. The directors may with the authority of an ordinary resolution of the Company –

(a) subject as hereinafter provided, resolve to capitalise any undivided profits of the Company not required for paying any preferential dividend (whether or not they are available for distribution) or any sum standing to the credit of the Company's share premium account or capital redemption reserve;

(b) appropriate the sum resolved to be capitalised to the members in proportion to the stated amounts of the shares (whether or not fully paid) held by them respectively which would entitle them to participate in a distribution of that sum if the shares were fully paid and the sum were distributable and were distributed by way of dividend and apply such sum on their behalf either in or towards paying up the amounts, if any, for the time being unpaid on any shares held by them respectively, or in payment up in full unissued shares of the Company of a stated amount or debentures of the Company of a stated amount equal to that sum, and allot the shares or debentures credited as fully paid to those members, or as they may direct, in those proportions, or partly in one way and partly in the other; but the share premium account, the capital redemption reserve, and any

33

profits which are not available for distribution may, for the purposes of this article, only be applied in paying up unissued shares to be allotted to members credited as fully paid up;

(c)   make such provision by the issue of fractional certificates or by payment in cash or otherwise as they determine in the case of shares or debentures becoming distributable under this article in fractions; and

(d)   authorise any person to enter on behalf of all the members concerned into an agreement with the Company providing for the allotment to them respectively, credited as fully paid, of any shares or debentures to which they are entitled upon such capitalisation, any agreement made under such authority being binding on all such members.

## Accounts

135. The directors shall cause true accounts to be kept

(a)   of the transactions of the Company;

(b)   of the sums of money received and expended by the Company and the matters in respect of which such receipts and expenditures take place; and

(c)   of the assets and liabilities of the Company.


136. The books shall be kept at the office or at such other place as the directors may determine.  The directors shall by resolution determine to what extent and on what conditions books and accounts of the Company, or any of them, shall be open to the inspection of the members, and the members, other than such of them as shall also be directors, shall have only the rights of inspection as are given to them by the Act or by such resolution as aforesaid PROVIDED ALWAYS that the Company in general meeting may direct that any person shall have a right to inspect and make extracts from the books of the Company.

137. At every annual general meeting the directors shall lay before the Company a statement of the income and expenditure for the past year made up to the accounting date.

138. A balance sheet shall be laid before the Company at each annual general meeting and such balance sheet shall contain a summary of the assets and liabilities of the Company as at the

accounting date and shall be accompanied by a report of the directors upon the general state of the Company and a recommendation as to the amount (if any) which they propose to set aside as a reserve fund.

139. A copy of every balance sheet and of all documents annexed thereto, including the report of the directors and the auditors (if any), shall, at least 10 clear days before the meeting, be served on each member in the manner in which notices are hereinafter directed to be served and on all holders of debentures and on the auditors (if any).

140. Every account passed by the directors when approved by any general meeting shall be conclusive, except as regards any error discovered therein within three months after approval thereof.  Whenever such an error is discovered within that period, the account shall forthwith be corrected and thereupon shall be conclusive.

### Audit

141. The directors may appoint the first auditors of the Company at any time before the first annual general meeting of the Company and where any auditors are so appointed they shall hold office until the conclusion of that meeting.

142. The Company at any annual general meeting may appoint auditors and where any auditors are so appointed they shall hold office from the conclusion of that meeting, until the conclusion of the next annual general meeting.

143. Where auditors have been appointed the directors may fill any casual vacancy in the office of auditor but while any such vacancy continues, the surviving or continuing auditors (if any) may act.

144. The remuneration of auditors appointed by the directors shall be fixed by the directors and of auditors appointed by the Company shall be fixed by the Company at the annual general meeting at which any such appointment was made, or in such manner as such meeting may determine.

145. The auditors (if any) shall examine such books, accounts and vouchers as may be necessary for the performance of their duties; and they shall make a report to the members on the accounts examined by them and on every balance sheet laid before the Company in general meeting during their tenure of office, and the report shall state

(a)  whether or not they have obtained all the information

35

and explanations they have required, and

(b) whether in their opinion the balance sheet referred to in the report is properly drawn up so as to exhibit a true and fair view of the state of the Company's affairs according to the best of their information and the explanations given to them and as shown by the books of the Company.

146. The auditors (if any) shall be furnished with a list of all books kept by the Company and shall at all times have the right of access to the books and accounts and vouchers of the Company and shall be entitled to require from the directors and officers such information and explanations as may be necessary for the performance of their duties.

147. The auditors (if any) shall be entitled to attend any general meeting of the Company at which any account which have been examined or reported on by them are to be laid before the Company and to make any statement or explanation they may desire with respect to the accounts and notice of every such meeting shall be given to the auditors (if any) in the manner prescribed for the members.

148. No person shall be eligible as an auditor who is personally interested otherwise than as a member in any transaction of the Company and no director or officer shall be eligible during his continuance in office.

MISCELLANEOUS

Service of Notices

149. Any notice to be given to or by any person pursuant to the articles shall be in writing except that a notice calling a meeting of the directors need not be in writing.

150. A member shall be entitled to receive any notice to be given to him pursuant to the articles notwithstanding that his registered address is not within the Federation. The company may give notice to a member either personally or by sending it by post in a prepaid envelope addressed to the member at his registered address or by leaving it at that address. In the case of joint holders of a share, all notices shall be given to the joint holder whose name stands first in the register of members in respect of the joint holding and notice so given shall be sufficient notice to all the joint holders.

36

151. Proof that an envelope containing a notice was properly addressed, prepaid and posted shall be conclusive evidence that the notice was given.  A notice shall be deemed to be given at the expiration of 48 hours after the envelope containing it was posted.

152. Where the Company has issued any bearer certificate, the directors shall arrange for any notice to be given by the Company pursuant to the articles to be published in one or more newspapers circulated in the Federation (but the directors may also arrange for such notice to be published in one or more newspapers circulated elsewhere than in the Federation) and such notice shall be deemed to be duly given to all holders of bearer certificates issued by the Company on the day on which it appears in any such newspaper.

153. A member present, either in person or by proxy, at any meeting of the Company or of the holders of any class of shares in the Company shall be deemed to have received notice of the meeting and, where requisite, of the purposes for which it was called.

154. Every person who becomes entitled to a share shall be bound by any notice in respect of that share which, before his name is entered in the register of members, has been duly given to a person from which he derives his title.

155. A notice may be given by the Company to the persons entitled to a share in consequence of the death or bankruptcy of a member by sending or delivering it, in any manner authorised by the articles for the giving of notice to a member, addressed to them by name, or by the title of representatives of the deceased, or trustee of the bankrupt or by any like description at the address supplied for that purpose by the persons claiming to be so entitled.  Until such an address has been supplied, a notice may be given in any manner in which it might have been given if the death or bankruptcy had not occurred.

### Minutes

156. The directors shall cause minutes to be made in books kept for the purpose in accordance with the Act.

### Seal

157. The seal shall only be used by the authority of the directors or of a committee of directors authorised by the directors. The directors may determine who shall sign any instrument to which the seal is affixed and unless otherwise so determined it shall be signed by two directors or by a director and the secretary.

## Authentication of Documents

158.  Any director or the secretary or any person appointed by the directors for the purpose shall have power to authenticate any documents affecting the constitution of the Company (including these presents) and any resolutions passed by the Company or the directors, and any books, records, documents and accounts relating to the business of the Company, and to certify copies thereof or extracts therefrom as true copies or extracts; and where books, records, documents or accounts are elsewhere than at the office, the local officer having the custody thereof shall be deemed to be a person appointed by the directors as aforesaid.

## Winding Up

159.  If the Company is wound up, the Company may, with the sanction of a special resolution and any other sanction required by the Act, divide the whole or any part of the assets of the Company among the members in specie and the liquidator or, where there is no liquidator, the directors may, for that purpose, value any assets and determine how the division shall be carried out as between the members or different classes of members, and with the like sanction, vest the whole or any part of the assets in trustees upon such trusts for the benefit of the members as he with the like sanction determines, but no member shall be compelled to accept any assets upon which there is a liability.

## Indemnity

160.  In so far as the Act allows, every present or former director and officer of the Company shall be indemnified out of the assets of the Company against any loss or liability incurred by him by reason of being or having been such a director or officer.

## Amendment of Articles

161.  Subject to the Act, the Company may from time to time by special resolution alter or amend these Articles of Association in whole or in part.

---

NAME AND ADDRESS OF SHAREHOLDER

---

ELIZABETH A KELSICK
of Frigate Bay
St. Kitts

Solicitor

EMelvin

---

Dated the 15th day of January 2001.

Witness to the above signature:

Signature: _Janile Ferdinand_

Name: _J. EMILE FERDINAND_

Address: _SHADWELL_
_ST. KITTS_

Occupation: _SOLICITOR_



# EXHIBIT 3



# SAINT CHRISTOPHER AND NEVIS

## Certificate of Incorporation

No. 003168

### I hereby Certify that

Marriott St. Kitts Management Company, Inc.

was this day incorporated under the Companies Act (No. 22 of 1996) as a Company with limited liability.

Given under the Hand and Seal of the Registrar of Companies, Saint Christopher and Nevis, this 16th day of January, 2001.

The Registrar of Companies

MI - 00083

# SAINT CHRISTOPHER AND NEVIS

## Certificate of Change of Name

No. 003168

### I hereby Certify that



**Marriott St. Kitts Management Company, Inc.**

Having with the sanction of a Special Resolution of the said Company, and with the approval of the Registrar of Companies, changed its name, is now called **Luxury Hotels International Management St. Kitts Limited**, and such new name was entered on the Register of Companies on the 14th day of October, 2008.

Given under the Hand and Seal of the Registrar of Companies, Saint Christopher and Nevis, this the 14th day of October, 2008.

*The Registrar of Companies (Deputy)*

MI - 00082